# APPENDIX OF UNPUBLISHED OPINIONS

1. *Breslin v. Morgenstern*, No. 12-0360, 2018 WL 4002857 (M.D. Pa. 2018)

2. *Bronstein v. Bayview Loan Servicing, LLC*, No. 18-4223, 2020 WL 703652 (E.D. Pa. 2020)

3. *Brown v. Gap Inc.*, No. 1:22-cv-00165, 2023 WL 3743134 (M.D. Pa. 2023)

4. *Commonwealth v. Bee*, No. 120 EDA 2018, 2018 WL 3980125 (Pa. Super. 2018)

5. *Handy v. Delaware River Surgical Suites, LLC*, No. 2:19-cv-1028-JHS, 2023 WL 11884784 (E.D. Pa. 2023)

6. *Henry v Marcelin*, Civ. No. 24-1891, 2024 WL 4293055 (E.D. Pa. 2024)

7. *McGee v. Times Leader*, No. 90–1098, 1990 WL 288628 (M.D. Pa. 1990)

8. *Prukala v. Chase Bank, N.A.*, No. 3:19-CV-1791, 2020 WL 5351042 (M.D. Pa. 2020)

9. *Starks v. N. York Cnty. Reg'l Police Dep't*, No. 1:24-CV-00739, 2025 WL 895826 (M.D. Pa. 2025)

10. *Thompson v. City of Williamsport*, No. 4:22-CV-01159, 2024 WL 1747645 (M.D. Pa. 2024)

11. *U.S. ex rel. Magid v. Wilderman*, No. Civ. A. 96-CV-4346, 2005 WL 469590 (E.D. Pa. 2005)

12. *Weiser Law Firm, P.C. v. Hartleib*, No. 2:19-cv-02728-KSM, 2022 WL 970757 (E.D. Pa. 2022) *aff'd*, No. 23-1889, 2024 WL 5219737 (3d Cir. 2024)

# 1

2018 WL 4002857
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Charles BRESLIN, et al., Plaintiffs
v.
John MORGENSTERN, Defendant

CIVIL ACTION NO. 12-0360
|
Filed 08/22/2018

**Attorneys and Law Firms**

Daniel A. Pallen, The Law Offices of Daniel A. Pallen, LLC, Media, PA, Don A. Bailey, Harrisburg, PA, for Plaintiffs.

**MEMORANDUM**

STENGEL, District Judge

***1** In February 2012, the plaintiffs brought this civil rights action ("Breslin II") in the Court of Common Pleas of Cumberland County against Dickinson Township, Raymond Jones, Daniel Wyrick, Allyn Perkins, Laura Portillo, Anthony Zizzi,[1] Susan J. Smith, Duncannon Borough, and John P. Morgenstern. The action was timely removed to federal court. In July 2009, the plaintiffs brought a very similar civil rights action against Dickinson Township, Raymond Jones, Allyn Perkins, Daniel Wyrick, Anthony Zizzi, and Ed Schorpp in the Middle District of Pennsylvania. See Breslin v. Dickinson Township, et al., 09-cv-1396 ("Breslin I").

1 On February 5, 2016, the plaintiffs filed a notice of voluntary dismissal as to Defendant Zizzi only, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). See Document #118.

Breslin II allegedly "addresses a number of violations of the plaintiffs' rights as guaranteed by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States." Defendant Morgenstern filed a motion to dismiss for failure to state a claim upon which relief can be granted. The plaintiffs responded. For the following reasons, I will grant the motion in its entirety.

## I. BACKGROUND

The plaintiffs are three retired senior military officers who are residents of Dickinson Township, Cumberland County, Pennsylvania. The complaint includes a number of violations of the plaintiffs' rights as guaranteed by the First, Fourth, and Fourteenth Amendments. Specifically, the plaintiffs allege that their First Amendment rights to comment on matters of public concern free of retaliation, and their rights to petition for a redress of grievances free of retaliation were violated by the defendants. Further, they allege that their rights to privacy as protected by the Fourth Amendment and their Equal Protection rights under the Fourteenth Amendment were violated by the defendants, and that several of the defendants conspired to knowingly make false claims of potential criminal wrongdoing and knowingly enabling false claims and baseless innuendoes to be made public. This conduct was allegedly done with the express intent of destroying the plaintiffs' reputations, tainting potential jury pools, and intimidating the plaintiffs from exercising their rights of expression and to petition for redress.

The plaintiffs further allege that the defendants hid certain information from them after the plaintiffs requested that information pursuant to Pennsylvania's Right-to-Know laws. They also claim that the defendants forced the plaintiffs to pay hundreds of dollars of fees in connection with these requests where other citizens did not have to pay. The information requested was allegedly directly related to the original complaint filed in Breslin I.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Following the Supreme Court decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleading standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to allege facts sufficient to show that the plaintiff has a plausible claim for relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

***2** In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all plausible inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

It remains true that the Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim. Rather, the Rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In recent rulings, however, the Supreme Court has rejected language in Conley stating that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, 550 U.S. at 561. Rather, a "complaint must allege facts suggestive of [the proscribed] conduct," Twombly, 550 U.S. at 564, and it must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556). Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

In assessing the merits of a motion to dismiss, courts must be careful to recognize that, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss." Id. at 679 (emphasis added). In recognition of these principles, courts must first identify those allegations in a complaint that are mere conclusions and are therefore not entitled to the assumption of truth, and next, consider whether the complaint's factual allegations, which *are* entitled to a presumption of truth, plausibly suggest an entitlement to relief. Id. (emphasis added).

While Rule 8 of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED.R.CIV.P. 8(a)(2), in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," Twombly, 550 U.S. at 555, the plaintiff must provide "more than labels and conclusions." Byrne v. Cleveland Clinic, 684 F. Supp. 2d 641, 649 (E.D. Pa. 2010)(citing Twombly, 550 U.S. at 554). A facially plausible claim may not be supported by conclusory allegations, but must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## III. DISCUSSION

### A. Constitutional Violations — Counts II and VIII

In Count II, the plaintiffs allege that Moving Defendant John Morgenstern, along with other defendants, violated their rights under the First and Fourteenth Amendments to the U.S. Constitution "by using and abusing legal process in the 1396 litigation as a means for harassing and intimidating the plaintiffs in retaliation for their exercising rights to petition for redress." See Compl. ¶ 162. In Count VIII, Plaintiff Charles Breslin alleges that Defendant Morgenstern, with malice aforethought, acquired Plaintiff Breslin's Social Security Number and intentionally misused it, in violation of his Fourth Amendment right to privacy and in violation of Pennsylvania law. See Compl. ¶ 224.

***3** To the extent they raise constitutional violations, these two claims were brought against Defendant Morgenstern pursuant to 42 U.S.C. § 1983. Under 42 U.S.C. § 1983, a private party may recover in an action against any person acting under the color of state law who deprives the party of his constitutional rights. The relevant text of § 1983 provides, in part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... or any other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 1983 does not by itself confer substantive rights, but rather, provides a remedy for redress when a constitutionally protected right has been violated. Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985) (citing Baker v. McCollan, 443 U.S. 137, 140, 144 n.3 (1979) ). Thus, in order to bring a successful claim for relief under § 1983, "a plaintiff must demonstrate that the defendant, acting under color of law, deprived him of a right secured by the Constitution or the laws of the United States." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).

These two claims fail because Defendant Morgenstern is not a state actor, and any alleged conduct attributed to him cannot be shown to have been "under color of law." The Third Circuit has held that "attorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court." Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 277 (3d Cir. 1999). In order to find that a private attorney was a "state actor" for purposes of

§ 1983, the plaintiffs "must point to some action that is 'fairly attributable' to the state." Id. at 277. That burden cannot be satisfied here. The Third Circuit set forth the following test for determining when a private attorney performed some action that is "fairly attributable" to the state:

> To do this, a plaintiff must show (l) that the attorney defendants' acts were the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and (2) that the attorney defendants may fairly said to be state actors.
>
> A person may be found to be a state actor when (1) he is a state official, (2) he has acted together with or has obtained significant aid from state officials, or (3) his conduct is, by its nature, chargeable to the state.

Id. at 277. Here, there are no allegations that could possibly lead to the conclusion that Moving Defendant Morgenstern was a state actor. First, there is no claim that he was a state official. To the contrary, Mr. Morgenstern is identified in the complaint as a private attorney of the firm Deasey Mahoney Valentini & North. See Comp. ¶ 3(h). Second, the claims against Mr. Morgenstern relate solely to his representation of the defendants in Breslin I. The plaintiffs allege that he filed motions, conducted depositions, and participated in court-ordered conferences. There is nothing about any of these acts that requires significant aid from state officials. Finally, all of the acts charged to Mr. Morgenstern are those which private attorneys traditionally take in the course of representation in litigation. None of his alleged conduct would traditionally be charged to the state. Accordingly, because the complaint identified Mr. Morgenstern as a private attorney, and because there are no facts to support a claim that he was a "state actor" for purposes of 42 U.S.C. § 1983, I will grant Mr. Morgenstern's motion to dismiss him as a defendant from the constitutional claims in Counts II and VIII.

**B. State Law Abuse of Process Claim — Count II**

***4** In addition to bringing the claims in Count II as constitutional violations, the plaintiffs allege that the defendants' actions were also violations of state law. Under Pennsylvania law, the gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it. McGee v. Feege, 535 A.2d 1020, 1023 (Pa. 1987). Among other prerequisites, a claim for abuse of process requires a plaintiff to establish that the defendant used a legal process against the plaintiff primarily to accomplish a purpose for which the process was not designed. Hart v. O'Malley, 647 A.2d 542, 551 (Pa. Super. 1994); Rosen v. American Bank of Rolla, 627 A.2d 190, 192 (Pa. Super. 1993). To satisfy the "perversion of process" element, the plaintiff must show some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process. Id. Furthermore, there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. Id. As the Third Circuit noted, the point of liability is reached when the utilization of the procedure for the purpose for which it was designed becomes so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure. Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 308 (3d Cir. 2003).

Therefore, since the tort of "abuse of process" is defined as the use of a legal process against another primarily to accomplish a purpose for which it is not designed, in order to establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff. Shiner v. Moriarty, 706 A.2d 1228, 1236 (Pa. Super. 1998).

Here, the plaintiffs have not pleaded facts which would permit such a finding. A review of the allegations in the complaint show that the defendants were trying to achieve the results they seek in this litigation, i.e., a favorable outcome on the merits. The actions which the plaintiffs now claim are an abuse of process are discovery matters to which the plaintiffs failed to object when they occurred. These actions either took place with the sanction of the court, or were deemed by the court to be matters unworthy of judicial intervention in the course of these discovery proceedings. Accordingly, I will grant Defendant Morgenstern's motion to dismiss him entirely as a defendant in Count II.

**C. State Law Invasion of Privacy Claim — Count VIII**

In addition to bringing the claims in Count VIII as constitutional violations, Plaintiff Breslin alleges that Defendant Morgenstern's actions were also violations of state law. Mr. Breslin alleges that at a meeting in February 2011, he informed Mr. Morgenstern that he would provide his military and medical records to Mr. Morgenstern, but he would not provide his social security number for any purpose. See Count VIII, Compl. ¶ 224. Mr. Breslin explained that his sensitivity to providing that number stemmed from

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

an experience of identity theft. Nevertheless, the plaintiff alleges, Mr. Morgenstern acquired the social security number and intentionally misused it. Id. at ¶ 225. Knowing of Mr. Breslin's concerns, Mr. Morgenstern allegedly faxed the social security number to a third person, namely, Defendant Susan Smith, the Solicitor for Dickinson Township, Mr. Morgenstern's client. Mr. Breslin claims that the abuse and misuse of his social security number was deliberate and in retaliation for bringing Breslin I. However, because the alleged transmission was between Attorney Morgenstern and a representative of his client, this state law claim for invasion of privacy fails.

As the Third Circuit has noted:

> Pennsylvania law recognizes four torts under the umbrella of invasion of privacy: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places the other in a false light before the public.

***5** Boring v. Google, Inc., 362 F.App'x 273, 278 (3d Cir. 2010) (quoting Burger v. Blair Med. Assocs., Inc., 964 A.2d 374, 376-77 (Pa. 2009) (citing RESTATEMENT (SECOND) OF TORTS §§ 652B-E) ). Given the alleged facts presented here, only two of the four choices can be considered, i.e., "unreasonable intrusion upon the seclusion of another," and "unreasonable publicity given to another's private life." Under Pennsylvania law:

> To state a claim for intrusion upon seclusion, plaintiffs must allege conduct demonstrating an intentional intrusion upon the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame, or humiliation to a person of ordinary sensibilities.

Boring, 362 F.App'x at 278-279 (quoting Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 247 (Pa. 2002) ). Similarly, "to state a claim for publicity given to private life, a plaintiff must allege that the matter publicized is (l) publicity, given to (2) private facts, (3) which would be highly offensive to a reasonable person, and (4) is not of legitimate concern to the public." Boring, 362 F.App'x at 280 (quoting Harris v. Easton Pub. Co., 483 A.2d 1377, 1384 (Pa. Super. 1984) (citing RESTATEMENT (SECOND) OF TORTS § 652D) ).

Here, pursuant to an Order entered by Magistrate Judge Martin C. Carlson on April 26, 2011, all plaintiffs were required to turn over their social security numbers to the defendants in Breslin I. See Breslin I, Document #112 at 19. Judge Carlson noted that such disclosure was "routinely approved by the courts." Id. at 13. In a Memorandum dated May 19, 2011, Judge Carlson noted that the plaintiffs had complied with all discovery requests. See Breslin I, Document #130 at 4.

Because Defendant Smith was the legal representative for Dickinson Township, Mr. Morgenstern could not have invaded Plaintiff Breslin's privacy by transmitting a document containing his social security number to her. Dickinson Township was involved in active litigation, and as part of that litigation, Mr. Morgenstern provided information relating to that litigation to his client—the legal representative of Dickinson Township. [2] An attorney providing discoverable information to his client's legal representative is far from "highly offensive to a reasonable person."

2 Pursuant to the Second Class Township Code, "The township solicitor shall direct and control the legal matter of the township." See 53 P.S. § 66101. Accordingly, Defendant Smith was the legal representative of Dickinson Township during the relevant period.

Further, there are no allegations that Mr. Breslin's social security number was disclosed to any party outside the litigation or that any party used his social security number improperly. Accordingly, I will grant Mr. Morgenstern's motion to dismiss him entirely as a defendant in Count VIII.

**D. Count VII — Violation of State Law Rights to be Free of "False Light" Misrepresentations, Defamation, Slander, and Libel, and to be Free of the Pernicious Effects of Civil Conspiracies.**

In Count VII, the plaintiffs allege that Defendants Daniel Wyrick, Susan Smith, Allyn Perkins, and John Morgenstern, intentionally engaged in a campaign to present the plaintiffs in a "false light." See Compl. ¶ 213. Specifically for the purposes of this motion to dismiss, the plaintiffs allege that Defendant Morgenstern colluded with Defendant Wyrick's "viscous" attacks.[3] See Count VII, Compl. ¶ 217. They also allege that Mr. Morgenstern publically accused the plaintiffs of wiretapping, of posing a threat to his personal safety, and of using their cell phones to transmit deposition testimony to recipients outside the deposition room. Id. at ¶ 221. He is further alleged to have accused the plaintiffs' counsel of being "delusional." Id. This behavior, the plaintiffs contend, constitutes a violation of the plaintiffs' state law rights to be free of "false light" misrepresentations, defamation, slander, and libel, and to be free of the pernicious effects of civil conspiracies. Id. at ¶ 221.

3 By the context of this sentence, I will assume that the plaintiffs meant to characterize Defendant Wyrick's attacks as vicious.

***6** First, the plaintiffs can have no claim of false light or defamation against Mr. Morgenstern for accusing a third person of being delusional. Second, apparently the statements attributed to Mr. Morgenstern were related to his representation of the defendants in Breslin I. The alleged collusion with Mr. Wyrick was based on Mr. Morgenstern feeding Mr. Wyrick, his client, information he received in discovery. The complaint is silent as to where the other statements were made. The plaintiffs fail to identify the nature of the alleged statements, the date on which statements took place, the audience of the alleged statements, and the format in which such statements were made. I agree, however, with Mr. Morgenstern that the statements alleged were most likely included either in pleadings or took place during a deposition. Thus, his challenged statements are protected by an absolute privilege. Pennsylvania has adopted Section 587 of the Restatement (Second) of Torts. See Pawlowski v. Smorto, 588 A.2d 36, 42 (Pa. Super. 1991). Pursuant to that section:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

See Restatement (Second) of Torts, § 587. Mr. Morgenstern served as the attorney for multiple defendants in Breslin I. He made filings with the court as part of that litigation, and participated in depositions on behalf of his clients. Mr. Morgenstern insists that, other than these actions, he has never had any contact with the plaintiffs or made any statements about them. "It is a well-established principle of Pennsylvania law that the filing of a complaint and other pleadings is protected by an absolute privilege." Werner v. Platzer-Zyberk, 51 Pa. D. & C. 4th 192 (2001), reversed on other grounds, 799 A.2d 776 (Pa. 2002), citing Smith v. Griffiths, 476 A.2d 22, 24 (Pa. 1984). The privilege is impenetrable:

> Pursuant to the judicial privilege, a person is entitled to absolute immunity for communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought. This privilege is based on the public policy which permits all suiters, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate.

Bochetto v. Gibson, 860 A.2d 67, 71 (Pa. 2004). "The key is whether the pertinent communication was undertaken in connection with the representation of a client in a judicial proceeding." Brown v. Delaware Valley Transplant Program, 539 A.2d 1372 (Pa. Super. 1988). All of the alleged statements

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

attributed to Mr. Morgenstern were undertaken in connection with his representation of the defendants in Breslin I. Thus, statements by a party, a witness, counsel, or a judge cannot be the basis of a defamation action whether they occur in the pleadings or in open court. Binder v. Triangle Publications, Inc.,442 Pa. 319, 323, 275 A.2d 53 (Pa. 1971).

Further, the purpose for which the privilege exists cannot fully be achieved by limiting the privilege to structured or formal proceedings. To permit an attorney to best serve a client, the privilege must be broad enough to include occasions when a client's cause is being advocated under less formal circumstances. Thus, the privilege extends to and includes preliminary demands, as well as informal conferences and negotiations conducted after litigation has been commenced or when litigation is seriously contemplated. Pelagatti v. Cohen, 370 Pa. Super. 422, 536 A.2d 1337 (Pa. Super. 1987) (citing Smith, 476 A.2d at 24). Accordingly, the plaintiffs' claim against Mr. Morgenstern must fail, and I will grant Mr. Morgenstern's motion to dismiss him as a defendant from Count VII.

**E. Sanctions for Bringing Time-Barred and Frivolous Claims**

***7** In his motion to dismiss, Defendant Morgenstern insists that the plaintiffs' claims are time-barred and "wholly frivolous," and that "it is clear that such claims have been brought in bad faith." Thus, he argues, plaintiffs' counsel is liable for sanctions pursuant to 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously *may be* required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (emphasis added). The statute, therefore, limits attorney sanctions imposed thereunder to instances where an attorney has: (1) multiplied the proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct. See In re Prudential Ins. Co. Am. Sales Practice Litig. Actions, 278 F.3d 175, 188 (3d Cir. 2002). The purpose of such sanctions is to deter an attorney from intentionally and unnecessarily delaying judicial proceedings. LaSalle Nat'l Bank v. First Conn. Holding Group LLC XXIII, 287 F.3d 279, 288 (3d Cir. Apr. 24, 2002). Sanctions are limited to the costs that result from such delay. Id.

Courts should exercise this sanctioning power only in instances of a serious and studied disregard for the orderly process of justice. Ford v. Temple Host., 790 F.2d 342, 347 (3d Cir. 1986) (quotations omitted). "The power to sanction under § 1927 necessarily 'carries with it the potential for abuse, and therefore the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law.' " LaSalle, 287 F.3d at 289 (quoting Mone v. Commn'r of Intern. Revenue, 774 F.2d 570, 574 (2d Cir. 1985) ).

Due to this potential for abuse, it has been well-established that sanctions may not be imposed under § 1927 without a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal. LaSalle, 287 F.3d at 289. Under § 1927, an attorney's "conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." Baker Industr. Inc. v. Cerberus, Ltd., 764 F.2d 204, 208 (3d Cir. 1985). Further, courts "should resist temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff ultimately did not prevail, his action must have been unreasonable or without foundation." Deyo v. St. Luke's Hospital and Health Network, 2010 U.S. Dist. LEXIS 39014, *8, 2010 WL 1632904 (E.D. Pa. Apr. 19, 2010).

Here, the plaintiffs' claims against Defendant Morgenstern are not outlandishly frivolous or necessarily poorly-reasoned. The claims stem from three citizens who honestly believe that their constitutional rights and various state law rights were violated. I can find nothing in the record that shows that the plaintiffs' attorney acted in bad faith or in such an egregious nature that would warrant sanctions under § 1927.

In a separate motion for sanctions, Mr. Morgenstern argues that, in addition to sanctions under § 1927, he is entitled to sanctions against the plaintiffs' counsel in the form of all costs and attorneys' fees, pursuant to Rule 11 of the Federal Rules of Civil Procedure. Rule 11(b) permits a district court to sanction parties or attorneys if "a pleading, written motion, or other paper ... [is] presented for any improper

purpose[;] ... the claims, defenses, and other legal contentions are [un]warranted by existing law[;] ... the factual contentions have [no] evidentiary support[;] [or] ... the denials of factual contentions are [un]warranted on the evidence."

***8** Rule 11 "imposes a non-delegable duty upon the signing attorney to conduct his own independent analysis of the facts and laws which forms the basis of a pleading or motion," Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1277 (3d Cir. 1994), and "provides that attorneys may be sanctioned if they, among other things, fail to make a reasonable inquiry into the legal legitimacy of the pleading." Ario v. Underwriting Members of Syndicate 53 of Lloyds, 618 F.3d 277, 297 (3d Cir. 2010).

When evaluating conduct allegedly in violation of Rule 11, "a district court must determine whether the attorney's conduct was objectively reasonable under the circumstances." Id. Reasonableness is the "objective knowledge or belief at the time of the filing of a challenged paper that the claim was well grounded in law and fact." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 289 (3d Cir. 1991). The court should impose sanctions only "in the exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988).

Again, I cannot find that the claims against Mr. Morgenstern are patently unmeritorious or frivolous. The claims stem from three citizens who honestly believe that their constitutional rights and various state law rights were violated by the defendants. I can find nothing in the record that shows that the plaintiffs' attorney acted in bad faith or in such an egregious nature that would warrant sanctions under Rule 11. Accordingly, I will deny Mr. Morgenstern's request for sanctions in his motion to dismiss and in his separate motion for sanctions.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4002857

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 2

2020 WL 703652
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Jola BRONSTEIN, Plaintiff,
v.
BAYVIEW LOAN SERVICING, LLC, et al., Defendants.

CIVIL ACTION NO. 18-4223
|
Signed 02/10/2020
|
Filed 02/11/2020

**Attorneys and Law Firms**

Michael P. Forbes, Wayne, PA, for Plaintiff.

Michael P. Trainor, Blank Rome LLP, Philadelphia, PA, for Defendants Bayview Loan Servicing, LLC, Bank of New York Mellon.

Robert W. Williams, Mattleman Weinroth & Miller PC, Cherry Hill, NJ, Michael P. Trainor, Blank Rome LLP, Philadelphia, PA, for Defendant Mattleman, Weinroth & Miller, P.C.

## OPINION

Slomsky, District Judge

## I. INTRODUCTION

***1** On September 14, 2018, Plaintiff Jola Bronstein filed suit in the Court of Common Pleas of Montgomery County, Pennsylvania, claiming that her house was improperly foreclosed upon because the interest rate she was charged was both erroneous and fraudulently misrepresented in the state court foreclosure complaint. She sued several parties, including: (1) the Bank of New York Mellon formerly known as The Bank of New York, individually and as Trustee for the Certificateholders of CWABS, Inc., Asset-Backed Certificates, Series 2007-SEA2 ("BONY"), the holder of the promissory note and mortgage; (2) Bayview Loan Servicing, Inc. ("Bayview"), BONY's loan servicer; and (3) Mattleman, Weinroth & Miller, P.C. ("MWM" and together with BONY and Bayview, "Defendants"), the law firm retained by Bayview on behalf of BONY to commence foreclosure proceedings.

On October 1, 2018, BONY and Bayview removed the case to this Court. (Doc. No. 1.) After removal, BONY and Bayview filed an Answer to the Complaint (Doc. No. 3). MWM, the law firm, however, filed a Motion to Dismiss the Complaint (Doc. No. 13) under Federal Rule of Civil Procedure 12(b)(6), which is now ripe for review. [1] For the following reasons, MWM's Motion to Dismiss will be granted in part and denied in part.

1 For purposes of this Opinion, the Court has considered the Notice of Removal and Plaintiff's Complaint contained therein (Doc. No. 1), Defendant Mattleman, Weinroth & Miller, P.C.'s Motion to Dismiss for Failure to State a Claim (Doc. No. 13), Plaintiff's Response in Opposition (Doc. No. 14), Defendant Mattleman, Weinroth & Miller, P.C.'s Reply in Support of their Motion to Dismiss (Doc. No. 18), and the parties' arguments presented during the hearing held on December 11, 2019 (Doc. No. 20).

## II. BACKGROUND

On May 18, 2007, Plaintiff purchased a house located at 112 Haverford Road, Wynnewood, Pennsylvania 19096 (the "Property"). (Doc. No. 1 at 33.) To finance the purchase, she obtained a $220,000 loan from Castle Point Mortgage, Inc. ("Castle Point"), a mortgage lender and mortgage broker for residential properties. (Id.) In exchange, Plaintiff executed an adjustable rate note (the "Note") that evidenced the loan and obligated Plaintiff to pay Castle Point, or any subsequent holder of the Note, the original principal balance of $220,000 plus interest. (Id.) The same day, to secure the obligations under the Note, Plaintiff executed and delivered a mortgage on the Property (the "Mortgage") to Mortgage Electronic Registration Systems, Inc. ("MERSCORP"), solely as nominee for Castle Point. [2] (Id. at 42.) The mortgage was subsequently recorded in the Montgomery County Recorder of Deeds. (Id.)

2 Castle Point was the effective holder of the mortgage; however, the nominal mortgage holder was Mortgage Electronic Registration Systems, Inc. ("MERSCORP"). (Doc. No. 13 at 8.) Mortgage loan originators, like Castle Point, often use MERSCORP to serve as the nominal mortgage holder in local government recording offices.

***2** The Note included an adjustable interest rate, meaning that over the life of the loan, the interest rate would change. (Id. at 14.) From July 1, 2007—Plaintiff's first payment date—until June 1, 2009, the Note's interest rate was fixed at 11.75%. (Id. at 33.) Then, on June 1, 2009, and every six months thereafter—each such date dubbed a “change date”—the interest rate would be reset. (Id. at 24.) On each change date, the rate would reset to 6.375% plus the most recent six-month U.S. dollar-denominated LIBOR (London Interbank Offered Rate) published in the Wall Street Journal, rounded to the nearest one-eighth of one percent. (Id.) The first reset rate could not be less than 11.750% nor greater than 14.750%, and no subsequent reset rate could increase or decrease more than 1% from the prior change date's interest rate. (Id.)

Alleged here is that Plaintiff stopped making her mortgage payments on December 1, 2010. (Doc. No. 13-1 at 8.) Thereafter, on May 10, 2011, BONY—which is in the business of acquiring and rehabilitating defaulted mortgage loans—purchased Plaintiff's Mortgage. It is unclear if the Mortgage was purchased from Castle Point or another entity, but, in any event, following the sale of the Mortgage, it was assigned by MERSCORP, the nominal mortgage holder, to BONY and recorded in the Montgomery County Recorder of Deeds on June 21, 2011. (Doc. No. 1 at 42.)

Plaintiff allegedly failed to make mortgage payments for the next three years and on May 28, 2014, Bayview sent Plaintiff a notice of their intent to foreclose on the Property, as required under Pennsylvania's Act 91, 35 P.S. § 1680.401 et seq., and Act 6, 41 P.S. § 401 et seq. (the “Foreclosure Notices”). (Doc. No. 1 at 57.) Among other things, the Foreclosure Notices informed Plaintiff that she could cure the default by paying the alleged deficiency in full within thirty days, along with any mortgage payments and late charges that became due during that thirty-day period. (Id. at 58.) A line-item breakdown of the alleged deficiency was provided in each of the Foreclosure Notices and is reproduced below.

| | |
|---|---|
| Total Monthly Payments Due: | $118,672.19 |
| (12/01/2010 – 06/01/2011 @ $3,178.04) | |
| (07/01/2011 – 10/01/2013 @ $2,762.50) | |
| (11/10/2013 – 5/28/2014 @ $2,725.13) | |
| Late Charges: | $1,998.72 |
| Other Charges: | |
| Uncollected NSF Fees: | $0.00 |
| Other Fees: | $0.00 |
| Corporate Advance Balance: | $1,624.50 |
| Unapplied Balance: | ($0.00) |
| **TOTAL YOU MUST PAY TO CURE DEFAULT:** | $122,295.41 |

(Id. at 58, 65.) Notably, under the heading “Total Monthly Payments Due,” Plaintiff's monthly mortgage payment changed three times, suggesting that Plaintiff was being charged a variable interest rate.

On July 13, 2016, after Plaintiff did not satisfy the alleged deficiency, BONY, by and through its legal counsel, MWM, initiated a judicial foreclosure proceeding by filing a Complaint in Mortgage Foreclosure in the Court of Common Pleas for Montgomery County, Pennsylvania (the “Foreclosure Complaint”). (Id. at 41.) The Foreclosure Complaint included an updated breakdown of the alleged amounts due on the Mortgage, reflected a fixed interest rate of 11.75%, and is reproduced below.

| | |
|---|---|
| Principal Balance | $215,619.44 |

| | |
|---|---|
| 11.75% interest from November 1, 2010 through July 1, 2016 at $69.41 per day | $143,566.36 |
| Late Charges | $4,330.56 |
| Escrow Advances – Taxes | $18,821.61 |
| Escrow Advances – Insurance | $10,006.00 |
| Corporate Advances – Property Inspections | $893.50 |
| Corporate Advances – Legal | $1,040.00 |
| TOTAL AMOUNT DUE | $394,277.47 |

(Id. at 43.) The foreclosure action remains pending in state court. (Id. at 11-13.)

On September 14, 2018, Plaintiff sued BONY, Bayview, and MWM, alleging that her debt was misrepresented in the Foreclosure Complaint because

> ***3** [d]espite their knowledge of the Adjustable Rate Note and the terms therein, Defendants filed the foreclosure complaint demanding a rate of interest which is in violation of the Note and excessive as well as Bayview continuing to send Plaintiff monthly statements demanding an excessive amount based upon an interest rate which is not stated in the Note [and that] [b]y filing the foreclosure complaint and attendant documents demanding a rate of interest which is in violation of the Note and excessive, Defendants have made false, misleading and deceptive representations to Plaintiff.

(Id. at 17.) In her Complaint, Plaintiff asserted five claims against Defendants: (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq. (Count I); (2) violation of the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 Pa. C.S. § 2270.1, et seq. (Count II); (3) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq. (Count III); (4) violation of the Real Estate Settlement and Procedures Act, 12 U.S.C. § 2601, et seq. (Count IV); and (5) breach of contract. (Id. at 18-30.) MWM is named only in the first three Counts. (See id.)

On July 8, 2019, MWM filed the instant Motion to Dismiss seeking to dismiss all three Counts alleged against it under Federal Rule of Civil Procedure 12(b)(6).[3] With respect to Count I—the alleged violation of the FDCPA—MWM argued that this claim must be dismissed because MWM is not a "debt collector," as defined by the Act, upon whom the statute imposes certain restrictions. (Doc. No. 13-1 at 13-16.) In addition, on Counts II and III—the alleged violations of the FCEUA and the UTPCPL, respectively—MWM argued that Pennsylvania's absolute judicial privilege, which, among other things, immunizes a law firm's statements made in the regular course of judicial proceedings, bars Plaintiff from bringing these state law claims against it. (Id. at 4, 10.)

3 On October 10, 2018, the other two Defendants, BONY and Bayview, filed an Answer (Doc. No. 3) asserting, among other things, that the interest rate included in the Foreclosure Complaint was correct because the terms of the Note had been modified from an adjustable rate to a fixed rate of 11.75% before the first change date. (Doc. No. 1 at 5-6; see Doc. No. 3 at 20.)

On July 22, 2019, Plaintiff filed a Response in Opposition to MWM's Motion to Dismiss (Doc. No. 14). In her Response, Plaintiff argued that MWM is a "debt collector" under the FDCPA, that MWM's actions violated the FDCPA, and because a violation of the FDCPA is a per se violation of Pennsylvania's FCEUA and UTPCPL, that MWM is also liable under those state law statutes. (Id. at 4-6, 12.) Plaintiff also argued that MWM is not immune from liability under Pennsylvania's absolute judicial privilege because their actions concerned debt collection, which is not protected

by the privilege and, alternatively, because Pennsylvania's statutory scheme renders any judicial privilege ineffective. (See id. at 15.) MWM filed a Reply on August 12, 2019. (Doc. No. 18.) On December 11, 2019, the Court held a hearing on MWM's Motion to Dismiss, during which the parties recited their respective positions. (See Doc. No. 20.)

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678, 129 S.Ct. 1937; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937).

***4** Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679, 129 S.Ct. 1937). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 (alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### IV. ANALYSIS

MWM moves to dismiss all of Plaintiff's claims against it, which arise under the FDCPA and Pennsylvania's FCEUA and UTPCPL. MWM argues that the FDPCA claim must be dismissed because it is not a "debt collector" under the Act, to whom the Act applies. Separately, MWM argues that Plaintiff's Pennsylvania state law claims under the FCEUA and UTPCPL are barred by Pennsylvania's absolute judicial privilege. The Court will consider MWM's arguments in turn.

#### A. Count I Will Not be Dismissed Because MWM is a "Debt Collector" Under the FDCPA.

Count I of the Complaint alleges MWM violated multiple provisions of the FDCPA. (Doc. No. 1 at 18.) Plaintiff claims that MWM violated the Act by, among other things, "making false, deceptive, or misleading representation[s] or means in connection with the debt collection[.]" (Id. at 18.) Specifically, Plaintiff alleges MWM violated 15 U.S.C. §§ 1692d, 1692e, 1692c(2), and 1692e(l0), which provide a non-exclusive list of actions that violate the FDCPA. Plaintiff also alleges MWM violated 15 U.S.C. §§ 1692f and 1692f(1) which forbid "us[ing] unfair or unconscionable means to ... attempt to collect [a] debt."

"To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." Jensen v. Pressler & Pressler, 791 F.3d 413, 417 (3d Cir. 2015). Only the second prong is disputed here. As

noted, MWM argues that Plaintiff's FDCPA claims must be dismissed because they are not a "debt collector," as defined by the Act. The Court disagrees.

***5** The definition of a "debt collector" is provided in Section 1692a(6) of the FDCPA and has two parts: a primary definition and a limited-purpose definition. 15 U.S.C. § 1692(a)(6); see Obduskey v. McCarthy & Holthus LLP, ––– U.S. ––––, 139 S. Ct. 1029, 1035-36, 203 L.Ed.2d 390 (2019). The primary definition states that

> [t]he term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6); Obduskey, 139 S. Ct. at 1036. Parties included under the primary definition are prohibited from engaging in any of the unlawful debt collection practices defined in the FDCPA. Obduskey, 139 S. Ct. at 1036. In contrast, the limited-purpose definition states

> [f]or the purpose of [15 U.S.C. § 1692f(6)], [the] term [debt collector] also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

15 U.S.C. § 1692a(6); Obduskey, 139 S. Ct. at 1036. Parties covered by limited-purpose definition are only prohibited from engaging in the acts defined in section 1692f(6) of the Act. Obduskey, 139 S. Ct. at 1036.

In the instant case, Plaintiff and MWM agree on certain facts. They agree that Pennsylvania is a judicial foreclosure state and that MWM initiated the judicial foreclosure process when it filed a foreclosure complaint in state court.[4] (See Doc. No. 14 at 9; Doc. No. 21 at 9.) They also agree on the historical understanding of relevant Third Circuit precedent. Specifically, they both acknowledge Kaymark v. Bank of Am., N.A., a Third Circuit case that confirmed that law firms are considered "debt collectors" under the FDCPA's primary definition when they file a foreclosure complaint on behalf of a client in Pennsylvania state court. 783 F.3d 168, 176-77 (3d Cir. 2015) (stating that a law firm "acted as a 'debt collector' when, by filing the [f]oreclosure [c]omplaint, it 'attempt[ed] to collect' a debt on behalf of [its client].") (citing 15 U.S.C. § 1692a(6)).

4 During the hearing held on December 11, 2019, MWM's counsel, Michael Forbes, Esquire, acknowledged that, "[MWM] fully recognize[s] that Pennsylvania is a judicial foreclosure state[.]" (Doc. No. 21 at 9.)

Plaintiff and MWM disagree, however, about whether Kaymark remains good law following the Supreme Court's ruling in Obduskey. ––– U.S. ––––, 139 S. Ct. 1029, 203 L.Ed.2d 390. In Obduskey, the Supreme Court held that a law firm that enforced a security interest by initiating a nonjudicial foreclosure on behalf of its client was not a "debt collector" under the FDCPA's primary definition. Id. at 1038. MWM argues that Obduskey's reasoning should be extended to apply to a Pennsylvania judicial foreclosure and, by doing so, this would exempt MWM from the FDCPA's primary definition of "debt collector." (Doc. No. 13-1 at 13-16.) It contends that given the similarities between Colorado's non-judicial foreclosure system—the state where the Obduskey case originated—and Pennsylvania's judicial foreclosure system, "Obduskey is highly persuasive that law firms that judicially enforce mortgages in Pennsylvania do not fall within the [FDCPA's "debt collector"] primary definition[.]" (Id. at 14.) Plaintiff, conversely, argues that Obduskey is inapplicable because Pennsylvania is a judicial foreclosure state and in Obduskey, "the Supreme Court limited [the] exclusion to non-judicial foreclosure actions." (Doc. No. 14 at 9-10.)

***6** The Court will adopt Plaintiff's argument. Despite the well-reasoned and thoughtful arguments of MWM's counsel, the Court declines to extend Obduskey's holding to Pennsylvania's judicial foreclosure system given its express limitation to apply only to nonjudicial foreclosures. See Obduskey, 139 S. Ct. at 1038 ("[I]n this case, [ ] we consider nonjudicial foreclosures. And whether those who judicially enforce mortgages fall within the scope of the primary definition is a question we can leave for another day.... [T]he availability of a deficiency judgment is a potentially relevant

distinction between judicial and nonjudicial foreclosures.”). This decision aligns with the understanding of other district courts in this Circuit, as well as the decisions of the district courts in other Circuits. See e.g., Lloyd v. Pluese, Becker, Saltzman, LLC, No. 18-9420, 2019 WL 6113859, at *2, 2019 U.S. Dist. LEXIS 199214, at *4-5 (D.N.J. Nov. 18, 2019).[5] “Indeed, the few courts to have considered Obduskey ... since it was decided have read the decision narrowly, and have specifically distinguished judicial foreclosures from nonjudicial foreclosures.” Id. Accordingly, the Court finds that MWM is a “debt collector” under the FDCPA's primary definition and Plaintiff's FDCPA claims are not defeated by Obduskey.

5 See also, Berg v. McCalla Raymer Leibert Pierce, LLC, 2019 WL 5592720, at *5 n.2, 2019 U.S. Dist. LEXIS 187993, at *6 n.2 (N.D. Ill. Oct. 30, 2019) (explaining that Obduskey's “holding expressly did not affect cases involving judicial foreclosure proceedings”); Gold v. Shapiro, Dicaro & Barak, LLC, 2019 WL 4752093, at *6, 2019 U.S. Dist. LEXIS 169028, at *16-17 (E.D.N.Y. Sept. 30, 2019) (distinguishing judicial and nonjudicial foreclosures and declining to extend Obduskey's holding to a judicial foreclosure); Flowers v. Baltax 2017, LLC, 2019 WL 3501584, at *4, 2019 U.S. Dist. LEXIS 129347, at *11-12 (D. Md. Aug. 1, 2019) (in an FDCPA case premised on actions taken by a law firm in a judicial foreclosure, holding that “Obduskey does not mandate dismissal of Plaintiff's FDCPA claims.”)

**B. Counts II and III Against MWM Will be Dismissed Because the Claims are Barred by Pennsylvania's Absolute Judicial Privilege.**

In Counts II and III, Plaintiff alleges violations of two Pennsylvania statutes. (See Doc. No. 1 at 20, 23.) Specifically, Count II alleges a violation of the FCEUA on the grounds that any violation of the FDCPA by a debt collector also constitutes an unfair or deceptive debt collection act or practice under the FCEUA. (Id. at 20.) Count III alleges a violation of the UTPCPL on the grounds that any unfair or deceptive debt collection act or practice under the FCEUA by a debt collector constitutes a violation of the UTPCPL. (Id. at 23.) MWM argues that these Pennsylvania state law claims must be dismissed because they are barred by Pennsylvania's absolute judicial privilege. The Court agrees.

In Pennsylvania,

> [t]he judicial privilege ... extends to ‘communications [(1)] which are issued in the regular course of judicial proceedings and [(2)] which are pertinent and material to the redress or relief sought.’ ” Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 311 (3d Cir. 2003) (quoting Post v. Mendel, 510 Pa. 213, 507 A.2d 351, 355 (Pa. 1986)). This privilege sweeps broadly to protect “[a]ll communications pertinent to any stage of a judicial proceeding,” Binder v. Triangle Publ'ns, Inc., 442 Pa. 319, 275 A.2d 53, 56 (Pa. 1971), including “not only ... communications made in open court, but also ... pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest,” Richmond v. McHale, 35 A.3d 779, 785 (Pa. Super. Ct. 2012) (internal quotation marks and emphasis omitted). Although the judicial privilege most often bars defamation suits, Pennsylvania courts have applied the privilege broadly to confer “immunity from civil liability in the context of judicial proceedings.” Moses v. McWilliams, 379 Pa.Super. 150, 549 A.2d 950, 956-57 (Pa. Super. Ct. 1988).

Schwartz v. OneWest Bank, FSB, 614 Fed. App'x. 80, 82-83 (3d Cir. 2015).

Pennsylvania's absolute judicial privilege requires that the immunized statements must be made in the course of practicing law. See Yelin v. Swartz, 790 F. Supp. 2d 331, 338 (E.D. Pa. 2011) (explaining that “the mere fact that [a] defendant happens to be an attorney” does not automatically invoke the privilege.) In debt collection cases, context is critical: attorneys engaged in the mere attempt to collect a debt, without more, are not engaged in the practice of law. See id. (attorneys were not practicing law when they sent collection letters on behalf of their client). In comparison, statements made in a state court foreclosure complaint are considered to be “made in connection with the attorney's representation of his client in a judicial proceeding.” Schwartz, 614 Fed. App'x at 82-83 (quoting Richmond, 35 A.3d at 786).

***7** Here, Plaintiff's Pennsylvania state law claims against MWM for violations of the FCEUA and UTPCPL must be dismissed because they arise solely from statements MWM made in the state court Foreclosure Complaint and MWM is therefore immunized under Pennsylvania's absolute judicial privilege. Specifically, the FCEUA and UTPCPL claims are predicated on the alleged violation of the FDPCA, which alleges that MWM “misstated that there [was] a default based

upon the amount due and misstat[ed] the interest rate" in "the [Foreclosure] Complaint and subsequent pleadings and exhibits[.]" (Doc. No. 1 at 18.) These allegedly-improper statements were made to advance MWM's clients' arguments in favor of obtaining a mortgage foreclosure. Such statements "reflect[ ] counsel's efforts to share their clients' litigation positions ... and thus were 'pertinent and material to the redress or relief sought' in the foreclosure case," Schwartz, 614 Fed. App'x at 83 (quoting Post, 507 A.2d at 355). As a result, MWM is immunized from liability.

In her Response and during oral argument, Plaintiff did not directly address Pennsylvania's absolute judicial privilege. Instead, she attacks the privilege by arguing that Pennsylvania's statutory framework denies MWM immunity. (See Doc. No. 21 at 31.) Specifically, Plaintiff argues that "the reason [MWM is] not immunized from [liability] is because of the per se violations under 73 P.S. § 2270.4, that a violation of the FDCPA is a violation of the [FCEUA] and ... a violation of the [FCEUA] is a violation of the [UTPCPL]." (Id. at 31.) Plaintiff is incorrect. "Pennsylvania law has long held that '[a]ll communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse.' " Greenberg v. McGraw, 161 A.3d 976, 981 (Pa. Super. 2017) (quoting Smith v. Griffiths, 327 Pa.Super. 418, 476 A.2d 22, 24 (Pa. Super. 1984)). Absolute privilege, as its name implies, is precisely that: absolute; it provides a complete defense to an otherwise plausible cause of action, even when the offense is a per se violation. See e.g., Matson v. Margiotti, 371 Pa. 188, 88 A.2d 892 (Pa. 1952) (holding that the Pennsylvania State Attorney General's absolute privilege provided immunity from civil suit, despite his statements being libelous per se). Put simply, Pennsylvania's absolute judicial privilege is not defeated by the State's FDCPA-correlative statutory scheme. See id. Accordingly, the Court will dismiss Plaintiff's FCEUA and UTPCPL claims against MWM because MWM is immunized from these claims under Pennsylvania's absolute judicial privilege.

## V. CONCLUSION

For the foregoing reasons, MWM's Motion to Dismiss (Doc. No. 13) will be granted in part and denied in part. Plaintiff's claims under the Pennsylvania FCEUA and UTPCPL against MWM will be dismissed with prejudice. However, the Court will deny MWM's Motion to Dismiss as it relates to Plaintiff's FDCPA claim. An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2020 WL 703652

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 3

2023 WL 3743134
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Quashae BROWN, et al., Plaintiffs
v.
The GAP INC., et al., Defendants

No. 1:22-cv-00165
|
Filed May 31, 2023

**Attorneys and Law Firms**

Richard M. Wiener, Law Offices of Richard M. Wiener, LLC, Consohocken, PA, for Plaintiffs Quashae Brown, Quanyae Brown.

Thomas A. Archer, Mette, Evans and Woodside, Harrisburg, PA, for Plaintiff Trinity Tiina Arlez Bellamy Reid.

Claire A. Murtha, Rolf E. Kroll, Margolis Edelstein, Camp Hill, PA, for Defendants Marygrace Kepple, Dennis Eckenrode, Rian Bell, Rebecca Kessler, Tom Pavone.

## MEMORANDUM

Kane, Judge

***1** Before the Court are four motions to dismiss, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), by which Defendant The Gap Inc. ("Gap Inc.")[1] (Doc. Nos. 73, 75) and Defendants Derry Township (the "Township"), Police Officers Marygrace Kepple, Dennis Eckenrode, Rian Bell, and Rebeca Kessler, and Detective Tom Pavone ("Officer Defendants," and with the Township, the "Township Defendants") (Doc. Nos. 71–72) move to dismiss the amended complaints filed, respectively, by Plaintiffs Quashae Brown and Quanyae Brown (the "Browns") (Doc. No. 61) and Trinity Tiina Arlez Bellamy Reid (collectively, "Plaintiffs") (Doc. No. 62). For the following reasons, the Court will grant all four motions to dismiss.

1 Gap Inc. asserts that "Plaintiffs incorrectly identify Defendant 'Gap, Inc.' as 'The Gap Inc.' " and states that, "[s]hould the claim against Gap, Inc. proceed, Gap preserves all defenses including, but not limited to, vicarious liability for the individuals named in the Second Amended Complaint." (Doc. No. 76 at n.1.) This is a nonissue given the Court's conclusion that Plaintiffs have failed to state viable claims against Gap Inc., see infra.

## I. BACKGROUND[2]

2 This background is drawn from the Plaintiffs' second amended complaints, the allegations of which the Court has accepted as true. See Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004). Because the allegations of Reid are virtually identical to those of the Browns, both second amended complaints are cited, but the Court generally quotes from the Brown's pleading.

In February 2022, Plaintiffs Quashae Brown and Quanyae Brown (the "Browns") and, separately, Trinity Tiina Arlez Bellamy Reid (collectively, "Plaintiffs") filed complaints in this Court asserting that Gap Inc. employees falsely accused them of retail theft. (Doc. No. 1); see Reid v. Kepple, No. 1:22-cv-00165 (M.D. Pa. filed Feb. 2, 2022), ECF No. 1. They also asserted that the Township Defendants unlawfully seized, arrested, and detained them. (Id.) At the parties' request, the Court consolidated Reid's action into this one, and the Browns (Doc. No. 26) and Reid (Doc. No. 27) later filed amended complaints. Defendants later filed—and the Court granted in part—motions to dismiss Plaintiffs' claims. (Doc. Nos. 30–32; 34; 59–60.) Specifically, the Court dismissed, without prejudice, Plaintiffs' Monell claim against the Township and their claims against Gap Inc. (Doc. No. 63.) The Browns and Reid then filed second amended complaints, reasserting a Monell claim against the Township and asserting a malicious prosecution claim against Gap Inc. (Doc. Nos. 61 (Browns), 62 (Reid)).

### A. Events Leading up to Arrests, Arrests, and Detention

In their operative, second amended complaints ("SACs"), Plaintiffs allege the following timeline of events, all of which stem from a 2020 incident in which Gap Inc. employees, followed by the Officer Defendants, accused Plaintiffs of shoplifting from two stores at the Tanger Outlets in Hershey, Pennsylvania ("Outlets"). (Doc. Nos. 61–62.) The Browns are sisters, and at the time, Quashae was a college student, while Quanyae and the Browns' cousin, Plaintiff Reid, were high school seniors. (Doc. Nos. 61 ¶¶ 16, 18; 62 ¶¶ 17, 19.) All three Plaintiffs are African American. (Doc. Nos. 61 ¶ 17; 62 ¶ 18.) From late morning to early afternoon on December

22, 2020, Plaintiffs purchased several items from stores at the Outlets, including Old Navy and The Gap Outlet, and placed the items in the vehicle by which they had arrived. (Doc. Nos. 61 ¶¶ 15, 19–20; 62 ¶¶ 16, 22–24.) Gap Inc. owns The Gap Outlet and the Old Navy outlet stores. (Doc. Nos. 61 ¶ 6; 62 ¶¶ 10, 21.)

***2** At around 12:51 p.m., Old Navy employee Beth Anne Staton ("Staton") called 911, "knowingly ma[de] a false report of an active retail theft at Old Navy," and "knowingly ma[de] a false report that three black females who stole from The Gap Outlet came into Old Navy and left with some items." (Doc. Nos. 61 ¶ 35; 62 ¶ 35.) In response, the Derry Township Police Department ("DTPD") dispatched the Officer Defendants to the scene, and they arrived minutes later. (Doc. Nos. 61 ¶ 36; 62 ¶ 37.)

Upon arriving at the scene, at around 12:54 p.m., Officer Kepple met with Staton at Old Navy. (Doc. Nos. 61 ¶ 37; 62 ¶ 38.) Staton was reviewing Old Navy surveillance footage because she had received a call from Gap employee Tania Roman ("Roman") stating that the individuals depicted in the video—later identified as Plaintiffs—were "acting suspicious" and "had stolen from [the Gap] big time." (Doc. Nos. 61 ¶¶ 39–40, 44–45, 47; 62 ¶¶ 39–40, 42–43, 49.) Staton showed Officer Kepple the footage, which Staton claimed depicted Quanyae stealing a six-dollar baby onesie at the 12:15 p.m. mark in the video. (Doc. Nos. 61 ¶ 42; 62 ¶ 43.) But the video did not depict any theft and showed Quanyae putting the onesie back on the shelf and not taking it. (Doc. Nos. 61 ¶ 43; 62 ¶ 44.)

After meeting with Staton, Officer Kepple, with Officer Eckenrode, proceeded to interview Roman at The Gap Outlet and, en route, happened upon Quanyae and Reid, who left The Gap Outlet and were headed to the vehicle in which they arrived. (Doc. Nos. 61 ¶¶ 45–47; 62 ¶¶ 25–26.) Kepple and Eckenrode detained, handcuffed, arrested, and placed in separate police vehicles. (Doc. Nos. 61 ¶ 24, 46; 62 ¶ 26.) Reid and Quanyae denied having stolen any items and indicated that they had receipts for their purchases, urging the officers to check the items in their bags against their receipts. (Doc. Nos. 61 ¶ 23; 62 ¶ 27.) The officers searched Reid and Quanyae and seized their purchased items and personal belongings. (Doc. Nos. 61 ¶ 22; 62 ¶ 28.) Shortly thereafter, Kepple and Officer Bell arrested Quashae and searched and seized items from her. (Doc. Nos. 61 ¶ 24; 62 ¶ 29.) Kepple then proceeded to The Gap Outlet and interviewed Roman, who told Kepple that "she had simply told [ ] Staton that the three girls were 'acting suspicious' " and never stated to anyone "that the girls had stolen anything." (Doc. Nos. 61 ¶¶ 47–48; 62 ¶¶ 49–50.) Kepple took no action and instead permitted the arrests to continue. (Doc. Nos. 61 ¶ 49; 62 ¶ 51.)

Following the arrests, at around 1:45 p.m., the officers transported Plaintiffs to the DTPD and detained them against their will until about 4:10 p.m., after which they were released from custody because they had committed no crime. (Doc. Nos. 61 ¶¶ 30–32; 62 ¶¶ 34–35.) The Browns were held in locked jail cells, and Reid was placed in a juvenile detention room. (Doc. Nos. 61 ¶¶ 31–32; 62 ¶¶ 33–34.) No charges were filed because none of the Plaintiffs had committed a crime. (Doc. Nos. 61 ¶ 32; 62 ¶ 35.)

**B. Allegations Regarding Lack of Probable Cause**

Plaintiffs allege that from before, during, and after the arrests and detentions, the Officer Defendants knew that Plaintiffs had not stolen any merchandise or committed any other crime but arrested, searched, and detained them nonetheless. Specifically, Plaintiffs allege that: (1) prior to their arrests, none of the Officer Defendants "had a reasonable basis for initiating, continuing, or failing to immediately terminate the aforesaid detentions, arrests, seizures, and incarcerations of [Plaintiffs]"; (2) "[b]efore the Derry Township police personnel arrested [them], and as the arrests continued for approximately three hours, Officers Kepple and Eckenrode had information clearly demonstrating [that] Quanyae had not engaged in retail theft as alleged by [ ] Staton"; (3) "[b]efore the Township Defendants transported [Plaintiffs] ... to police headquarters, ... Officer Kepple and Officer Eckenrode had information clearly demonstrating there was no reasonable basis to suspect [Plaintiffs] had participated in retail theft or any other criminal activity"; (4) "[i]n connection with the initiation and continuation of the arrests of [Plaintiffs], [the Officer Defendants] each had information clearly demonstrating there was no reasonable basis to suspect [Plaintiffs] had participated in retail theft or any other criminal activity"; (5) the Officer Defendants had no "reasonable basis for the arrest[,] detention[,] [a]nd incarceration of [Reid], nor for the seizure of her property"; (6) "[i]n connection with initiating and continuing the arrests of [Plaintiffs], the involved Derry Township police personnel possessed but disregarded evidence and information showing that [none of them] had committed any crime" and failed to "conduct[ ] a timely or reasonable investigation regarding the girls' denials that they had stolen anything"; and (7) the Officer Defendants "initiated and continued the aforesaid false accusations and arrests of [Plaintiffs] without probable cause, in reckless

disregard of rights, and with malice, and despite the existence of credible, exculpatory evidence[.]" (Doc. Nos. 61 ¶¶ 27–29, 48–56; 62 ¶¶ 32–33, 53–62.)

### C. Motions and Briefing

***3** The Gap and the Township Defendants filed their motions to dismiss Plaintiffs' SACs on June 30, 2023 (Doc. Nos. 71–73; 75) and also filed briefs in support of their respective motions (Doc Nos. 74; 76; 80–81). Plaintiffs filed briefs in opposition in February 2023 (Doc. Nos. 79; 82–84), and Plaintiffs' filed reply briefs in late February and early March 2023 (Doc. Nos. 85; 86–88). Accordingly, all four motions to dismiss are ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). When reviewing the sufficiency of a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). However, the Court need not accept legal conclusions proffered as factual allegations. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Rather, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Consistent with the Supreme Court's rulings in Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 664). A complaint is properly dismissed where the factual content in the complaint does not allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Iqbal, 556 U.S. at 678.

## III. DISCUSSION

In its Memorandum and Order resolving Defendants' motions to dismiss Plaintiffs' first amended complaints, the Court permitted amendment as to two sets of claims: Plaintiffs' Monell claim against Defendant Derry Township and their malicious prosecution/malicious abuse of process claim asserted against The Gap Outlet. Accordingly, those are the only two claims properly before the Court. The Court will disregard the Township Defendants' attempt to relitigate—without having filed a timely motion to reconsider—the Court's prior ruling that Plaintiffs sufficiently stated an equal protection claim as to the Officer Defendants. (Doc. Nos. 71 ¶ 19–21; 72 ¶ 19-21.) The Court addresses Defendants' motions to dismiss the two relevant claims below.

### A. Section 1983 Monell Claim Against Derry Township

#### 1. Legal Standard

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

***4** See id. Section 1983 "does not ... create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim for relief under § 1983, a plaintiff "must allege the

violation of a right secured by the Constitution and laws of the United States" and "show that the alleged deprivation was committed by a person acting under color of state law." See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

Municipalities such as Derry Township are considered "persons" under § 1983 and may be held liable for injuries caused by violations of constitutional rights. See Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). They can only be held liable, however, "for their own illegal acts." See Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986). It is only when a municipality's "execution of [a] policy or custom ... inflicts the injury" that the municipality "as an entity is responsible under § 1983." See Monell, 436 U.S. at 694. To plead a § 1983 claim against a municipality, a plaintiff must allege (1) an underlying constitutional violation (2) caused by the municipality's execution of a municipal policy or custom. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).

A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." See City of Canton v. Harris, 489 U.S. 378, 385 (1989). A custom is "an act 'that has not been formally approved by an appropriate decision maker,' but is 'so widespread as to have the force of law.' " See Natale, 318 F.3d at 584 (quoting Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)). In order to recover from a municipality under this theory of liability, a plaintiff must show "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." See City of Canton, 489 U.S. at 385. Complaints alleging municipal liability under § 1983 are not subject to heightened pleading standards. See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993). However, a plaintiff attempting to establish a Monell claim must "identify a custom or policy, and specify what exactly that custom or policy was." See McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009).

In the alternative, a municipality may be liable under § 1983 for a failure to train, monitor, or supervise—however, the failure alleged in such a circumstance must amount to "deliberate indifference to the constitutional rights of persons with whom the police come in contact." See City of Canton, 489 U.S. at 388. To establish deliberate indifference in this context, a plaintiff must generally show the failure alleged "has caused a pattern of violations." See Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). Where a failure to train claim is alleged based on a single incident, the complaint must contain allegations that policymakers "kn[e]w to a moral certainty" that the alleged constitutional deprivation would occur and the need for further training "must have been plainly obvious." See City of Canton, 489 U.S. at 390 n.10. Further, "[l]iability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.' " See Thomas v. Cumberland Cnty., 749 F.3d 217, 226 (3d Cir. 2014) (citing Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir. 1991)).

### 2. Analysis

***5** Here, as to the first element of Plaintiffs' Monell claims—the existence of an underlying constitutional violation—the Court previously concluded that Plaintiffs have plausibly alleged violations of their constitutional rights. (Doc. No. 59.) Yet, as was the case with Plaintiffs' first amended complaints, their SACs do not state a plausible Monell cause of action against Derry Township. Below are the assertions that form the bases of Plaintiffs' Monell claims.

> 75. Defendant Derry Township operates, administers, maintains, and controls the Derry Township Police Department.
>
> 76. Defendant Derry Township has established and/or acquiesced to policies, procedures, directives, practices, and customs for its Police Department regarding searches, seizures, detentions, arrests, and imprisonments of citizens accused of retail theft.
>
> 77. In establishing and/or acquiescing to these policies, procedures, directives, practices, and customs, Defendant Derry Township has a duty under the Fourth and Fourteenth Amendments to the United States Constitution to refrain from enforcing or continuing in effect policies, procedures, directives, practices, or customs that create a substantial likelihood that citizens will be subjected to improper and unlawful searches, seizures, detentions, arrests, and imprisonments by its Police Department and the individuals working therein.
>
> 78. Notwithstanding its aforesaid duty, Defendant Derry Township committed one or more of the following

wrongful acts or omissions in violation of and with deliberate indifference to [Plaintiffs'] constitutional rights:

(a) Failing to establish appropriate policies, procedures, directives, practices, and/or customs regarding whether, when, and how to search, seize, detain, arrest, and imprison an individual accused by a storeowner of committing retail theft where there is no objective proof of such crime and where potentially exculpatory video surveillance evidence is available to be reviewed by investigating police officers and/or detectives;

(b) Allowing policies, procedures, directives, practices, and customs to continue in force and effect which resulted in the improper search, seizure, detention, arrest, and imprisonment of search and seizure of [Plaintiffs]; and

(c) Establishing, maintaining, and/or allowing to exist and continue policies, procedures, directives, practices, and/or customs of failing to properly and effectively supervise, discipline, train, and retrain individuals in its Police Department with regard to searches, seizures, detentions, arrests, and imprisonments under circumstances such as those presented herein.

79. The aforesaid improper searches, seizures, detentions, arrests, and imprisonments of [Plaintiffs] were the direct and proximate result of Defendant Derry Township's failure to properly and/or sufficiently formulate, institute, oversee, and/or supervise the training, supervision, and discipline of individuals working within the Derry Township Police Department with regard to searches, seizures, detentions, arrests, and imprisonments of individuals accused by a storeowner of committing retail theft where there is no objective proof of such crime and where potentially exculpatory video surveillance evidence is available to be reviewed by investigating police officers and/or detectives.

80. The aforesaid unlawful searches, seizures, detentions, arrests, and imprisonments of [Plaintiffs] were the direct and proximate result of the failure of Defendant Derry Township to properly and/or sufficiently develop, formulate, institute, and/or maintain appropriate policies, practices, procedures, and customs regarding law enforcement encounters such as the one set forth herein, especially with regard to investigating accusations of retail theft.

***6** 81. Defendant Derry Township and its policymakers, including but not limited to the township's board of supervisors as well as its supervisory agents and/or employees in the Derry Township Police Department, acted with deliberate indifference to an unreasonable risk that the rights of citizens with whom police officers and detectives within the Derry Township Police Department come into contact would be deprived of their rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, thereby directly and proximately causing the aforesaid unlawful searches, seizures, detentions, arrests, and imprisonments of [Plaintiffs].

82. As a direct, proximate, and foreseeable result of the aforesaid acts and omissions of Defendant Derry Township, [Plaintiffs] have each suffered the violations and incurred the damages and harms set forth in [SACs].

(Doc. No. 61 ¶¶ 75–82); see (Doc. No. 62 ¶¶ 84–90).

Even accepting these sweeping allegations in the SACs as true, and even drawing all inferences from them in Plaintiffs' favor, they do not set forth non-conclusory "facts showing the existence of a policy or a custom attributable to the Township which deprived [them] of any constitutional right." See Titus v. Newtown Twp., 621 F. Supp. 754, 755 (E.D. Pa. 1985). Plaintiffs "allege[ ] a single instance of [related] arrest[s] based on a [proven] false report," which "is insufficient to state a claim of municipal liability." See Deemer v. City of Oil City, No. 1:19-cv-00380, 2021 WL 4391275, at *5 (W.D. Pa. Sept. 24, 2021). They plead "vague and conclusory allegations"—mere "conclusory and general averments"—none of which "satisfy the rigorous standards of culpability and causation required to state a claim for municipal liability." See id. (internal quotation marks omitted) (quoting Wood v. Williams, 568 F. App'x 100, 102–04 (3d Cir. 2014) (unpublished)).

Further, allegations of a "failure to provide specific training" must have a "causal nexus with [the claimed] injuries," and Plaintiffs have failed to plausibly allege "that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." See Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). The allegations of a failure to train are conclusory and merely parrot the relevant legal standard without providing factual support. See id.; see also, e.g., Pahler v. City of Wilkes-Barre, 207 F. Supp. 2d 341, 353

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(M.D. Pa. 2001) (dismissing failure to train claim where the plaintiff pleaded no facts to support the contention that his injuries were caused by a failure to train, failed to identify the specific training the city should have offered, and failed to establish that training was not provided). Nor can, as here, claims of failures to supervise, discipline, and monitor be pleaded in conclusory fashion. See, e.g., Moresi v. City of Phil., No. 15-cv-00038, 2015 WL 4111724, at *4 (E.D. Pa. July 8, 2015) (dismissing Monell claims asserting "failure to investigate, supervise, or discipline [ ] police officers" where, "[a]part from the single incidence of alleged police misconduct against [the plaintiff], [the plaintiff] plead[ed] no other facts necessary to establish a municipal liability claim"). Accordingly, the Court will grant the Township Defendants' motions to dismiss Plaintiffs' Monell claims.

### B. State Law Malicious Prosecution Claim Against Gap Inc. [3]

3 In permitting amendment following its partial dismissal of the first amended complaints as against Gap Inc. without prejudice, the Court acknowledged Plaintiffs' assertion that they had established a "malicious abuse of process claim," although they did not plead such a claim in their first amended complaints. (Doc. No. 59 at 30 n.10); see (Doc. No. 40 at 12–13). While there is some authority for the proposition that a malicious abuse of process claim is distinct from a malicious prosecution claim, see, e.g., Jennings v. Shuman, 567 F.2d 1213, 1218 (3d Cir. 1977) (noting, as opposed to a malicious prosecution claim, that "in a malicious abuse of process case, presence or absence of probable cause is irrelevant"), Plaintiff Reid now asserts that "Common Law 'Malicious Prosecution" and 'Malicious Abuse of Process' are interchangeable" (Doc. No. 82 at 7 n.1), and neither party has identified any authority or provided specific arguments in support of a viable malicious abuse of process claim separate and apart from a malicious prosecution claim (Doc. Nos. 79; 81).

#### 1. Legal Standard

***7** A cause of action for malicious prosecution under Pennsylvania law "has three elements: (1) the defendant has initiated criminal proceedings against the plaintiff without probable cause; (2) the defendant has acted deliberately with malice; and (3) the proceedings have terminated in favor of the plaintiff." See Braswell v. Wollard, 243 A.3d 973, 977 (Pa. Super. Ct. 2020) (citing Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010)). Pennsylvania courts rely heavily on Restatement (Second) of Torts to determine the scope of liability under a malicious prosecution cause of action. See Stevens v. Sullum, No. 3:20-cv-01911, 2021 WL 2784817, at *13 (M.D. Pa. July 2, 2021) ("In analyzing claims for malicious prosecution, Pennsylvania courts have relied extensively on the Restatement (Second) of Torts."); see also Burgos v. Morgan, Lewis & Bockius, LLP, No. 735 EDA 2015, 2017 WL 57879, at *7 (Pa. Super. Ct. Jan. 5, 2017) (noting that Pennsylvania law as to malicious prosecution has developed largely based on the Restatement (Second) of Torts §§ 653 and 654).

Three sections of the Restatement of Torts (Second) are relevant to Plaintiffs' claims. The first is Restatement (Second) of Torts § 653, which sets forth the elements of a malicious prosecution cause of action:

> A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if
>
> (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and
>
> (b) the proceedings have terminated in favor of the accused.

See id. The second is § 654, which defines "Institution of Criminal Proceedings" as such:

> (1) The term "criminal proceedings" includes any proceeding in which a government seeks to prosecute a person for an offense and to impose upon him a penalty of a criminal character.
>
> (2) Criminal proceedings are instituted when
>
> (a) process is issued for the purpose of bringing the person accused of a criminal offense before an official or tribunal whose function is to determine whether he is guilty of the offense charged, or whether he shall be held for later determination of his guilt or innocence; or
>
> (b) without the issuance of process an indictment is returned or an information filed against him; or

(c) he is lawfully arrested on a criminal charge.

See id. And the third is § 659, which relates to "Manner of Termination" and provides:

Criminal proceedings are terminated in favor of the accused by

(a) a discharge by a magistrate at a preliminary hearing, or

(b) the refusal of a grand jury to indict, or

(c) the formal abandonment of the proceedings by the public prosecutor, or

(d) the quashing of an indictment or information, or

(e) an acquittal, or

(f) a final order in favor of the accused by a trial or appellate court.

See id.

Together, and as relevant here, these provisions stand for the proposition that a malicious prosecution claim can be maintained (1) by a plaintiff who was "lawfully arrested on a criminal charge," (2) against a "private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged," (3) where the criminal proceedings are terminated in favor of the accused. See id. §§ 653–54, 659. Regarding claims against a private person, Pennsylvania courts have cited approvingly comment g to § 653 of the Restatement (Second) of Torts, which states as follows:

A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable ... even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

***8** If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

See Bradley v. Gen. Acc. Ins. Co., 778 A.2d 707, 710–11 (Pa. Super. Ct. 2001) (emphasis added) (quoting Restatement (Second) of Torts § 653 cmt. g).[4] Within this framework, the Court turns to an analysis of Plaintiffs' claims.

4 For purposes of this Memorandum, the Court assumes, without deciding, that Gap Inc. is liable for the alleged actions of Staton and Roman.

### 2. Analysis

Based on the Plaintiffs' allegations and the applicable law, the Court concludes that Plaintiffs have failed to state malicious prosecution claims against Gap Inc. Plaintiffs' allegations, accepted as true, establish that the Officer Defendants were "left entirely to [their] discretion to initiate the [criminal] proceedings or not." See id. According to the SACs, prior to Plaintiffs' arrests, and despite the initial representations by Staton, the Officer Defendants had actual knowledge of the fact that Plaintiffs had neither stolen any merchandise nor committed any other crime and, in fact, knew that they lacked probable cause to arrest Plaintiffs. (Doc. Nos. 61 ¶¶ 27–29, 48–56; 62 ¶¶ 32–33, 53–62.) For this reason alone, regardless of the other elements of Plaintiffs' malicious prosecution claim, Plaintiffs have failed to state a plausible malicious prosecution claim because their allegations do not establish, prima facie, the cause of action's first element, i.e., initiation of criminal proceedings by Gap Inc. See Braswell, 243 A.3d at 977.

The Court recognizes the proposition that, "[i]f ... the information is known by the giver [i.e., private person] to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information." See Restatement (Second) of Torts § 653 cmt. g. But according to the allegations here, the Officer Defendants were not deprived of an intelligent exercise of their discretion. Rather, they knew they lacked probable cause, viewed the video that allegedly depicted theft but actually showed none, discovered that Roman had not accused Plaintiffs of shoplifting, and ignored exculpatory statements and other evidence, including receipts matching the items in Plaintiffs' possession. This is simply not a case where "an intelligent exercise of [an] officer's discretion bec[a]me[ ] impossible," see id., where, in other words, "a private individual who reports suspected criminal conduct to a law enforcement officer causes the institution of any subsequent proceedings initiated as a result of the information provided." See Stevens, 2021 WL 2784817, at *13 (emphasis added). In contradistinction, as but one example, the Pennsylvania Superior Court in Braswell found it impossible "for [an officer] to have grounded his probable cause determination on evidence other than [the defendant's] version of events" because the "sole basis for the officer to believe [the plaintiff] to be the perpetrator was [the defendant's] statement" accusing the plaintiff of "committing a crime." See Braswell, 243 A.3d at 978 (emphasis added).

***9** The authorities upon which Plaintiffs rely (Doc. Nos. 79 at 8–9, 11–12; 82 at 8–9, 11) do not further their arguments. Plaintiffs rely on Bradley, but the court in that case simply held that "prosecuting authorities had the discretion to determine whether charges should be pursued" and could not be held liable for malicious prosecution. See 778 A.2d at 712. The Officer Defendants in this case similarly retained the discretion to determine whether to arrest and detain Plaintiffs, and Bradley therefore appears to contradict rather than support Plaintiffs' position. Plaintiffs also cite to Gallucci v. Phillips & Jacobs, Inc., 614 A.2d 284 (Pa. Super. Ct. 1992), but the court in that case found "[in]sufficient process to support a cause of action in malicious prosecution" because "[t]he only process issued ... was a records subpoena issued by the grand jury." See id. at 290. This case does not involve any similar facts or legal issues, making Gallucci inapposite.

Plaintiffs' reliance on a third case—Rivera-Guadalupe v. City of Harrisburg, No. 1:19-cv-01400 (M.D. Pa. July 22, 2020), ECF No. 30 at 14—is similarly misplaced. In Rivera-Guadalupe, the plaintiff alleged "that [a detective] contributed to the initiation of the criminal case against [the plaintiff] by advising the district attorney's office to bring charges based on insufficient facts," and the court concluded that such an allegation satisfied "the 'initiation' element of malicious prosecution under both federal and Pennsylvania law." See id. Dissimilar to Plaintiffs' allegations in this case, Rivera-Guadalupe involved a detective-defendant who led an investigation, applied for and was granted a search warrant, and, despite obtaining only exculpatory evidence, arrested the plaintiff. See id. at 2. Here, the Officer Defendants learned, before arresting Plaintiffs, that the only bases upon which to believe Plaintiffs had committed a crime were patently false, according to the allegations in the SACs, which the Court must assume are true at this stage of the proceedings. In short, based on the allegation set forth in the SACs, the Court is constrained to conclude that Plaintiffs' pleadings establish that the Officer Defendants retained "the discretion to determine whether charges should be pursued." See Bradley, 778 A.2d at 712. The Court will therefore grant Gap Inc.'s motions to dismiss.

### C. Leave to Amend

The Third Circuit has "instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." See Phillips, 515 F.3d at 236 (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) (citing Smith v. NCAA, 139 F.3d 180, 190 (3d Cir. 1998), rev'd on other grounds, 525 U.S. 459 (1999)). Here, the Court finds that permitting Plaintiffs to file a third amended complaint would be futile given their continuing inability to state any viable claims against Gap Inc. or any plausible Monell claims against Derry Township. The Court therefore declines to permit Plaintiffs another opportunity to file amended pleadings and will direct the Clerk of Court to terminate Gap Inc. and Derry Township from this action.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the Township Defendants' motions to dismiss (Doc. Nos. 71–72) and Gap Inc.'s motions to dismiss (Doc. Nos. 73, 75). The Court will not permit further leave to amend. Because Plaintiffs have not stated any viable claims against either Gap Inc., or Derry Township, An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3743134

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 4

2018 WL 3980125
Only the Westlaw citation is currently available.
**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**
Superior Court of Pennsylvania.

COMMONWEALTH of Pennsylvania
v.
Jason Joseph BEE, Appellant

No. 120 EDA 2018
|
Filed August 21, 2018

Appeal from the Judgment of Sentence March 3, 2016 in the Court of Common Pleas of Bucks County, Criminal Division at No(s): CP-09-CR-0004323-2015

BEFORE: LAZARUS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:

***1** Jason Joseph Bee ("Bee") appeals, *pro se*, from the judgment of sentence imposed following his convictions of possession of a controlled substance, possession with intent to deliver a controlled substance, and possession of drug paraphernalia. ***See*** 35 P.S. §§ 780-113(a)(16), (30), (32). We affirm.

On May 5, 2015, Bensalem police pulled over a red Ford Mustang for speeding. Police issued the driver of the Mustang, Bee, a traffic ticket. Police learned that Bee's vehicle was registered at 414 Daylily Drive in Langhorne, Pennsylvania.

On May 11, 2015, an anonymous person called Bensalem police and told an officer that Bee was a large-scale marijuana dealer in the Philadelphia area who sold marijuana from a red convertible Mustang. The anonymous person told the officer that Bee lives with his mother at 414 Daylily Drive, and provided Bee's cell phone number.

Thereafter, Bensalem police searched for Bee's information in a police database and learned that Bee's residence was registered at 414 Daylily Drive. Police also learned that the cell phone number provided by the anonymous person was registered to Bee at the same address, and that the Middletown police had previous contacts with Bee at the same address.

On May 12, 2015, Bensalem police went to 414 Daylily Drive and identified Bee's red Ford Mustang in the driveway. While police were at the residence, they also conducted a "trash pull."[1] Police recovered the following items from the trash pull: (1) two pieces of mail addressed to Agnes Levin (Bee's mother) at 414 Daylily Drive; and (2) a gallon size plastic bag that had the word "Purple" written on it. Police used a field test kit to test for the presence of drugs inside the gallon size plastic bag. The field test kit indicated a positive result for marijuana.

1 A trash pull is a law enforcement investigative technique, where officers seize household trash that is left at the street/curbside during routine trash collection. The trash is seized and taken to the police department, where the trash is searched for evidence.

Police obtained a search warrant to search Bee's residence at 414 Daylily Drive. On May 14, 2015, police executed the search. The following items were located inside Bee's bedroom:

1. A one-pound bag of marijuana hidden in tan pants;
2. Two bags of marijuana found in different pants;
3. Several marijuana joints and loose marijuana in an ashtray;
4. Eight glass tubes used for crack cocaine;
5. Three boxes of new sandwich bags from a desk;
6. Used sandwich bags and large bags from the desk;
7. A digital scale found in the desk that had marijuana and cocaine residue on it;
8. A bottle with twenty-eight yellow pills;
9. Various rolling papers;
10. Various pieces of mail in [Bee's] name;
11. A Social Security card for [Bee];
12. An identification card for [Bee];
13. Two birth certificates for [Bee];

14. Several bags of marijuana inside a black bag inside a closet;

15. Three marijuana pipes; and

16. $770.00 in United States currency.

In total, police seized 1,386.9 grams (3.06 pounds) of marijuana in Bee's bedroom.

***2** Bee was later arrested and charged with a variety of offenses. Bee filed a Motion to Suppress the evidence seized from his home, which the trial court denied. In 2015, a jury trial was held, where Bee represented himself.[2] On November 10, 2015, the jury found Bee guilty of the above-mentioned crimes.

2 Prior to accepting Bee's *pro se* request, the trial court conducted a thorough colloquy. The court also repeatedly advised Bee that he should retain counsel.

On March 3, 2016, Bee was sentenced to an aggregate prison term of three to eight years.[3] On March 14, 2016, Bee filed a "Post-Sentence Motion to Modify Sentence be Waived from Bucks County and Moved to Superior Court," which the trial court denied. On May 27, 2016, Bee filed an untimely appeal to this Court, which he subsequently withdrew. Thereafter, Bee submitted a Petition pursuant to the Post Conviction Relief Act ("PCRA")[4] seeking to reinstate his post-sentence and appeal rights *nunc pro tunc.* The PCRA court appointed Bee counsel. Thereafter, Bee filed a Motion seeking to proceed *pro se.* The PCRA court granted Bee relief pursuant to his PCRA Petition. That same day, the court held a ***Grazier***[5] hearing, after which it determined that Bee voluntarily waived his right to counsel and could represent himself.

3 On December 7, 2015, prior to the imposition of sentence, Bee filed a Notice of appeal. The Notice of appeal was subsequently dismissed.

4 ***See*** 42 Pa.C.S.A. §§ 9541-9546.

5 ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

In July and August of 2017, Bee filed three Post-Sentence Motions, namely a "Motion for Sentence Modification," a "Post-Sentence Motion," and a "Supplement Amendment of Post-Sentence Motion," all of which were denied. Bee, *pro se*, filed a timely Notice of appeal and a court-ordered Concise Statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Bee raises the following issues for our review:

1) Did the [t]rial [c]ourt err, pursuant to Pa.R.Crim.P. 581(H), in denying [Bee's] [M]otion to [S]uppress the evidence recovered as a direct result of the search warrant and affidavit, because the Commonwealth did not go forward with any evidence, and where it was patently clear [Bee] was never offered an opportunity to develop the fact that the Police lacked [c]onstitutionally satisfactory probable cause?

2) Pursuant to Pa.R.E. 702, does the Dequenois-Levine (D-L) Reagent in the Narco Pouch Drug Test meet ***Frye***[ 6 ] [s]tandards to be established as trustworthy probable cause for a search warrant, especially because it was tested on an [e]mpty clear freezer bag that was allegedly found in [Bee's] trash?

3) Was [Bee] denied his [c]onstitutional right to a fair trial where the [t]rial [c]ourt failed to appoint stand-by counsel (or advise [Bee] he could retain stand-by counsel) under Pa.R.Crim.P. [ ] 121(D), since it is clear the [trial court] did not explain the standards of conduct and stand-by counsel could have answered questions of concern of [Bee] during [t]rial if [Bee] was unsure of what was occurring in [o]pen [c]ourt?

4) Did the [t]rial [c]ourt err, in failing to order a competency evaluation, pursuant to ***Indiana v. Edwards***, 554 U.S. 164 (2008), prior to granting [Bee's] request to represent himself, where [Bee] had suffered from mental problems?

5) Was the evidence sufficient as a matter of law, to prove beyond a reasonable doubt that [Bee] was guilty of possession of cocaine?

***3** Brief for Appellant at 3-4 (citations corrected, emphasis omitted, footnote added).

6 ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923).

Bee raises the following issue, in a supplemental brief,[7] for our review:


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

> 6) Did the [s]entencing [c]ourt err in denying [Bee's] “Motion for Sentence Modification” requesting relief upon review of the [s]entence with respect to available mitigating factors, thus misapplying the Sentencing Guidelines, adding points to [Bee's] offense gravity score for [an] offense [Bee] was NEVER charged with, resulting in an abuse of discretion when it handed down an aggregate [s]entence of three to eight years incarceration?

Supplemental Brief for Appellant at 7 (emphasis in original).

7 Attached to Bee's brief is a “Supplemental Brief,” in which Bee raises a sixth issue for our review. Since Bee is a *pro se* appellant, we will address his sixth claim. ***See Commonwealth v. Lyons***, 833 A.2d 245, 251-52 (Pa. Super. 2003) (declaring willingness to construe materials filed by a *pro se* litigant liberally, while recognizing that *pro se* status generally confers no special benefit on an appellant). Bee's Supplemental Brief will be cited as Supplemental Brief for Appellant.

In his first claim, Bee alleges that the trial court erred in denying his pre-trial Motion to Suppress the evidence recovered from his bedroom. ***See*** Brief for Appellant at 29, 34, 38-39. Bee asserts that the Commonwealth violated Pa.R.Crim.P. 581(H), because the Commonwealth did not present testimony to establish the validity of the statements set forth in the warrant and Affidavit of probable cause. ***See id.*** at 29, 32, 33; ***see also id.*** at 39 (claiming that the Affidavit of probable cause must be complete on its face). Bee claims that he was not offered an opportunity to develop the record regarding probable cause to issue the warrant. ***See id.*** at 29, 34. Bee argues that the field test was unreliable, that the police made false statements, and that the anonymous tip was false. ***See id.*** at 30-32, 35, 36-38; ***see also id.*** at 35-37 (arguing that the police did not corroborate the tip or the reliability of the tipster).

Our standard of review when addressing a challenge to a trial court's denial of a suppression motion is

> whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Eichinger***, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted).

> [T]he question of whether probable cause exists for the issuance of a search warrant [is] answered according to the “totality of the circumstances” test articulated in ***Commonwealth v. Gray***, 503 A.2d 921 (Pa. 1985), and its Pennsylvania progeny, which incorporates the reasoning of the United States Supreme Court in ***Illinois v. Gates***, 462 U.S. 213 (1983). The task of the magistrate acting as the issuing authority is to make a practical, common sense assessment of whether, given all the circumstances set forth in the affidavit, a fair probability exists that contraband or evidence of a crime will be found in a particular place. A search warrant is defective if the issuing authority has not been supplied with the necessary information.

***4** ***Commonwealth v. Huntington***, 924 A.2d 1252, 1255 (Pa. Super. 2007) (some citations and quotation marks omitted).

Further, "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H). The standard of proof is preponderance of the evidence. ***Id.***, cmt. "[A] defendant at a suppression hearing has the right to test the veracity of the facts recited in the affidavit in support of probable cause." ***Commonwealth v. James***, 69 A.3d 180, 187 (Pa. 2013) (citation omitted). When testing the veracity of the facts recited in the affidavit, a defendant must make "a substantial preliminary showing [that] the affiant[ (s) ] knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit." ***Id.*** at 188 (citation omitted).

Here, the Commonwealth introduced the Affidavit of probable cause and the search warrant into evidence at the suppression hearing. N.T., 10/27/15, at 75. The averments contained in the Affidavit of probable cause were set forth, in relevant part, as follows:

> On 5/5/15, Cpl. Cowden from the Bensalem Township Police Department issued a traffic ticket to [Bee] [ ] for speeding in a Red Ford Mustang (PA Tag NB - 0016). A Penn [DOT] records check was conducted on this vehicle and learned that it is registered to 414 Daylily Dr. Langhorne, PA 19047 to an Agnes Levine (12/28/1941).
>
> On 5/11/15, Officer Jennifer Petine spoke with the complainant over the phone who wished to remain anonymous. The anonymous complainant state[d] [that] [Bee] is a large scale, high grade marijuana dealer. Bee sells four different [strains] of high grade marijuana from a red convertible Ford Mustang. Bee sells marijuana in the area of Eddington, Andalusia, Northeast Philadelphia and Croydon. The complainant state[d] that Bee keeps the marijuana in a tote bag in his Ford Mustang. The complainant stated that Bee sells the marijuana in various bars in the North East sections of Philadelphia and Bensalem.
>
> On 5/11/15, Officer Gansky spoke with the same anonymous complainant in reference to [Bee]. During that conversation[,] Officer Gansky learned that Bee lives with his mother in Langhorne, Bucks County, but also stops by his girlfriend's house in North East Philadelphia. Bee lives at his mother's residence at 414 Daylily Dr. Langhorne, PA 19047. The anonymous source stated that Bee's cell phone number is [ (redacted) ]. The anonymous source stated that Bee keeps a large amount of money from the marijuana sales at his mother's residence.
>
> You[r] affiants also ran a computer check using the T.L.O. computer system. T.L.O. is an information database utilized by law enforcement. Your affiants learned that [Bee] is registered to 414 Daylily Drive Langhorne, PA 19047 as his residence. He is listed to that address from August of 1998 to the present. Officer Gansky was able to T.L.O. this phone number and learned that it is registered to [Bee] at 414 Daylily Drive, Langhorne, PA 19047.
>
> ***5** Officer Gansky learned that the Middletown Township Police Department has also had contacts with [Bee] where he is listed at 414 Daylily Drive, Langhorne, PA 19047.
>
> On 5/12/15[,] Officer Gansky and Officer Hill conducted a trash pull at 414 Daylily Drive Langhorne, PA 19047. A trash pull is a common law enforcement investigative technique utilized by the Bensalem Police Department. A trash pull is conducted when a suspect places their household trash to the street/curbside for routine trash collection. The trash is then seized and taken to the Bensalem Police Department where it is searched through for evidence of violations of Title 35. The following items were recovered from 414 Daylily Drive Langhorne, PA 19047 during the 5/12/15 trash pull:
>
> X1: 2 pieces of mail from 414 Daylily Drive Langhorne, PA 19047. The mail is to Agnes Levin[.]
>
> X2: A gallon size plastic bag with marijuana residue in it. The plastic bag had the name of "Purple" on there. Based on your affiant['s] training and experience, "Purple" is believed to be a specific brand of marijuana.
>
> While conducting a trash pull at 414 Daylily Drive Langhorne, PA [19047], your affiant[s] also observed a red Ford Mustang parked in the driveway. The tag on the vehicle is (HNB-0016). This is the same vehicle that Jason Bee was stopped in by Corporal Cowden.
>
> The marijuana [was] field tested using the Narco field test kit and a positive result for marijuana was attained. Furthermore, the marijuana was sent to the Bucks County Crime Laboratory.

> A criminal history was completed on [Bee]. The criminal history revealed that Bee was arrested for the following drug offenses.
>
> On 9/11/1991[,] Bee was arrested by Philadelphia Police Department for possession of controlled substance. Bee was placed in Accelerated Rehabilitation Program.
>
> On 7/2/1992[,] Bee was arrested by Philadelphia Police Department for possession of controlled substance. Bee pled guilty.
>
> On 11/9/1993[,] Bee was arrested by Philadelphia Police Department for possession of controlled substance. Bee was found guilty.
>
> On 6/28/1994[,] Bee was arrested by the Wildwood Police Department for possession of marijuana and use of drug paraphernalia. Bee pled guilty to possession of marijuana.
>
> On 12/7/1994[,] Bee was arrested by the North Wildwood Police Department for distribution of heroin/cocaine, manufacture/distribute controlled substances, possession of controlled substances, possession of marijuana, and use of drug paraphernalia. Bee was found guilty of manufacture/deliver controlled substances.
>
> On 5/11/2008[,] Bee was arrested by the Lower Southampton Police Department for possession of marijuana and use of drug paraphernalia. Bee pled guilty to possession of marijuana.
>
> The trash pull mentioned above gives credibility to [the] witness and[,] furthermore[,] it freshens the complainant's information to as recently as today. This proves that criminal activity is ongoing and evidence of this will be recovered.
>
> The facts[,] when considered in their totality, establish probable cause to believe that 414 Daylily Drive Langhorne PA, 19047 contains evidence of violations of Title 35 including[,] but not limited to[,] marijuana and marijuana paraphernalia, evidence of use and distribution of marijuana and other controlled substances, and evidence of any proceeds (cash or material) from the use and distribution of marijuana.

***6** Affidavit of Probable Cause, 5/13/15, at 2-4 (unnumbered).

Here, the Affidavit of probable cause explained the manner in which the police became aware of Bee's drug activity. It described the timing of the police's investigation and the steps taken by the police officers to corroborate and verify the tip they received. Further, the substance in the trash was found to be marijuana. Thus, the totality of the circumstances was sufficient to demonstrate a fair probability that contraband would be found on the premises. Moreover, Bee did not demonstrate that the averments contained in the Affidavit were false or were made with reckless disregard for the truth. ***See James***, 69 A.3d 188 (stating, "the defendant must allege deliberate falsehood or reckless disregard for the truth, accompanied by an offer of proof.") (citation omitted). Thus, the trial court properly denied Bee's Motion to Suppress, and his first claim is without merit.

In his second claim, Bee argues that, pursuant to Pa.R.E. 702, the Commonwealth must show that the field test kit satisfied the standards set forth in ***Frye***, ***supra***, to establish the requisite probable cause for the issuance of the search warrant. ***See*** Brief for Appellant at 40-42. Bee contends that the D-L Reagent "continually renders false positives for marijuana when tested on substances such as caffeine (coffee, tea), lavender, oregano, tobacco, nut meg, sucrets (cough suppressants), and numerous kinds of vegetable matter[.]" ***Id.*** at 41. Bee further claims that the testing could not have indicated the presence of marijuana in an empty freezer bag found in his trash. ***See id.*** at 40, 42. Bee asserts that because the D-L Reagent test is flawed, the police lacked probable cause for the search warrant. ***Id.*** at 42. [8]

8 We note that Bee's has not cited to relevant authority to support his suppression claim that the field test kit was unreliable and could not have been used to support probable cause. ***See*** Pa.R.A.P. 2119(a) (declaring that the rules require an appellant to provide in the argument section of his or her brief "such discussion and citation of authorities as are deemed pertinent."). Indeed, Pa.R.E. 702 pertains to expert witnesses and the admissibility of expert testimony at **trial**. ***See*** Pa.R.E. 702. Similarly, Frye pertains to the admissibility of expert evidence or scientific evidence at **trial**. ***See Frye***, 293 F. at 1014. While this Court will not develop Bee's argument or act as his appellate counsel, ***see Commonwealth v. Tchirkow***, 160 A.3d 798, 804 (Pa. Super. 2017), we will briefly address Bee's second claim.

Here, Bee has made no showing, other than bald assertions, that the field test was inaccurate or unreliable. ***See*** Trial Court Opinion, 4/11/18, at 4 (noting that Bee "did not introduce any evidence to support his claim that the test used by the police in this case was inaccurate."); ***id.*** at 4-5 (stating that the only evidence Bee introduced were "two articles of unknown origin and authorship," that were not properly authenticated or established the unreliability of the "Nacro field test kit" used in this case). Further, Bee does not show that the averments regarding the field test kit contained in the Affidavit were false or were made with reckless disregard for the truth. ***See James, supra***. To the extent, Bee argues that the field test kit was inadmissible, we note that probable cause may be supported by inadmissible evidence. ***See Commonwealth v. Weaver***, 76 A.3d 562, 567-68 (Pa. Super. 2013), ***aff'd***, 105 A.3d 656 (Pa. 2014) (holding that probable cause to arrest can be supported by the existence of evidence that is inadmissible at trial). Thus, Bee's second claim does not entitle him to relief.

***7** In Bee's third claim, he challenges the court's discretion concerning the appointment of counsel. ***See*** Brief for Appellant at 43-47. Bee argues that, pursuant to Pa.R.Crim.P. 121(D), the trial court was compelled to appoint him standby counsel. ***See id.*** at 43, 45, 46. Bee claims that the trial court did not advise him of the Standards of Conduct required of a *pro se* defendant. ***See id.*** at 44-45.

> A criminal defendant has a constitutional right, necessarily implied under the Sixth Amendment of the U.S. Constitution, to self-representation at trial. However, before a defendant will be permitted to proceed *pro se*, he or she must knowingly, voluntarily, and intelligently waive the right to counsel. To ensure that a waiver is knowing, voluntary, and intelligent, the trial court must conduct a "probing colloquy," which is a searching and formal inquiry as to whether the defendant is aware both of the right to counsel and of the significance and consequences of waiving that right.

***Commonwealth v. Spotz***, 18 A.3d 244, 263 (Pa. 2011) (citations omitted).

Further, "[w]hen the defendant's waiver of counsel is accepted, standby counsel *may* be appointed for the defendant. Standby counsel shall attend the proceedings and shall be available to the defendant for consultation and advice." Pa.R.Crim.P. 121(D) (emphasis added); ***see also Commonwealth v. Spotz***, 47 A.3d 63, 82 (Pa. 2012) (stating that "neither the United States Supreme Court nor our Rules of Criminal Procedure mandate the appointment of standby counsel[.]"). While "Rule 121 suggests the advisability of appointing standby counsel... especially in long or complicated cases," the trial court is not required to do so. ***Spotz***, 47 A.3d 63 at 82.

On September 9, 2015, the trial court judge and Bee engaged in the following dialogue:

> THE COURT: All right. You want to represent yourself?
>
> [Bee]: Absolutely.
>
> THE COURT: And you understand that having a lawyer appointed, that lawyer would be able to make legal arguments on your behalf?
>
> [Bee]: I already filed motions. I already did that all myself.
>
> THE COURT: All right. Well, there's certain requirements that we need to cover. You're not a lawyer. You're not trained in the law. And what we –
>
> [Bee]: I know the law enough that I filed motions –
>
> THE COURT: Can I finish, please?
>
> [Bee]: Okay.
>
> THE COURT: The lawyer that would be appointed to you would be a lawyer from our conflict list that would have experience in criminal defense, who would be a skilled advocate, who would be able to make legal arguments and cross-examine on your behalf. Those are qualities or skills or training that you don't have. And if you represent yourself, you're going to have to conduct a trial the same as a lawyer would. In other words, the judge is not going to take into consideration necessarily that you're not a lawyer. You'll have to play by the same rules.
>
> [Bee]: I understand.

THE COURT: We have Rules of Criminal Procedures and Rules of Evidence, and you'll be held to the same standard as a lawyer would in asking questions and making legal arguments. Do you understand that?

[Bee]: Yes. Absolutely.

THE COURT: And you understand that we're willing to appoint a lawyer off the conflict list for you free of charge; it won't cost you anything?

[Bee]: Judge, you appointed Ellissa Heinrichs to my –

THE COURT: I just want to know if that's –

[Bee]: No. No. No, it's not acceptable. I want to represent myself.

***8** N.T., 9/9/15, at 8-10.

On October 27, 2015, the trial court appointed a public defender to represent Bee. N.T., 10/27/15, at 17. However, Bee rejected the public defender's representation and adamantly opposed the aid of the public defender's office. ***Id.*** at 18. At the hearing, the court explained to Bee the charges that were being brought against him as well as the period of time Bee could be imprisoned if found guilty of those charges. ***Id.*** at 18-25. Bee indicated that he understood the nature of the proceedings, and that he was able and willing to conduct his own defense. ***Id.*** at 25-30.

In light of this testimony, the trial court addressed Bee's third claim as follows:

> In the instant case the [c]ourt made counsel available to [Bee] on at least two separate occasions. [Bee] spoke to at least four different attorneys. [Bee] chose, however, to proceed *pro se*. That choice was knowing and voluntary and was based on his unalterable belief that only he could properly present his defense. The trial was short and uncomplicated. [Bee] demonstrated his understanding of the issues and the consequences of waiving his right to counsel. Under these circumstances[,] there was no reason to appoint standby counsel.

Trial Court Opinion, 4/11/18, at 12 (footnotes omitted). Considering the above, we discern no error by the trial court in its decision not to appoint standby counsel. ***See id.*** Thus, Bee's third claim is without merit.

In his fourth claim, Bee avers that the court erred by not ordering a competency evaluation pursuant to ***Edwards***, ***supra***, because he suffers from a variety of mental disorders. ***See*** Brief for Appellant at 47-48, 49. Bee argues that he was denied a fair trial, and he seeks a new trial. ***See id.*** at 49-50.

In ***Edwards***, the United States Supreme Court recognized that, when a defendant is not mentally competent to conduct his or her own defense, the United States Constitution permits the judge to require the defendant to be represented by counsel. ***Edwards***, 553 U.S. at 556; ***see also*** Pa.R.Crim.P. 121, cmt. In order to prove that a defendant is not competent to waive his right to counsel, a defendant must establish that he was either unable to understand the nature of the proceedings against him or to participate in his own defense. ***Commonwealth v. Starr***, 664 A.2d 1326, 1339-40 (Pa. 1995). A defendant is presumed competent and bears the burden of establishing that he was unable to understand the nature of the proceedings. ***Commonwealth v. Mason***, 130 A.3d 601, 655 n.62 (Pa. 2015); ***Spotz***, 47 A.3d at 79. "Further, an evaluation of a criminal defendant's technical legal knowledge and courtroom skill is not relevant to an assessment of his knowing and intelligent exercise of the right to defend himself." ***Starr***, 664 A.2d at 1337 (citation omitted).

Here, the court and Bee engaged in the following dialogue:

THE COURT: Do you suffer from any mental health issues that might affect your ability to understand what is being said to you?

[Bee]: No.

THE COURT: Do you suffer from any mental health issues that might affect your ability to communicate with the jury?

***9** [Bee]: No.

THE COURT: Do you suffer from any mental health issues that might interfere with your ability to make judgments and decisions?

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

[Bee]: No.

N.T., 10/27/15, at 28.

The trial court addressed Bee's fourth claim as follows:

> [Bee's] belated averments of mental deficiency are belied by the record. [Bee] was given a full colloquy with regard to his decision to waive his right to counsel on at least two occasions. This [c]ourt specifically inquired as to any potential health issues before accepting [Bee's] waiver of counsel.
>
> * * *
>
> Given these statements, made under oath, and the fact that [Bee] failed by word or deed to indicate that he did not understand the proceedings or the significance of his decision to proceed *pro se*, his unsubstantiated claim of mental incompetence is insufficient to support a claim for relief.

Trial Court Opinion, 4/11/18, at 13 (footnote omitted). Considering the above, we discern no error in the trial court's decision to accept Bee's request to proceed *pro se*. ***See id.*** Thus, Bee's fourth claim is without merit.

In Bee's fifth claim, he argues that the evidence presented at trial was insufficient to support the conviction of possession of cocaine. ***See*** Brief for Appellant at 50. Bee claims that the Commonwealth did not present any evidence to establish that the glass pipes found in his bedroom contained cocaine. ***See id.*** at 51. Bee asserts that the residue amount of cocaine found on his digital scale was insufficient to support the conviction. ***See id.*** at 52.

We apply the following standard of review when considering a challenge to the sufficiency of the evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Melvin***, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

The Controlled Substance, Drug, Device and Cosmetic Act provides as follows, in relevant part:

> (a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:
>
> ***10** * * *
>
> (16) Knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except as otherwise authorized by this act.

35 P.S. § 780-113(a)(16).

As this matter involves the interpretation of a statutory provision, we are guided by the principles set forth in the Statutory Construction Act (the "Act"). ***See*** 1 Pa.C.S.A. § 1501 *et seq*. Section 1921 of the Act specifies that the object

of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. ***See id.*** § 1921. However, statutory interpretation is not without its limits.

The plain language of the statute is the clearest indication of legislative intent, and when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. ***See id.*** § 1921(b). "It is only when the words of the statute are not explicit on the point at issue that resort to statutory construction is appropriate." ***Commonwealth v. Dellisanti***, 876 A.2d 366, 369 (Pa. 2005) (citation omitted).

When construing statutory language, "words and phrases shall be construed according to rules of grammar and according to their common and approved usage...." 1 Pa.C.S.A. § 1903. A statute must "be construed, if possible, to give effect to all its provisions," so that no provision is rendered mere surplusage. ***Id.*** § 1921(a). When two such "statutes or parts of statutes... relate to the same persons or things or to the same class of persons or things," they are *in pari materia* and must be construed together as a single provision. ***Id.*** § 1932(a). "Where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded." ***Commonwealth v. Johnson***, 125 A.3d 822, 831 (Pa. Super. 2015) (citations omitted).

We glean from a plain reading of 35 P.S. § 780-113(a)(16) that it does not require the possession of a specific amount of cocaine in order to sustain a conviction. A plain reading of the provision indicates that our General Assembly has banned the act of knowingly or intentionally possessing cocaine, in any amount. Without the inclusion of a numerical value that indicates the minimum amount of cocaine required to sustain a conviction for its possession under 35 P.S. § 780-113(a)(16), it is not in the province of this Court to read into the statute such a numerical value absent ambiguity or a legislative void. No such ambiguity or void exists here. Thus, we find that the text of 35 P.S. § 780-113(a)(16) indicates the legislature's intent to prohibit the possession of **any** amount of cocaine.

This finding of the General Assembly's intent with regard to the plain language of 35 P.S. § 780-113(a)(16) is consistent with the express statutory language of other prohibitive provisions under 35 P.S. § 780-101 *et seq.* For example, in prohibiting the possession of marijuana, the General Assembly delineated tiers of culpability based on the amount of marijuana possessed by an offender.[9] Plainly, the General Assembly's intent in delineating such tiers was to punish offenders according to the amount of marijuana the offender *de facto* possessed. ***See*** 35 P.S. § 780-113(a)(31). Pointedly, the General Assembly *did not* include such a tiered system for the possession of cocaine. ***See Johnson***, 125 A.3d at 831 (stating, "where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent."). Indeed, if the General Assembly wished to criminalize the possession of a "usable," "weighable," or specific amount of cocaine, it would have done so. Thus, constrained by our rules of statutory construction, we find that a residue amount of cocaine is sufficient to sustain a conviction under 35 P.S. § 780-113(a)(16). ***See Commonwealth v. Williams***, 565 A.2d 160, 169 (Pa. Super. 1989) (holding "the Controlled Substance, Drug, Device and Cosmetic Act does not designate the minimum amount of a controlled substance which must be [possessed] to constitute grounds for criminal liability[.]").

9 The amount of marijuana is weighed in grams.

***11** Here, Bee testified that all of the physical evidence seized from his bedroom at 414 Daylily Drive was his. N.T., 11/10/15, at 15. Officer Gansky of the Bensalem Police Department testified that police found eight glass tubes that were used to smoke crack cocaine in Bee's bedroom. N.T., 11/9/15, at 107-08. Two of the pipes appeared to have been used. ***Id.*** Officer Gansky further testified that a digital scale was found in Bee's bedroom. ***Id.*** at 109. Joshua Folger of the Bucks County Crime Lab testified that the lab tested the residue found on the digital scale and determined that a residue amount of cocaine was present. ***Id.*** at 161. Bee's admission that he possessed all of the items seized in his bedroom, coupled with the testimony from Joshua Folger that cocaine residue was present on the digital scale found in his bedroom, is sufficient to sustain Bee's conviction for possession of cocaine. ***See Commonwealth v. Harvard***, 64 A.3d 690, 699 (Pa. Super. 2013) (stating that "[a]n intent to maintain a conscious dominion may be inferred from the totality of the circumstances, and circumstantial evidence may be used to establish a defendant's possession of drugs or contraband.") (citation omitted). Thus, Bee's fifth claim is without merit.

In his sixth claim, Bee challenges the discretionary aspects of his sentence. Supplemental Brief for Appellant at 11-15.

"Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." ***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether the appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).
>
> * * *
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

***Moury***, 992 A.2d at 170 (quotation marks and some citations omitted).

Here, Bee filed a timely Notice of appeal, preserved his sentencing claims in Post-Sentence Motions, and included a Rule 2119(f) Statement in his brief. Further, Bee's claim that the trial court miscalculated his prior record score [10] by omitting an out-of-state felony conviction raises a substantial question. ***See Commonwealth v. Janda***, 14 A.3d 147, 165 (Pa. Super. 2011) (holding that "improper calculation of a prior record score based on out-of-state offenses raises a substantial question."). Thus, we will review Bee's sentencing claims.

10 Bee uses offense gravity score and prior record score interchangeably throughout his brief. Nevertheless, upon review, Bee is raising a claim regarding the alleged miscalculation of his prior record score. Moreover, Bee has not demonstrated that his offense gravity score for any of the convictions was incorrect.

Our standard of review is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Mastromarino***, 2 A.3d 581, 589 (Pa. Super. 2010) (citation omitted).

Bee contends that the trial court abused its discretion in imposing the excessive sentence where the prior record score considered a prior conviction of distribution of heroin/cocaine and did not reflect a prior conviction of intent to distribute less than 50 grams of marijuana. Supplemental Brief for Appellant at 16-17, 21-22. Bee also argues that the sentence did not reflect his lack of serious criminal history, the severity of the crimes, the need to protect the public, his education and work history, and his lack of violent behavior. ***Id.*** at 21

***12** Our review of the record discloses that Bee's prior record score properly reflected Bee's criminal history. ***See*** Trial Court Opinion, 4/11/18, at 19 (stating that "[Bee] has continued to engage in misdemeanor and felony drug offenses over the span of more than twenty years despite the repeated intervention of the criminal justice system[;] sentences within the standard range of the sentencing guidelines cannot be deemed clearly unreasonable."); ***see also*** N.T., 3/3/16, at 5-10 (wherein the trial court reviews Bee's prior criminal history, including his out-of-state conviction); ***id.*** at 39. In fact, Bee's previous convictions for Driving Under the Influence (three times) and various other misdemeanors gave Bee a maximum prior record score of "5." ***See*** 204 Pa. Code § 303.4(a)(3).

Moreover, the trial court considered Bee's pre-sentence investigation report in imposing the sentence. N.T., 3/3/16, at 3-10, 13-14, 15-16; ***see also Commonwealth v. Downing***, 990 A.2d 788, 794 (Pa. Super. 2010) (stating that "where the


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed.") (citation omitted). The trial court also considered the gravity of the offense in relation to the impact on the community, as well as Bee's rehabilitative potential. N.T., 3/3/16, at 16-25, 43-44; ***see also Commonwealth v. Griffin***, 804 A.2d 1, 10 (Pa. Super. 2002) (stating that, in sentencing, the trial court "is required to consider the particular circumstances of the offense and the character of the defendant. In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics, and his potential for rehabilitation.") (citation omitted); ***id.*** (noting that our law requires a sentencing court "to consider the prior criminal record to ascertain a defendant's amenability to rehabilitation[.]").

Additionally, the trial court took into account Bee's recent attainment of a degree from the Community College of Philadelphia, Bee's own testimony, and the testimony of Bee's mother. N.T., 3/3/16, at 15-20, 26-32, 34, 38, 44. The trial court also had discretion in imposing the sentences consecutively. ***See Moury***, 992 A.2d at 171 (holding that the trial court "has discretion to impose sentences consecutively or concurrently[.]"). Thus, we discern no abuse of discretion, and cannot grant Bee relief on his sentencing claims. ***See Commonwealth v. Andrews***, 720 A.2d 764, 768 (Pa. Super. 1998) (rejecting defendant's argument that the sentencing was focused on his prior criminal history in imposing the sentence, as a review of the record demonstrated that the court took a number of factors into consideration).

In light of the foregoing, Bee's claims are without merit.

Judgment of sentence affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2018 WL 3980125

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 5

2023 WL 11884784
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Robert HANDY, Plaintiff,
v.
DELAWARE RIVER SURGICAL SUITES, LLC d/b/a Bucks County Surgical Suites, et al., Defendants.

CIVIL ACTION No. 2:19-cv-1028-JHS
|
Signed January 19, 2023

**Attorneys and Law Firms**

Edward T. Kang, Beth A. Hurley, Kandis L. Kovalsky, Kyle Garabedian, Kang Haggerty LLC, Philadelphia, PA, for Plaintiff.

Gabriel Montemuro, Patricia Collins, William T. MacMinn, Antheil Maslow & MacMinn, LLP, Doylestown, PA, Samuel W. Cortes, Fox Rothschild LLP, Exton, PA, for Defendant Delaware River Surgical Suites, LLC.

Gabriel Montemuro, Patricia Collins, William T. MacMinn, Antheil Maslow & MacMinn, LLP, Doylestown, PA, for Defendants Kieran D. Cody, Charles B. Burrows, Ninad D. Sthalekar, Thomas H. Vikoren, Sean Butler, Jung Park, Douglas A. Boylan.

Alicia S. Luke, Ashley L. Beach, Samuel W. Cortes, Fox Rothschild LLP, Exton, PA, Lindsey Cook, Fox Rothschild LLP, Blue Bell, PA, for Defendant Thomas E. Mackell, M.D., Ltd.

**REPORT AND RECOMMENDATION OF SPECIAL MASTER JAMES J. ROHN, ESQ.**

JOEL H. SLOMSKY, DISTRICT JUDGE

## I. INTRODUCTION

***1** Plaintiff Dr. Robert Handy initiated this action against Defendants Delaware River Surgical Suites, LLC d/b/a Bucks County Surgical Suites ("the Surgical Center"); Kieran Cody, M.D., Charles B. Burrows, M.D., Ninad Sthalekar, M.D., Thomas H. Vikoren, M.D., Sean Butler, D.O., Jung Park, M.D., Douglas A. Boylan, M.D. (the "Individual Defendants"); and Thomas E. Mackell, M.D., Ltd. d/b/a Bucks County Orthopedic Specialists ("BCOS"). BCOS previously moved to dismiss the claims against it. The Special Master recommended that the Court deny BCOS's Motion to Dismiss. (Doc. # 245.) The Court overruled BCOS's objections and adopted the Special Master's Report and Recommendation denying the Motion to Dismiss. (Doc. # 250.) The Court also denied BCOS's Motion for Reconsideration of the Court's decision to deny BCOS's Motion to Dismiss. (Doc. # 262.)

After the Court denied its Motion to Dismiss, BCOS answered Dr. Handy's Complaint and asserted five Counterclaims against him. (Doc. # 255.) Now before the Special Master is Dr. Handy's Motion to Dismiss BCOS's Counterclaims I, II, and V.[1] Broadly, Dr. Handy argues that BCOS's Counterclaims fail to state claims for breach of contract and specific performance under the language of the relevant contracts and under the judicial privilege. BCOS responds that its Counterclaims meet the plausibility standard and that the judicial privilege does not bar its claims.

1 Dr. Handy did not move to dismiss Counterclaims III and IV, which allege breach of the Shareholders' Agreement and specific performance related to Dr. Handy's refusal to offer to sell his shares in BCOS.

For the reasons set forth below, the Special Master recommends that Dr. Handy's Motion to Dismiss BCOS's Counterclaims be granted in part and denied in part as follows:

1) In Counterclaim I, BCOS alleges a breach of contract (the Employment Agreement) on two theories: (a) Dr. Handy's continued possession of certain documents breaches his contractual obligation to return the documents to BCOS and (b) Dr. Handy's prior use of certain documents breached his contractual loyalty obligations. As to Counterclaim I, Dr. Handy's Motion to Dismiss is **GRANTED** in part to the extent that Counterclaim I asserts a claim related to Dr. Handy's prior use of documents because such a claim is barred by the judicial privilege. Dr. Handy's Motion to Dismiss is **DENIED** in part to the extent that Counterclaim I asserts a claim related to Dr. Handy's ongoing possession of documents.

2) As to Counterclaim II, Dr. Handy's Motion is **GRANTED**.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

3) As to Counterclaim V, Dr. Handy's Motion is **GRANTED** in part and **DENIED** in part to the same extent as Counterclaim I.

## II. FACTS AND PROCEDURAL HISTORY

The Special Master and the Court have set forth the background in many previous Reports and Recommendations and Opinions. The facts and history discussed here are limited to the newly-asserted Counterclaims and the pending Motion to Dismiss Counterclaims.

BCOS's Counterclaims relate to two contracts between BCOS and Dr. Handy. BCOS alleges that, as a shareholder employee at the time, Dr. Handy is subject to an employment agreement entered into between BCOS and all shareholder employees on or about July 1, 2017 (the “Employment Agreement”).[2] (Doc. # 255, BCOS's Counterclaims ¶ 121; Doc. #255-1, Counterclaim Exhibit 2.) BCOS also alleges that Dr. Handy is a party to BCOS's Second Amended and Restated Shareholder's Agreement (the “Shareholders' Agreement”). (Doc. # 255, BCOS's Counterclaims ¶ 141; Doc. # 255-1, Counterclaim Exhibit 13.)

2 Dr. Handy disputes which employment agreement governs the terms of his employment. On this Motion to Dismiss, however, we must accept as true that that the July 1, 2017 Employment Agreement applies.

***2** BCOS asserts five counterclaims against Dr. Handy, but only three are subject to Dr. Handy's Motion to Dismiss Counterclaims: Counterclaims I, II, and V. Counterclaim I alleges Breach of Contract for a Breach of the Employment Agreement. BCOS contends that Dr. Handy breached (1) an obligation to return certain documents to BCOS after his termination and (2) a loyalty obligation by using documents in litigation and sharing them with his personal counsel. (Doc. # 255, BCOS's Counterclaims ¶¶ 197-199.) In Counterclaim II, alleging breach of the Shareholder's Agreement, BCOS asserts that Dr. Handy breached his obligations “to put BCOS's interests ahead of his own” and his duty of loyalty to BCOS. *Id.* ¶¶ 203-204. Counterclaim V seeks specific performance under the Employment Agreement; specifically, it requests that Dr. Handy return certain documents to BCOS. *Id.* ¶ 228.

Dr. Handy moved to dismiss Counterclaims I, II, and V, and BCOS opposed the Motion. The Court referred the Motion to Dismiss Counterclaims to the Special Master for Report and Recommendation.[3] (Doc. # 274.) In addition to consideration of the parties' briefs, the Special Master held oral argument on this Motion, along with other pending motions, on December 20, 2022.

3 On September 30, 2022, the Court referred this Motion and related filings to the Special Master for Report and Recommendation, along with other pending motions. (Doc. # 274.) Specific to this Motion, the Court referred the following filings to the Special Master: Dr. Handy's Motion to Dismiss Counterclaims (Doc. # 259), BCOS's Response in Opposition to Dr. Handy's Motion to Dismiss Counterclaims (Doc. # 260), and Dr. Handy's Reply to BCOS's Response (Doc. # 261). The Special Master has reviewed and considered all of these filings.

## III. STANDARD OF REVIEW

Like a motion to dismiss a complaint, a motion to dismiss counterclaims under Fed. R. Civ. P. 12(b)(6) is evaluated under the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). “To survive dismissal, ‘a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.’ ” *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). “Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true.” *Twombly*, 550 U.S. at 545. However, “the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.” *Iqbal*, 556 U.S. at 678.

The Third Circuit applies a three-part analysis when evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss: “First, the court must ‘tak[e] note of the elements a plaintiff must plead to state a claim.’ Second, the court should identify allegations that, ‘because they are no more than conclusions, are not entitled to the assumption of truth.’ Finally, ‘where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.’ ” *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679). “The ‘plausibility’ determination is a ‘context-specific task that requires the reviewing court to draw on its judicial experience and common sense.’ ” *Arcuri*

*v. Cty. of Montgomery*, No. CV 20-5408, 2021 WL 1811576, at *5–6 (E.D. Pa. May 6, 2021) (citing *Iqbal*, 556 U.S. at 679).

## IV. THE SPECIAL MASTER'S ANALYSIS

Whether BCOS's Counterclaims survive Dr. Handy's Motion to Dismiss depends on whether Dr. Handy can be liable for (A) possessing certain documents in violation of the Employment Agreement or (B) using certain documents in violation of either the Employment Agreement or Shareholders' Agreement.

### A. Possession of Documents Under the Employment Agreement

***3** BCOS alleges that Dr. Handy breached Section 8(a) of his Employment Agreement by failing to return the disputed documents following his termination. (Doc. # 255, Counterclaim ¶ 150.) Section 8(a) provides:

> 8. **Proprietary and Confidential Information.**
>
> (a) **Proprietary Information.** All Records, books of account, patient lists employment and procedural manuals, financial and corporate documents and any and all copies hereof (including, without limitation, photocopies, tapes and computerized databases containing such information) (collectively, the ***"Proprietary Information"***) are proprietary and confidential, shall remain the property of Corporation, in its sole custody, and shall be returned to or retained by Corporation upon and following termination of Physician's employment by Corporation.

The documents that BCOS contends Dr. Handy must return "include, without limitation, privileged and confidential communications" among key BCOS representatives and legal counsel listed in Counterclaim Exhibit 16. (Doc. # 255, BCOS Counterclaim ¶ 150.) BCOS notes that Judge Slomsky concluded that "BCOS's current management holds the attorney-client privilege, and Plaintiff may not access BCOS's attorney-client privileged documents or communications." *Id.* ¶ 176 (citing Doc. # 124, Order dated 3/24/2020.) BCOS alleges that Dr. Handy was terminated on May 7, 2019 and that he has refused to return BCOS's Proprietary Information. *Id.* ¶¶ 145, 149-151, 189, 197.

Dr. Handy argues that BCOS fails to allege a plausible claim for breach of the Employment Agreement by his continued possession of the documents because the documents that he has retained are not Proprietary Information under the Employment Agreement. (Doc. # 259-2, Handy Mem. at 8-9.) BCOS responds that, under the definition of "Proprietary Information," the subject documents are "Records" (as defined by another section of the Employment Agreement) and "corporate documents" (undefined in the Employment Agreement). (Doc. # 255, BCOS Counterclaim ¶¶ 123-24, 151.)

#### 1. Records

The term "Records," which is included in Section 8(a)'s description of Proprietary Information, is defined in Section 2(f) of the Employment Agreement. Section 2(f) addresses employee physicians' responsibilities:

> 2. **Responsibilities of Physician.** Physician shall diligently devote his full business and professional time and best efforts and attention to the performance of his responsibilities under this Agreement .... Without limiting the generality of the foregoing, Physician shall throughout the term hereof:
>
> ...
>
> **(f) Records.** Prepare and maintain (or cause to be prepared and maintained, as appropriate) on a timely, accurate and complete basis all reports, records, histories, claims and correspondence necessary or appropriate in connection with rendering professional services (collectively, ***"Records"),*** all of which Records shall belong solely to Corporation and remain in its exclusive custody, except as otherwise set forth in Section 7 and Section 8 hereinafter.

BCOS alleges that the documents at issue are Records in a conclusory allegation in its Counterclaim. BCOS Counterclaim ¶ 151; *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). BCOS's Opposition to the Motion to Dismiss Counterclaims reiterates this interpretative position without further elaboration or support. (Doc. # 260, BCOS Opp. Mem. at 5.) Dr. Handy responds that the plain meaning of Section 2(f) concerns documents related to the employee physician rendering professional services as a doctor. (Doc. # 259-2, Handy Mem. at 5.)

***4** The Employment Agreement defines Records as those "necessary or appropriate in connection with rendering

professional services." (Doc. # 255-1, Counterclaim Ex. 2, Employment Agreement § 2(f).) The employment contemplated is "to render services as an orthopedic surgeon." *Id.* § 1. "Records" is defined alongside provisions addressing licensure, privileges, and board certifications, among others. *Id.* § 2(c), (i), (j). Thus, the term Records refers to documents related to an employee-physician's provision of medical services.

In contrast, the documents that BCOS alleges that Dr. Handy possesses in violation of the Employment Agreement are emails among BCOS shareholders, key personnel, and BCOS's legal counsel. (Doc. # 255, Counterclaim ¶ 150, Ex. 16.) The subjects of the emails are contracts among employees and shareholders, and the legal advice of counsel. *Id.* These documents are unrelated to the performance of services as orthopedic surgeons. Thus, the documents that BCOS alleges Dr. Handy possesses in breach of the Employment Agreement are not "Records" under Section 8(a) of the Employment Agreement.

### 2. Corporate documents

BCOS also asserts that the subject documents are "corporate documents" under Section 8(a) of the Employment Agreement. "Corporate documents" is not otherwise defined by the Employment Agreement. BCOS offered no definition of "corporate documents." Rather, its Opposition referred to its allegation that the subject documents are "privileged and confidential communications by, between, and/or among BCOS, its shareholders, Chief Executive Officer, certain other BCOS employees, and BCOS's legal counsel." (Doc. # 260, BCOS Opp. Mem. at 4-5 (citing BCOS Counterclaim ¶ 150)). At oral argument, counsel for BCOS argued that a definition would require a factual inquiry inappropriate on a motion to dismiss. (Oral Argument Transcript, at 17-19.) BCOS's position is essentially an unbounded and broad conception of the term "corporate documents."

In contrast, Dr. Handy attempts to narrowly define the term by reference to statutes that require corporations to keep certain "corporate records," such as "complete and accurate books and records of account, minutes of the proceedings of the incorporators, shareholders and directors and a share register."[4] (Doc. # 261, Handy Reply Mem. at 3 (citing 15 Pa. C.S. § 1508(a)).) Dr. Handy argues that the documents referenced in the Counterclaims "largely pertain to Shareholder employment agreements, not any of the specifically enumerated categories identified in Section 8 of the Employment Agreement." (Doc. # 259-2, Handy Mem. at 9.)

4 Dr. Handy also contends that his shareholder status and the fact that some documents were sent to his personal email address before his termination is a basis to grant the Motion. However, nothing in the Employment Agreement nullifies the obligation to return the documents upon termination based upon the manner in which the documents were provided.

Neither party's argument regarding the scope of "corporate documents" is on solid ground at this stage. BCOS has not described any principle that limits the term to anything other than every document that BCOS may have possessed. If that was the intent of Section 8(a), "proprietary" would have no meaning as all information provided to BCOS employees would be subject to the return obligation. And while Dr. Handy's attempts to tether "corporate documents" to the statutory list of "corporate records," the connection is not complete because "Propriety Information" under Section 8(a) of the Employment Agreement is more expansive than the corporate records statute. *Compare* 15 Pa. C.S. § 1508 (required records are "books and records of account, minutes of the proceedings of the incorporators, shareholders and directors and a share register") *with* Doc. # 255-1, Counterclaim Ex. 2, Employment Agreement § 8(a) ("Records, books of account, patient lists, employment and procedural manuals, financial and corporate documents ..."). Further, Dr. Handy's reference to the surrounding terms also does not define the "corporate documents" because those terms span most aspects of the company's operation – professional services, financial information, and employment information. *See* Doc. # 255-1, Counterclaim Ex. 2, Employment Agreement § 8(a).

***5** Although both parties answered that "corporate documents" was an unambiguous term when asked at oral argument (Oral Argument Tr. at 33-34), the substance of their arguments demonstrate that the undefined term is actually ambiguous. "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 910 (Pa. 2019). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* Here, "corporate documents" is reasonably susceptible to both a broader and narrower interpretation; thus, it is ambiguous. Because "corporate documents" is

ambiguous, the Special Master recommends denying the Motion to Dismiss Counterclaims to the extent that BCOS may prove that Dr. Handy posseses documents in breach of his obligations under the Employment Agreement. *First Liberty Corp. v. Selective Insurance Company of the Southeast*, No. CV 21-4471, 2022 WL 16696070, at *2 (E.D. Pa. Nov. 3, 2022) ("Because [the resolution of a contractual ambiguity] is assigned to the finder of fact, granting a motion to dismiss on claims arising from ambiguous contract provisions is inappropriate.") *see also IKB International S.A. v. Wilmington Trust. Co.*, 774 F. App'x 719, 724 (3d Cir. 2019) ("[A] motion to dismiss must be denied when the contract provisions at issue are ambiguous.") (quotations omitted).

* * *

For Counterclaim I's claim that Dr. Handy possesses Proprietary Information in breach of the Employment Agreement to survive a motion to dismiss, the documents allegedly kept must be either "Records" or "corporate documents." For the reasons discussed above, the allegations and the contract do not support a conclusion that the subject documents are "Records." The term "corporate documents," however, is ambiguous. Thus, Counterclaim I's possession claim survives the Motion to Dismiss to the extent that BCOS has alleged that Dr. Handy possesses "corporate documents" in breach of the Employment Agreement.

B. <u>Use of Documents Under the Loyalty Provisions of the Employment Agreement and Shareholders' Agreement</u>

BCOS asserts that Dr. Handy breached the loyalty provisions of the Employment Agreement and the Shareholders' Agreement by (a) reading certain documents into deposition records, (b) attempting to admit certain documents into evidence during a hearing, (c) attaching certain documents to a state court filing, and (d) sharing the documents with his personal legal counsel. (Doc. # 255, BCOS Counterclaim ¶¶ 199, 204.) The allegedly violated provisions provide:

**<u>Employment Agreement:</u>**

11. **<u>Loyalty</u>.** In consideration of Physician's employment hereunder, Physician represents and covenants as follows:

(a) **<u>Ownership, Custody and Control of Records</u>.** Physician acknowledges and agrees that any patients treated by him pursuant to the terms of this Agreement ***("Patients")*** shall be deemed patients of Corporation, and that all Patient data, charts and other Records, Proprietary Information and equipment shall, as between Physician and Corporation, be considered the property of Corporation and shall be and remain in the sole custody and control of Corporation. Furthermore, all accounts receivable, furniture, equipment, leasehold improvements, referring physician lists, patient lists, medical records, histories, charts and the like of patients treated or matters handled by the Physician hereunder shall at all times be considered by Physician and Corporation to be the property of Corporation, subject to rules and regulations regarding the practice of medicine. All remuneration earned by Physician during his employment from any medically related activities (including without limitation patient care, insurance or legal consultation, etc.) is considered to be income of Corporation, and Physician agrees to promptly turn over any such amounts(s) to Corporation.

**<u>Shareholder Agreement:</u>**

11. **<u>Relationship of the Shareholders and Corporation</u>.** Certain of the Shareholders may, by reason of serving on Corporation's Board of Directors or otherwise, owe a fiduciary duty to Corporation. It is the intention of the Shareholders and Corporation that all Shareholders be responsible to Corporation to the same extent. Therefore, the Shareholders agree that each owes a fiduciary duty to Corporation. Each Shareholder acknowledges that he understands the increased responsibility this relationship imposes and knowingly and freely accepts such responsibility. More specifically and without limiting the responsibility of a fiduciary obligation, the Shareholders acknowledge, that they owe Corporation:

***6** (a) a duty of loyalty,

(b) a duty to place Corporation's interest over their personal interest,

(c) a duty to present to Corporation's Board any business opportunity within the scope of Corporation's practice of which they become aware,

(d) a duty to disclose to Corporation's Board and to refrain from voting on issues which involve them in a conflict of interest, and

(e) a duty to hold confidential the private business affairs, patient lists and methods of operation of Corporation.

Dr. Handy argues that Counterclaims I and II should be dismissed because the loyalty provisions do not prohibit the alleged use and because the judicial privilege bars the claims.

### 1. Language of the Loyalty Provisions

Dr. Handy argues that the Employment Agreement's loyalty provision relates to patient records and that its purpose is to prevent employees from using the information gained to compete with the company. (Doc. # 259-2, Handy Mem. 11-13.) The Employment Agreement, however, applies to more than patient records and competitive information. As defined by the loyalty provision, BCOS's property includes "Proprietary Information and equipment." (Doc. # 255-1, Counterclaim Ex. 2, Employment Agreement § 11(a).) And Propriety Information is defined to include "corporate documents." *Id.* § 8. As discussed above, the term "corporate documents" is ambiguous. Thus, it would be inappropriate to grant the Motion to Dismiss Counterclaims on this basis where an ambiguous term is at issue. *See First Liberty Corp.*, No. CV 21-4471, 2022 WL 16696070, at *2.

The loyalty provision in the Shareholders' Agreement is broader than the Employment Agreement. It establishes a general fiduciary duty of shareholders to the corporation. (Doc. # 255-1, Counterclaim Exhibit 13, Shareholders' Agreement § 11.) Dr. Handy argues that the documents at issue "largely relate" to shareholders' employment agreements and that he is actually upholding his duties to the corporation through a derivative suit. (Doc. # 259-2, Handy Mem. 11-13.) BCOS argues that the documents are attorney-client privileged and Dr. Handy's unilateral attempt to force a waiver by using the documents is a breach of fiduciary duty. (Doc. # 260, BCOS Opp. Mem. 6-8.) Because this claim is bound up with many subsidiary factual issues that are disputed, including the duties owed by Dr. Handy to the corporation, Counterclaim II meets the plausibility standard.

### 2. Judicial Privilege

All of BCOS's allegations related to Dr. Handy's use of the documents are in the litigation context. *See* Doc. # 255, BCOS Counterclaim ¶¶ 199. Thus, Dr. Handy argues that the judicial privilege bars these claims, and BCOS contends that the judicial privilege does not apply.

In Pennsylvania, "It has long been established that statements contained in pleadings, as well as statements made in the actual trial or argument of a case, are privileged." *Post v. Mendel*, 507 A.2d 351, 353 (Pa. 1986). The judicial privilege "extends not only to communications made in open court, but also encompasses pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest." *Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. 1991).

***7** "The purpose for the privilege is to preserve the integrity of the judicial process by encouraging full and frank testimony." *Panitz v. Behrend*, 632 A.2d 562, 564 (Pa. Super. 1993). The judicial privilege "is absolute and cannot be destroyed by abuse." *Pawlowski v. Smorto*, 403 Pa. Super. 71, 81, 588 A.2d 36, 41 (1991). Thus, "it provides a complete defense to an otherwise plausible cause of action," even when a *per se* violation of state law is at issue. *Bronstein v. Bayview Loan Servicing, LLC*, No. CV 18-4223, 2020 WL 703652, at *7 (E.D. Pa. Feb. 11, 2020) (Slomsky, J.). The judicial privilege is, however, "composed only of those communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought.*" *Post*, 507 A.2d at 355/

Although the judicial privilege had its origin in defamation actions, "it has now been extended to include all tort actions based on statements made during judicial proceedings." *Panitz*, 632 A.2d at 564. "The form of the cause of action is not relevant to application of the privilege. Regardless of the tort contained in the complaint, if the communication was made in connection with a judicial proceeding and was material and relevant to it, the privilege applies." *Id.* (quoting *Clodgo by Clodgo v. Bowman*, 601 A.2d 342, 345 (Pa. Super 1992)). "The privilege is equally applicable where the cause of action is stated in terms of misrepresentation or a contractual requirement to exercise due care." *Id.*

Here, the judicial privilege applies to BCOS's claims. The allegations relate to core litigation functions "in the regular course of judicial proceedings" and are "pertinent and material to the redress or relief sought." *Post*, 507 A.2d at 355. Reading documents into a deposition record is part of "full and frank" testimony that the privilege is designed to protect. *See* Doc. # 255, BCOS Counterclaim ¶ 199(a). Attempting to admit evidence or attaching documents to pleadings is a communication with the court attempting to seek relief. *Id.* ¶

199(b), (c). Sharing documents with counsel is necessary to accomplish litigation tasks. *Id.* ¶ 199(d).

BCOS's attempts to avoid application of the judicial privilege cannot be distinguished in a principled way from the cases applying the privilege. BCOS argues that the privilege applies only to tort actions and not breach of contract. (Doc. # 260, BCOS Opp. Mem. at 8.) Although *Pantiz* does note the origin of the privilege in defamation and the extension to "all tort actions," this is based on the context of defamation as a tort; it does not limit the application in contract cases. *Panitz*, 632 A.2d at 564. The court also explicitly stated that "[t]he form of the cause of action is not relevant to application of the privilege." *Id.* And other cases conceptualize a complete application of the privilege to all causes of action. *Bronstein*, No. CV 18-4223, 2020 WL 703652, at *7 (Slomsky, J.) (noting that "it provides a complete defense to an otherwise plausible cause of action").

Thus, BCOS's Counterclaims I and II should be dismissed to the extent that they are based on Dr. Handy's use of the documents in connection with litigation.

* * *

In sum, BCOS's Counterclaims I and II plausibly state claims against Dr. Handy under the language of the loyalty provisions of the Employment Agreement and the Shareholders' Agreement for his alleged use of the documents. Nevertheless, those claims must be dismissed because they are barred by the judicial privilege.

C. Specific Performance

***8** BCOS's Counterclaim V alleges Specific Performance under the Employment Agreement. "Specific performance is an equitable remedy for breach of contract, not an independent cause of action[.]" *Nationwide Life Insurance Co. v. Franklin Mills Associates Limited Partnership*, No. CIV.A. 13-0038, 2014 WL 4722623, at *5 (E.D. Pa. Sept. 23, 2014). Thus, Counterclaim V can be construed as a request for equitable relief for the breach of contract alleged in Counterclaim I. *Id.* Accordingly, Count V survives the Motion to Dismiss Counterclaims only to the extent that Count I survives.

## V. RECOMMENDATION

For the reasons set forth above, the Special Master recommends that the Court grant in part and deny in part Dr. Handy's Motion to Dismiss Counterclaims as follows:

1) In Counterclaim I, BCOS alleges a breach of contract (the Employment Agreement) on two theories: (a) Dr. Handy's continued possession of certain documents breaches his contractual obligation to return the documents to BCOS and (b) Dr. Handy's prior use of certain documents breaches his contractual loyalty obligations. As to Counterclaim I, Dr. Handy's Motion to Dismiss is **GRANTED** in part to the extent that it asserts a claim related to Dr. Handy's prior use of documents because such a claim is barred by the judicial privilege. Dr. Handy's Motion to Dismiss is **DENIED** in part to the extent that it asserts a claim related to Dr. Handy's ongoing possession of documents.

2) As to Counterclaim II, Dr. Handy's Motion is **GRANTED**.

3) As to Counterclaim V, Dr. Handy's Motion is **GRANTED** in part and **DENIED** in part to the same extent as Counterclaim I.

## ORDER

**AND NOW**, this ___ day of ___, 2023, based upon the January 19, 2023 Report and Recommendation of the Special Master, it is hereby **ORDERED** that Plaintiff Robert Handy's Motion to Dismiss Counts I, II, and V[5] of Nominal Defendant Bucks County Orthopedic Specialists' ("BCOS") Counterclaims is **GRANTED** in part and **DENIED** in part, as follows:

1) In Counterclaim I, BCOS alleges a breach of contract (the Employment Agreement) on two theories: (a) Dr. Handy's continued possession of certain documents breaches his contractual obligation to return the documents to BCOS and (b) Dr. Handy's prior use of certain documents breached his contractual loyalty obligations. As to Counterclaim I, Dr. Handy's Motion to Dismiss is **GRANTED** in part to the extent that Counterclaim I asserts a claim related to Dr. Handy's prior use of documents because such a claim is barred by the judicial privilege. Dr. Handy's Motion to Dismiss is **DENIED** in part to the extent that Counterclaim I asserts a claim related to Dr. Handy's ongoing possession of documents.

2) As to Counterclaim II, Dr. Handy's Motion is **GRANTED**.

3) As to Counterclaim V, Dr. Handy's Motion is **GRANTED** in part and **DENIED** in part to the same extent as Counterclaim I.

5 Dr. Handy did not move to dismiss Counts III and IV of BCOS's Counterclaims.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 11884784

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 6

KeyCite Yellow Flag
Distinguished by Uslu v. Evans, E.D.Pa., January 31, 2025

2024 WL 4293055
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Lakisha HENRY, Plaintiff,
v.
Edras MARCELIN & Lyft, Inc., Defendants.

CIVIL ACTION No. 24-1891
|
Filed September 25, 2024

**Attorneys and Law Firms**

Marc I. Simon, Charles E. Williams, Richard Santosusso, Simon & Simon, PC, Newtown Square, PA, for Plaintiff.

John R. Sereda, Law Offices of Mezzanotte, Hasson & Sichok, Scranton, PA, for Defendant Esdras Marcelin.

Douglas V. Sanchez, Cruser Mitchell & Sanchez LLC, Woodcliff Lake, NJ, for Defendant Lyft, Inc.

## MEMORANDUM

JOSÉ RAÚL ARTEAGA, United States Magistrate Judge [1]

1 The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c). (See ECF 22, 24.)

***1** Plaintiff Lakisha Henry was injured when she was a passenger in a motor vehicle collision involving a vehicle driven by Defendant Esdras Marcelin—a Lyft driver—on October 5, 2023. She asserts claims against Marcelin for negligence (Count I) and Defendant Lyft, Inc., for negligent hiring, retention, training, supervision, and entrustment (Count II) and for respondeat superior liability (Count III). (*See* Compl., ECF 1, Ex. A.) Lyft moves for partial judgment on the pleadings with respect to Count II. (ECF 29.) For the reasons that follow, the Court grants its motion.

## I. BACKGROUND

Henry alleges she was riding in a vehicle traveling southbound on 65 th Street near its intersection with Buist Street in Philadelphia, Pennsylvania. (ECF 1, Ex. A., at ¶ 4.) Marcelin was driving another vehicle which "was owned, rented, leased, and/or otherwise under the control of and entrusted to Marcelin by Lyft, Inc." (*Id.* at ¶ 5.) Marcelin's vehicle collided with another vehicle at the intersection of Buist and 65 th , causing the other vehicle to strike the vehicle in which Henry was a passenger. (*Id.* at ¶¶ 5-7.) Henry alleges that Marcelin was Lyft's agent during the accident; and thus, the accident occurred "in the course and scope of [Marcelin's] agency and/or employment" for Lyft. (*Id.* at ¶¶ 8-9.)

Henry contends that she suffered "various serious and/or permanent personal injuries and/or aggravation of pre-existing conditions and other ills and injuries" as a result of the collision. (*Id.* at ¶¶ 24-25.) She also avers that she suffered emotional injuries and damage to her own personal property. (*Id.* at ¶¶ 26-27.)

Seeking compensatory damages and other costs in excess of $75,000, Henry initiated suit against both defendants in the Philadelphia County Court of Common Pleas. On May 3, 2024, Marcelin removed Henry's suit to this Court based on diversity jurisdiction. (ECF 1 at 4.) Believing Lyft had not filed an answer to Henry's Complaint within the time required, Henry requested the entry of a default against it. (***See*** ECF 17.) Judge Mark A. Kearney subsequently held an initial pretrial conference during which he "confirmed there [wa]s *no default in appearance* by Lyft, Inc.," so the Clerk's Office never entered a default under Federal Rule of Civil Procedure 55(a). (ECF 21 at 1 (emphasis added).)

According to Henry, after private negotiations, she agreed to lift the default (which was never entered) if Lyft promised to file an answer and not file a motion to dismiss as to any issue. (ECF 35-1 at 3.) Lyft's counsel agreed that it would "file and answer within 30 days in lieu of any motion to dismiss." (*Id.*) Judge Kearney granted Lyft "leave to file an Answer by no later than June 12, 2024" and the parties consented to the jurisdiction of a Magistrate Judge on June 7, 2024. (ECF 21 at 1.) Lyft filed its Answer to Henry's complaint shortly thereafter. (ECF 26.)

On July 16, 2024, Lyft moved for partial judgment on the pleadings, arguing that Count II of Henry's Complaint fails to state a claim upon which relief can be granted. (ECF 29 at 1.) In response, Henry argues: (1) Lyft's motion for judgment on the pleadings is identical to a motion to dismiss, and thus, it

would be unfair to grant it, and (2) even if the Court considers the Motion on its merits, Henry's Complaint alleges sufficient facts to state a claim. (ECF 35.) In reply, Lyft argues that its Motion for Judgment on the Pleadings is different from a motion to dismiss because it requires the Court to evaluate Henry's claims in the context all of the pleadings and not just the sufficiency of the Henry's Complaint. (*See* ECF 33 at 5.)

## II. LEGAL STANDARD

***2** "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Rule 12(h)(2) provides that a defense of failure to state a claim upon which relief can be granted may ... be made by a motion for judgment on the pleadings," in which case the Court applies "the same standards as under Rule 12(b)(6)." *Turbe v. Govt. of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

Thus, as with a Rule 12(b)(6) motion, the Court "must accept the [C]omplaint's allegations as true and draw all reasonable inferences in favor of" Henry. *Gross v. German Found. Indus. Initiative*, 549 F.3d 605, 610 (3d Cir. 2008) (citation omitted). To defeat Lyft's motion, Henry's Complaint must provide factual allegations that are "enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It need not contain "detailed factual allegations," but "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The plausibility standard requires more than a "sheer possibility that [Lyft] has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

To determine whether Henry's Complaint plausibly gives rise to an entitlement to relief the Court: (1) takes "note of the elements a plaintiff must plead to state a claim;" (2) identifies the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) assumes "[the] veracity [of well-pleaded factual allegations]." *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (citation and internal quotation omitted).

## III. DISCUSSION

In Count II, Henry alleges that Lyft is liable for her injuries because it negligently hired, trained, retained, or supervised Marcelin when the accident occurred. Henry also alleges that Lyft is liable for her injuries because it negligently entrusted Marcelin with the vehicle. The Court takes note of the elements for these claims and analyzes Lyft's 12(c) motion for each.

### A. Henry's Fairness Argument Does Not Require the Court to Deny Lyft's Motion for Judgment on the Pleadings.

To begin, Henry argues the Court should not consider Lyft's Motion because it is "simply a Motion to Dismiss by any other name" and Lyft agreed not to move to dismiss her Complaint. (ECF 35 at 4.) She argues its "sleight of hand must not be rewarded" because "such practices are likely to overburden the courts with needless motions ...." (*Id.*) However, her fairness argument does not require the Court to allow Count II to proceed to discovery without considering Lyft's Motion on its merits.

Henry does not cite to any case or other law that requires the Court to dismiss Lyft's Motion without considering whether judgment on the pleadings is appropriate with respect to Count II. Although she requested a default, no default was actually entered against Lyft. (*See* ECF 17 and 18.) After holding a telephonic Initial Pretrial Conference, Judge Kearney entered his Order confirming that Lyft was never in default. (*See* ECF 21 at 1.) So, when the parties negotiated about whether Henry would agree to lift the "default," there was actually nothing to negotiate about.

***3** Moreover, Henry never asked Lyft to agree to refrain from filing a motion for judgment on the pleadings. As Lyft's reply correctly notes, the Federal Rules of Civil Procedure include separate provisions for motions to dismiss and motion for judgment on the pleadings. *See* Fed. R. Civ. P. 12(b)–(c). Lyft never agreed not to file a motion under Rule 12(c), which permits the Court to consider not only the Complaint, but also, *inter alia*, any answers, replies, and counterclaims. *See* Fed. R. Civ. P. 7(a)-(c). In the correspondence Henry attaches to her response, Lyft agreed only that it would not file a motion to dismiss, *i.e.*, a motion under Rule 12(b). (ECF 35-1 at ECF p. 3.) It did precisely that.

### B. Negligent Hiring, Retention, and Supervision

For Henry's negligent hiring, training, retention, or supervision claim to proceed under Pennsylvania law, her "[C]omplaint must allege specific facts tending to show: (1) [Marcelin] demonstrated a propensity for misconduct or ill fitness for the position and, (2) nevertheless, [Lyft] chose to hire, failed to train, declined to terminate, or failed to adequately supervise [Marcelin], putting [Henry] in danger." *Fusco v. Uber Techs., Inc.*, No. 17-36, 2018 WL 3618232, at *4 (E.D. Pa. 2018) (citations omitted). Negligent hiring, negligent retention, and negligent supervision all have different elements that Henry must plausibly allege to proceed.

To make out a claim for negligent hiring, she must show that Lyft, knowing or on notice of Marcelin's propensity for misconduct, nevertheless hired him and so exposed Henry to danger. *See Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39-40 (Pa. Super. Ct. 2000) (citing Restatement (Second) of Torts, § 317 (1965)). A negligent retention claim is similar but requires Henry to show that Lyft negligently declined to terminate Marcelin after learning of a dangerous tendency. *See Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968) (citing Restatement (Second) of Torts, § 317 (1965)). To make out a claim for negligent supervision, Henry must show that Lyft knew or should have known of a need to supervise Marcelin, and that, by failing to do so, exposed Henry to Marcelin's misbehavior. *See R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. Ct. 2000) (citing Restatement (Second) of Torts, § 317 (1965)).

All these theories share the common requirement that Henry show that Marcelin's prior bad acts would have put a reasonable employer on notice of Marcelin's propensity to injure others. *See Heller v. Patwil Homes*, 713 A.2d 105, 108 (Pa. Super. Ct. 1998); *see also Dempsey*, 246 A.2d at 422 (stating the inquiry to be: "what was [the employee's] conduct prior to [the incident] and was it of such nature as to indicate a propensity for violence?"); *Gjeka v. Delaware Cnty. Cmty. Coll.*, No. 12-4548, 2013 WL 2257727, at *13 (E.D. Pa. 2013) (finding that because the "[p]laintiff ... failed to plead any facts indicating that she ... complained about [the employee's] actions to an appropriate administrator," she had "failed to plead facts satisfying the 'reasonably foreseeable' element of a negligent supervision claim"). A general allegation that Marcelin was dangerous does not meet this burden. *See Fusco*, 2018 WL 3618232, at *5 (holding that the plaintiff's complaint did not survive a Rule 12(b)(6) motion because it only "generally allege[d]" that the Uber driver who attacked him was "unqualifed and dangerous"). Similarly, a general allegation that Henry was in a sensitive position does not carry Henry's burden. *See id.* at *4.

Rather, Henry must allege specific examples of violent or dangerous behavior to survive Lyft's Motion. *See id.* at *5 (recognizing that federal courts routinely dismiss negligent hiring claims under Rule 12(b)(6), if the plaintiff fails to allege a specific instance of misconduct); *accord Doe A.F. v. Lyft, Inc.*, No. 23-3990, 2024 WL 3497886, at *4 (dismissing the plaintiff's negligent supervision claim against Lyft without prejudice because the plaintiff did not include past passenger complaints of sexual misconduct by Lyft driver in her complaint); *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 231 (D.D.C. 2015) (dismissing negligent hiring claim against Uber after the Uber driver stabbed the plaintiff passenger because no specific instance of the driver's past misconduct was alleged in her complaint). *Cf., Lockhart v. Willingboro High Sch.*, 170 F. Supp. 3d 722, 738 (D.N.J. 2015) (denying motion to dismiss the plaintiff's negligent hiring claim following a "student-on-student" sexual assault because the plaintiff alleged there was a "pattern of sexual assaults" or harassment when a teacher would leave the classroom).

***4** Here, Henry broadly alleges that:

> [r]etaining and Permitting Defendant Esdras Marcelin to operate the [Motor Vehicle] when [Lyft] knew or, in the exercise of due care and diligence, should have known by and through his prior unsafe conduct, and/or substandard driving conduct during his tenure as agent/employee of Defendant Lyft, Inc. that Defendant [Marcelin] was incompetent and/or unfit to drive a motor vehicle, capable of committing and likely to commit actions and inactions like those set forth above that would harm the motoring public.

(ECF 1, Ex. A., ¶ 22(e).) Henry also alleges that Lyft failed: (1) to take proper and adequate measures to prevent Marcelin from endangering the motoring public; (2) to train Marcelin according to industry custom; and (3) to warn the public of Marcelin's negligent or careless operation of a motor vehicle.

(*Id.* at ¶ 22.). Her allegations are only "[t]hreadbare recitals of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, that cannot "nudge" her claim for negligent hiring, retention, and supervision "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. Henry fails to identify any past misconduct that would put a reasonable employer on notice of an employee's propensity for dangerous activity. To the extent that Count II of her Complaint rests on a claim for negligent hiring, training, retention, or supervision, Lyft's Motion is GRANTED.

### C. Negligent Entrustment

Dismissal is also warranted to the extent that Henry seeks to proceed with a negligent entrustment claim against Lyft. In Pennsylvania, Section 308 of the Restatement (Second) of Torts governs claims for negligent entrustment. *See Fakes v. Terry*, No. 15-1574, 2018 WL 1382513, at *5 (W.D. Pa. 2018) (citing *Knecht v. Balanescu*, No. 16-549, 2017 WL 4573796, at *7 (M.D. Pa. 2017)). It provides that:

> [i]t is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

Restatement (Second) of Torts § 308.

To withstand Lyft's Motion, Henry must allege facts sufficient to show that Lyft "(1) permitted [Marcelin], (2) to operate its [automobile], and (3) that [Lyft] knew or should have known that [Marcelin] intended to or was likely to use the [automobile] in such a way that would harm another." *Fakes*, 2018 WL 1382513, at *5 (citing *Knecht*, 2017 WL 4573796, at *7). *Cf. Perez v. Bardo*, No. 11-376, 2011 WL 941380, at *3 (E.D. Pa. 2011) (denying a motion to dismiss where the plaintiff alleged that the trucking company defendant knew its driver lacked training or was not fit to drive).

Henry argues her allegations are akin to those found to be sufficient to withstand dismissal in *Youells v. Dzakpasu*, where a tractor-trailer driver struck an ambulance driver at a traffic intersection in icy conditions and the plaintiff ambulance driver suffered severe physical injuries. No. 19-633, 2019 WL 3046300, at *1 (M.D. Pa. 2019). The ambulance driver sued the company that hired the truck driver under a negligent entrustment theory. *See id.* The plaintiff alleged that the trucking company: (1) failed to train its driver; (2) knew its driver was unqualified; (3) allowed its driver to operate the truck despite being unqualified; and (4) knew that allowing its driver to operate its vehicle was an unreasonable risk. *See id.* at *1-2. The court denied the trucking company's motion to dismiss because, in its view, the ambulance driver had pled sufficient facts to compel discovery. *See id.* at *8.

***5** Plaintiff also compares her allegations to those which the court held were sufficient to put the defendants on "notice of the underlying factual allegations" in *McMahon v. Arsenberger*, No. 17-1242, 2018 WL 4855458, at *1 (E.D. Pa. 2018). There, a truck collided with the plaintiff's car. *See id.* The plaintiff alleged that the trucking company: (1) knew its driver was unqualified to operate the vehicle; (2) became aware of this fact during the driver's interview; (3) did not provide any safety training for the vehicle; and (4) still entrusted the driver with the tractor-trailer. *Id.* at *9. The court denied the defendant's motion to dismiss because the plaintiff alleged the company interviewed, hired, and trained the driver negligently, and failed to properly train the driver, so "a jury could find that Defendants were negligent in hiring and retaining [the driver] and entrusting him with Defendants' vehicle." *Id.*

The plaintiffs in *Youells* and *McMahon* both alleged that the trucking company defendants hired someone who they knew or should have known was not trained to operate commercial motor vehicles. In *Youells*, the Court held that the plaintiff had alleged at least "25 different ways" the company negligently entrusted its vehicle to the driver. *Youells*, 2019 WL 3046300, at *1. In *McMahon*, the plaintiff supported her claim with allegations about a specific "interview" during which the company became aware of the driver's lack of qualification before deciding to hire him anyway. *McMahon*, 2018 WL 4855458, at *9. Allegations of hiring decisions made with knowledge that an individual does not possess the requisite training are sufficient to withstand dismissal because they imply that a company knowingly hired an unqualified employee to operate a company vehicle; thus, satisfying the elements of negligent entrustment.

Here, although Henry alleges in conclusory fashion that Lyft knew of Marcelin's prior unsafe conduct (*see* ECF 1,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Ex. A, ¶ 22(e)), she does not specify any facts to support her claim; making her averment a "factual recitation of the elements" that does not suffice to state a plausible claim for relief. *See Twombly*, 550 U.S. at 555; *see also Brearey v. Ramashai*, 24-1693, 2024 WL 2848297, at *1 (E.D. Pa. 2024) (citing *id.*). Moreover, her remaining generalized allegations of Lyft's lack of investigation of Marcelin's record do not permit a reasonable inference that Lyft *knew* that Marcelin was unqualified. (*See* ECF 1, Ex. A, ¶ 22.) Instead, her allegations only permit an inference that Lyft did not know anything about Marcelin's qualifications because Lyft did not investigate him.

In arguing that her claim is like *Youells* and *McMahon*, Henry implicitly asks this Court to presume a generalized duty to investigate. The Court declines to presume that such a duty exists because, under Pennsylvania law, lessors—who are arguably similarly situated to Lyft—do not have a duty to investigate a lessee's driving records unless they affirmatively assume responsibility from their lessee. *See Gordon v. Robbins*, No. 23-2149, 2024 WL 4008756, at *5 (M.D. Pa. 2024); *see also Simpson v. Buchanan*, 20-2583, 2020 WL 4504444, at *3 (E.D. Pa. 2020) (dismissing a negligent entrustment claim in a motor vehicle accident because the plaintiff failed to specify anything about the defendant's prior conduct that would have put the lessor of the vehicle on notice of how the driver would operate the vehicle). Henry's complaint lacks any factual allegations that are sufficient to show that Lyft affirmatively assumed responsibility from Marcelin. Additionally, Henry cannot rely on *Youells* and *McMahon* without alleging specific facts supporting the knowledge element of her claim.

As a result, Lyft's Motion is granted to the extent that Count II of Henry's Complaint raises a claim for negligent entrustment.

## IV. CONCLUSION

***6** Because Henry's Complaint does not allege enough facts to state a plausible claim for relief against Lyft for negligent hiring, retention, training, or supervision or for negligent entrustment, its Motion is GRANTED and Count II is DISMISSED. Because the Court cannot say that amendment would be futile or inequitable, Count II is DISMISSED WITHOUT PREJUDICE with leave to amend if Henry can allege sufficient facts to state a claim.[2] An appropriate Order follows.

2 The court should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[T]here certainly is no categorical rule that judgment on the pleadings is per se with prejudice." *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 501 (E.D. Pa. 2014). "[W]hen a complaint is vulnerable to dismissal on the pleadings, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation and internal quotation omitted). "This is true even where the plaintiff's failure to state a claim is raised in a defendant's Rule 12(c) motion." *Hu v. Herr Foods, Inc.*, 251 F. Supp. 3d 813, 824 (E.D. Pa. 2017).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4293055

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 7

1990 WL 288628
United States District Court, M.D. Pennsylvania.

John J. MCGEE, Plaintiff,
v.
The TIMES LEADER, et al., Defendants.

Civ. No. 90–1098.
|
Sept. 14, 1990.

*MEMORANDUM*

KOSIK, District Judge.

***1** Currently pending before the court is the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative, for a more specific statement pursuant to Fed.R.Civ.P. 12(e). For the reasons that follow, the motion shall be granted in part and denied in part.

*Background*

On April 26, 1989, in conjunction with the opening of the Lackawanna County Multi-purpose Stadium, The Times Leader published an extensive supplement which included an article entitled "A Decade of Dreams Comes True." The article detailed the efforts of various citizens, including the plaintiff, towards purchasing a minor league baseball franchise, constructing a stadium and operating the franchise in Northern Pennsylvania. In addition, the supplement published the following statements regarding the plaintiff:

But NBI has sold its Class AA franchise for $1.6 million, and McGee managed to avoid a prison sentence despite a conviction on federal tax evasion charges.

As such, he will be around to see the stadium open and the Red Barons come home.

Based on the foregoing, the plaintiff commenced the instant civil action by filing a complaint in the Court of Common Pleas of Lackawanna County, Pennsylvania on April 24, 1990. The complaint alleges claims for [1] intentional defamation; [2] negligent defamation; [3] invasion of privacy; and [4] intentional infliction of emotional distress. On June 11, 1990, the defendants filed a petition for removal pursuant to this court's diversity jurisdiction under 28 U.S.C. § 1332. On June 18, 1990, the defendants filed a motion to dismiss and/or a motion for a more definite statement. After appropriate briefing, this matter is now ripe for consideration.

*Discussion*

The standard to be applied by this court in considering a motion to dismiss is clear. When a motion to dismiss is filed, the court must accept the allegations in the plaintiff's complaint as true. *Wisniewski v. Johns–Mansville Corp.,* 759 F.2d 271, 273 (3d Cir.1985). Moreover, we can dismiss a claim pursuant to Rule 12(b)(6) only if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations. *Id.* With this standard in mind, we shall address the instant motion to dismiss.

A. *Defamation Claims*

In Counts I and II the plaintiff alleges that the defendants intentionally and/or negligently published defamatory statements referring to the plaintiff.

Under Pennsylvania law, a defamation action generally must allege [1] the defamatory character of the communication; [2] publication; [3] that the communication referred to the plaintiff; [4] a third party's understanding of the communication's defamatory character; and [5] injury. *Marcone v. Penthouse Intern. Magazine For Men,* 754 F.2d 1072 (3d Cir.1985), *cert. denied,* 474 U.S. 864 (1985); *Sugarman v. RCA Corp.,* 639 F.Supp. 780 (M.D.Pa.1985). Giving the plaintiff's allegations the most liberal reading possible, we believe that they are sufficient to state a claim for defamation and to give the defendants fair notice of the claim.

***2** To the extent that the defendants argue that the alleged statements published cannot be considered defamatory, we must disagree. It is the trial court's function to determine whether a communication is capable of a defamatory meaning, and if so, it then becomes the jury's function to decide whether the communication was so understood by its recipients. *Zartman v. Lehigh County Humane Society,* 333 Pa.Super. 245, 482 A.2d 266 (1984). Under Pennsylvania law, a statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Marcone, supra* at 1078 [*quoting Coralie v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971) {*quoting Cosgrove Studio and Camera Shop, Inc. v. Payne,* 408 Pa. 314, 318, 182 A.2d 751, 753 (1962){. We

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

believe that under the above standard, the statement alleged here is capable of defamatory meaning.

In addition, the defendants argue that the plaintiff is a public figure and that the complaint fails to allege malice on the part of the defendants as required by *New York Times v. Sullivan,* 376 U.S. 254 (1964). An examination of the complaint, however, reveals that the plaintiff alleges that he is a private figure, an allegation which we must consider true at this juncture. Furthermore, in the event that the plaintiff is found to be a public figure, it is clear that the complaint has indeed alleged malice on the part of the defendants. Thus, we find the defendants' assertions to be without merit.

Accordingly, the defendants' motion to dismiss Count I and II shall be denied.

B. *Invasion of Privacy Claim*

The defendants contend that the plaintiff has failed to state a claim for invasion of privacy because he has not alleged that he was placed in a false light which is "highly offensive."

The Pennsylvania courts have adopted Section 652E of the Restatement (Second) of Torts as the cause of action for invasion of privacy based on publicity placing a person in a false light. *Fogel v. Forbes, Inc.,* 500 F.Supp. 1081, 1087 (E.D.Pa.1980); Restatement (Second) of Torts § 652E (1977). "In order for there to be liability under Section 652E, it is not necessary that the matters publicized be private, or that it be in and of itself false and defamatory. It is enough that the defendant has given publicity to any matter concerning the plaintiff that creates a "highly offensive" false impression about the plaintiff." *Fogel, supra* at 1087–88.

As we pointed out in our discussion of the plaintiff's defamation claims, it is for the court to determine whether a communication is capable of bearing a particular meaning. *Fogel, supra* at 1088. For the reasons set forth in connection with the plaintiff's defamation claims, we believe that the instant statement is capable of conveying a highly offensive false impression about the plaintiff.

Accordingly, the defendants' motion to dismiss Count III shall be denied.

C. *Intentional Infliction of Emotional Distress Claim*

***3** Finally, the defendants argue that the plaintiff has failed to set forth outrageous conduct on the part of the defendants sufficient to prevail on a claim for intentional infliction of emotional distress. We agree.

In *Williams v. Guzzardi,* 875 F.2d 46, 50 (3d Cir.1989), the Third Circuit stated that Pennsylvania will impose liability for intentional infliction of severe emotional distress where appropriate. The Court further determined that, under Pennsylvania law, the plaintiff must satisfy the following four elements to prevail on a claim of intentional infliction of emotional distress: [1] the conduct must be extreme and outrageous; [2] the conduct must be intentional or reckless; [3] it must cause emotional distress; and [4] the distress must be severe. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.1979); *see also* Restatement (Second) of Torts § 46 at 71 (1965).

Here, the plaintiff claims that the defendants' conduct was outrageous in publishing the statement in question. We conclude, as a matter of law, that the conduct alleged here is not sufficiently outrageous to state a claim under Pennsylvania law for intentional infliction of emotional distress. Although Pennsylvania courts have recognized such claims when they involve a special relationship between a landlord and a tenant [1] or a parent and child, [2] courts have rejected such claims when premised on the basis of defamatory remarks. *See Sugerman v. RCA Corp.,* 639 F.Supp. 780 (M.D.Pa.1986).

Accordingly, the defendants' motion to dismiss Count IV shall be granted.

*ORDER*

AND NOW, this 14 day of September, 1990, IT IS HEREBY ORDERED THAT:

[1] the defendants' motion to dismiss is granted as to Count IV;

[2] the defendants' motion is otherwise denied; and

[3] the defendants are directed to file an answer to the remaining counts in the complaint within twenty [20] days of the date of this Order.

1 *See Williams v. Guzzardi, supra.*

2 *See Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1976).

**All Citations**

Not Reported in F.Supp., 1990 WL 288628, 18 Media L. Rep. 1748

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 8

2020 WL 5351042
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Christina PRUKALA, Plaintiff,
v.
CHASE BANK, N.A., Defendant.

3:19-CV-1791
|
Filed 09/04/2020

**Attorneys and Law Firms**

Joseph T. Succec, Grantham, PA, for Plaintiff.

Jenny N. Perkins, Ballard Spahr, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

Robert D. Mariani, United States District Court Judge

## I. INTRODUCTION AND PROCEDURAL HISTORY

***1** On September 9, 2019, Plaintiff Christina Prukala filed a putative class action complaint in the Court of Common Pleas of Lackawanna County against Defendant JPMorgan Chase Bank, N.A., improperly named as "Chase Bank", [hereinafter "Chase"] for alleged violations of Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA") and the federal Fair Debt Collection Practices Act ("FDCPA"). (Doc. 1, Ex. 1). On October 16, 2019, Defendant Chase properly removed the action to this Court. (Doc. 1).

On October 21, 2019, Defendant filed a Motion to Dismiss Plaintiff's complaint. (Doc. 4). On November 4, 2019, Plaintiff amended her complaint eliminating the FDCPA claims, but still alleging Defendant violated the FCEUA when Defendant reported Plaintiff's consumer credit report as "delinquent, with derogatory information therein." (Doc. 8, at ¶¶ 1, 11). Plaintiff seeks relief under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). (*Id.* at ¶ 39). Plaintiff seeks monetary damages, punitive damages, and injunctive relief on behalf of herself and a putative class. (*Id.* at 10-11).

On December 5, 2019, Defendant again filed a Motion to Dismiss Plaintiff's Amended Complaint with prejudice, which is now pending before the Court. (Doc. 9). The issues have been fully briefed and Defendant's Motion is ripe for disposition.

For the reasons set forth below, the Court will grant Defendant's Motion to Dismiss with prejudice. (Doc. 9).

## II. FACTUAL ALLEGATIONS

Plaintiff's Amended Complaint (Doc. 8) alleges the following facts which, for the purposes of resolving Defendant's Motion to Dismiss, the Court takes as true:

Plaintiff Christina Prukala is a citizen and resident of the Commonwealth of Pennsylvania. (Doc. 8, at ¶ 4). Defendant Chase is a "corporate entity engaged in, among other enterprises, collection of allegedly overdue credit accounts." (*Id.* at ¶ 5a). Defendants John Does 1-10 are unknown individuals or entities who "played a substantial role in the commission of the acts." (*Id.* at ¶ 5b). Defendants X, Y, and Z Corporations are unknown entities who also "played a substantial role in the commission of the acts." (*Id.* at ¶ 5c).

Plaintiff possesses consumer debts, used for "personal, household or family purposes," that Defendant was seeking to collect. (*Id.* at ¶ 10).

One of Plaintiff's consumer accounts was reported as delinquent and derogatory information was placed on her credit report by Defendant. (*Id.* ¶¶ 11, 14; Doc. 8-1, at 21–22). When Plaintiff discovered the derogatory information on her credit report, she "sent Defendant letters both disputing the high balance of each account and requesting copies of the original contracts." (*Id.* at ¶ 12).

Defendant updated the Credit Reporting Agencies ("CRAs") on a regular basis, which is reflected on Plaintiff's consumer credit report. (*Id.* at ¶¶ 15, 17). Defendant "constructively, if not actively" updated the information on Plaintiff's consumer report "without either reinvestigating said derogatory information or notating on the report that the account was disputed." (*Id.* at ¶ 19).

***2** Defendant had actual and/or constructive notice that Plaintiff disputed the debts as Plaintiff sent letters

to Defendant indicating her dispute and requesting an accounting of the debts and the original contracts. (*Id.* at ¶ 18A; Doc. 8-1, at 23–25). Plaintiff never received a response from Defendant to her letters. (*Id.* at ¶ 18B).

The derogatory information on the consumer credit report "negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness." (*Id.* at ¶ 16).

As a result, Plaintiff suffered "repeated disruption of te [sic] pursuit of any business affairs affected by the false, unverified information on her credit report as well as the emotional distress suffered from being the target of Defendant's collection activity." (*Id.* at ¶ 43). Plaintiff's damages include "lost time in dealing with said violations, including but not limited to loss of credit opportunities and business standing in the community, and in seeking and contacting legal counsel for the purpose of exploring and commencing this litigation." (*Id.* at ¶ 34).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.' " *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.' " *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* at 786-787 (quoting *Iqbal*, 556 U.S. 679).

***3** However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendant Chase argues that Plaintiff's Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted. (Doc. 9). Defendant's argument under the UTPCPL is twofold: (1) Plaintiff has not pleaded facts that she suffered an ascertainable loss resulting from Defendant's fraudulent actions, and (2) Plaintiff has not pleaded facts


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

that demonstrate justifiable reliance on Defendant's actions or failure to act. (Doc. 10, at 6–7). The Court agrees.

Pennsylvania's FCEUA statute outlines actions taken by creditors which constitute an "unfair or deceptive debt collection act or practice." 73 Pa. Stat. Ann. § 2270.4(b). It further declares any violation of the FCEUA to also constitute a violation of Pennsylvania's UTPCPL. 73 Pa. Stat. Ann. § 2270.5(a). The UTPCPL provides a private right of action to any person who has suffered "any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [the UTPCPL]." 73 Pa. Stat. Ann. § 201-9.2.

The FCEUA does not provide a private cause of action for violations; instead, plaintiffs must use the UTPCPL's remedy provision to obtain relief. *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 359 (E.D. Pa. 2013); *see* 73 Pa. Stat. Ann. § 201-9.2. Consequently, to plead a cause of action under the FCEUA, plaintiffs must be able to state a claim under the UTPCPL. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015); *see also Baldwin v. Monterey Fin. Servs., Inc.*, No. 3:14-CV-2346, 2017 WL 4767696, at *6 (M.D. Pa. Oct. 20, 2017).

To state a claim under the UTPCPL, the plaintiff first must allege "an ascertainable loss as a result of the defendant's prohibited action." *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001). Second, the plaintiff must show that "he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Hunt v. U.S. Tobacco Co.*, 583 F.3d 217, 224 (3d Cir. 2008)(quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

To allege an ascertainable loss, the plaintiff "must be able to point to money or property that he would have had but for the defendant's fraudulent actions." *Benner*, 917 F. Supp. 2d at 359. Damages resulting from emotional distress are not cognizable under the UTPCPL. *Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 358 (E.D. Pa. 2015). Likewise, the cost of retaining counsel does not qualify as an ascertainable loss. *Grimes v. Enter. Leasing Co. of Philadelphia, LLC*, 105 A.3d 1188, 1193 (Pa. 2014)(explaining that the UTPCPL separately provides for awards of costs and reasonable attorney's fees).

***4** Moreover, "damages cannot be speculative." *Jarzyna v. Home Properties, L.P.*, 185 F. Supp. 3d 612, 626 (E.D. Pa. 2016), *aff'd*, 783 F. App'x 223 (3d Cir. 2019); *see also Grimaldi v. Bank of Am.*, No. 3:12-CV-2345, 2013 WL 1050549, at *5 (M.D. Pa. Mar. 14, 2013)(holding a hypothetical attempt to refinance a home is not an ascertainable loss). The test for speculative damages is not necessarily about "the difficulty in calculating the amount," but instead with "whether there are identifiable damages." *Kaymark*, 783 F.3d at 182 (quoting *Pashak v. Barish*, 450 A.2d 67, 69 (Pa. 1982)).

Here, Plaintiff alleged that she has suffered "repeated disruption of any business affairs" and "emotional distress." (Doc. 8, at ¶ 43). Plaintiff failed to provide any facts regarding what the business affairs are, in what ways they were disrupted, or what specifically was lost because of the disruption. (*See generally*, Doc. 8). Without alleging any facts that she lost money or property that she would have had but for Defendant's actions, Plaintiff's damages are speculative and unascertainable.

Furthermore, Plaintiff's "emotional distress" (*Id.* at ¶ 43) is not cognizable under the UTPCPL and is, therefore, not an ascertainable loss. Additionally, Plaintiff's damages connected to retaining legal counsel (*Id.* at 10–11) are not an ascertainable loss under the statute.

Plaintiff has not met her burden to prove that she has lost any money or property that she would have had but for Defendant's actions. Plaintiff's Amended Complaint does not allege an ascertainable loss as required for a UTPCPL or FCEUA claim.

In addition to alleging an ascertainable loss, the Pennsylvania Supreme Court "has categorically and repeatedly stated that, due to the causation requirement in the Consumer Protection Law's standing provision, 73 Pa. Cons.Stat. § 201–9.2(a) (permitting suit by private plaintiffs who suffer loss "as a result of" the defendant's deception), a private plaintiff pursuing a claim under the statute must prove justifiable reliance." *Hunt*, 538 F.3d at 221.

The Pennsylvania Supreme Court has held that the UTPCPL is to be "liberally construed to effectuate its objective of protecting the consumers." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007). However, the Pennsylvania Supreme Court has also held, "Nothing in the legislative history suggests that the legislature ever intended statutory

language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Weinberg*, 777 A.2d at 446. Therefore, the plaintiff's justifiable reliance on the defendant's fraudulent conduct must have caused the harms suffered by the plaintiff. *See Hunt*, 538 F.3d at 224–225; *Walkup*, 147 F. Supp. 3d at 358.

It is the plaintiff's burden to prove justifiable reliance in the complaint. *Weinberg*, 777 A.2d at 446; *see also Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 202 (Pa. 2007)("... [A] plaintiff alleging violations of the [UTPCPL] must prove justifiable reliance."); *Hunt*, 538 F.3d at 227 (rejecting a presumption of reliance).

Viewing all facts in the light most favorable to the Plaintiff and drawing all reasonable inferences in Plaintiff's favor, there is no allegation of causation or justifiable reliance in the Amended Complaint. (*See generally*, Doc. 8). Even if the disrupted pursuit of business affairs was an ascertainable loss (*Id.* at ¶ 43), Plaintiff does not allege how the Defendant's actions caused such a disruption. Plaintiff pleads that Defendant caused derogatory information to be placed on her consumer credit report despite sending Defendant a dispute letter. (*Id.* at ¶¶ 14, 18). However, she does not explain what the derogatory information is or how that derogatory information impacted her business pursuits. Nor does Plaintiff allege reliance, justifiable or not, on any actions taken or statements made by the Defendant.

***5** Plaintiff's Amended Complaint does not allege causation or justifiable reliance as is required by the UTPCPL and FCEUA; and therefore, fails to state a claim upon which relief may be granted.

A district court may dismiss a complaint without leave to amend "on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004). Furthermore, "it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 230 (3d Cir. 2011)("A district court may enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint.").

A motion to dismiss with prejudice is appropriate in cases where the plaintiff has already had the opportunity to amend her complaint, but was still unable to plead facts sufficient to survive a Rule 12(b)(6) motion. *Ghaffari v. Wells Fargo Bank N.A.*, 621 F. App'x 121, 125 (3d Cir. 2015)("[Plaintiff] had already been given an opportunity to amend his complaint after Wells Fargo filed its motion to dismiss his original complaint."); *see also Fletcher-Harlee Corp.*, 482 F.3d at 253 ("Here, Fletcher-Harlee was not caught unaware by the Court's entry of judgment, as it had notice of Pote's motion and every opportunity to amend its complaint beforehand."); *Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, No. CV1700018FLWLHG, 2018 WL 1535285, at *8 n.3 (D.N.J. Mar. 29, 2018) ("Plaintiff filed the Second Amended Complaint ... with full knowledge of the arguments in Defendant's original motion, and, yet, has failed to address them. Plaintiff's demonstrated inability to allege the most basic facts, which should be within her knowledge, in support of her claim ... makes dismissal with prejudice the appropriate outcome here.").

Plaintiff does not allege facts sufficient to state a claim upon which relief can be granted in her Amended Complaint, nor does she request leave to amend the complaint. (*See generally*, Doc. 8). The Court is not required to grant leave to amend where, as here, the plaintiff already has had an opportunity to amend her complaint. Defendant Chase filed a Motion to Dismiss Plaintiff's original Complaint on October 21, 2019. (Doc. 4). Defendant's original Motion not only raised the defects in Plaintiff's FDCPA claims (*Id.* at 7–11), but also raised the same defects that are present in Plaintiff's FCEUA and UTPCPL allegations. (*Id.* at 11–15). In response, Plaintiff saw fit not to amend her complaint at all, other than abandoning her FDCPA claims. (*Compare* Doc. 1-2, Ex. 1 *with* Doc. 8). Defendant Chase therefore raised the same two defects of the UTPCPL claim once again in its Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 10, at 6–10). Plaintiff opposed the Motion but neither addressed these issues nor sought leave to amend the Amended Complaint. (Doc. 11).

The Court deems Plaintiff had the opportunity to amend her Complaint and cure its deficiencies but did not do so. No further leave will be granted.

***6** Without alleging justifiable reliance on the Defendant's prohibited statements or actions and without alleging an ascertainable loss as a result of that reliance, Plaintiff's complaint does not state a claim upon which relief can be

granted under the UTPCPL and the FCEUA. Plaintiff was on notice of these defects after Defendant's initial Motion to Dismiss, but saw fit not to address them. The complaint must be dismissed without leave to amend.

## V. CONCLUSION

Therefore, for the reasons set forth in this Memorandum Opinion, the Court will grant Defendant's Motion to Dismiss with prejudice (Doc. 9). A separate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5351042

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 9

2025 WL 895826
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Richard Louis STARKS and Christian Starks, Plaintiffs,
v.
NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT, et al., Defendants.

Civil No. 1:24-CV-00739
|
Signed March 24, 2025

**Attorneys and Law Firms**

Charles D. Mandracchia, Mandracchia Law, LLC, Harleysville, PA, Christopher Mandracchia, CDM Law, Conshohocken, PA, Jeffrey W. Soderberg, Mandracchia Law, LLC, Skippack, PA, for Plaintiffs.

Claire A. Murtha, Rolf E. Kroll, Margolis Edelstein, Camp Hill, PA, for Defendants Northern York County Regional Police Department, Sergeant Jack C. Asper, Officer Steven Lebo, Lieutenant John Migatulski.

Claire A. Murtha, Rolf E. Kroll, Margolis Edelstein, Camp Hill, PA, Benjamin P. Novak, Gregory S. Hirtzel, Fowler, Hirtzel, McNulty & Spaulding, LLP, Lancaster, PA, for Defendant Heidelberg Township of York County, Pennsylvania.

Matthew B. Weisberg, Louis Anthony DiJiacomo, Weisberg Law, Morton, PA, for Defendants William K. Knight, Marvin Knight.

## MEMORANDUM

JENNIFER P. WILSON, United States District Judge

***1** The events giving rise to the instant case began with a neighborhood property dispute and ended with a failed prosecution for attempted murder. The former criminal defendant, Richard Louis Starks ("Starks"), along with his son, Christian Starks ("Christian"), now bring an array of § 1983 and state-law claims against several police officers, a police department, and a township. These claims include malicious prosecution and false arrest in violation of the Fourth Amendment and Pennsylvania law, selective enforcement in violation of the Fourteenth Amendment, a variety of other constitutional claims, conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Currently before the court is a motion to dismiss filed by the police officers, the police department, and the township. For the reasons that follow, the court will grant in part and deny in part Defendants' motion.

## BACKGROUND

### A. Property Dispute and Subsequent Altercation

Starks owned Paws Pet Resort ("Paws") located at 6876 Cannery Road in Heidelberg Township, Pennsylvania. (Doc. 25, ¶ 11.) Christian, who managed Paws, was present at the pet resort on the morning of May 2, 2022. (*Id.* ¶¶ 12, 26.) That morning, William Kenneth Knight ("Knight") allegedly entered the Paws property and began threatening to "blow the place up" and poison the dogs located there. (*Id.* ¶¶ 46, 49.) When making these threats, Knight allegedly possessed a black object that Plaintiffs allege was a firearm. (*Id.* ¶¶ 49, 52.) Knight's alleged outburst was triggered by a property dispute he had with Starks. (*See id.* ¶ 62.) Knight's family farm is located at 6900 Cannery Road. (*Id.* ¶ 66.)

After Knight left, Christian called his father—who was not at Paws—to report the incident to him. (*See id.* ¶ 51.) Upon receiving Christian's call, Starks called 911. (*Id.*) No one responded to Starks's first 911 call, which was allegedly "not of record." (*Id.* ¶ 59.) Knight then allegedly returned to Paws with his father, Marvin Knight. (*Id.* ¶ 58.) Christian reported Knight's return to Starks, who called 911 twice more. (*Id.* ¶¶ 56–57, 60.) Starks then traveled to Paws and, upon his arrival, allegedly saw Knight on an adjacent property. (*See id.* ¶ 61.) At this point, Starks "believed that ... Knight was returning to Paws for a third time to make good on his threats." (*Id.*) Allegedly in fear for his and Christian's lives, Starks obtained guns from his gun safe on the property. (*Id.* ¶ 64.) Guns in tow, Starks drove after Knight's vehicle in order to obtain a license plate number for the 911 operator with whom he was on the phone. (*Id.* ¶ 66.) Starks followed Knight to an "access roadway" located on Knight's family farm off Cannery Road ("Farm Lane"). (*Id.* ¶¶ 67, 71.) On the Farm Lane, Starks advised the 911 operator of Knight's license plate number as Knight's vehicle drove past him towards Cannery Road. (*Id.* ¶ 69.) Starks then followed Knight towards Cannery Road. (*Id.* ¶ 70.) Knight's vehicle eventually stopped, and Starks drove past him on the left. (*Id.* ¶ 71.) As Starks passed, Knight allegedly kicked the passenger side of Starks's vehicle. (*Id.*

¶ 71.) Starks then stopped his car to inspect his vehicle for damage. (*Id.* ¶¶ 72–73.)

***2** At this point, Knight allegedly accelerated his vehicle towards Starks's, making violent contact. (*Id.* ¶ 75.) Starks reentered his vehicle in the hopes of escaping the scene, but his vehicle was allegedly disabled by the impact. (*Id.* ¶ 77.) At the same time, Knight allegedly drove his vehicle towards Cannery Road, turned around, and then again accelerated towards Starks. (*Id.* ¶¶ 79–80, 83.) Knight allegedly then caused a second violent collision while Starks was in his vehicle. (*Id.* ¶ 84.) Following this second impact, Knight allegedly reversed his car and again accelerated towards Starks's vehicle. (*Id.* ¶ 86.) This time, Starks fired several rounds of his rifle towards Knight's vehicle in an attempt to stop the alleged attack. (*Id.* ¶ 87.) Shortly thereafter, police arrived on scene.

### B. Police Investigation

Defendants Lieutenant John Migatulski ("Migatulski"), Sargent Jack Asper ("Asper"), and Officer Steven Lebo ("Lebo") of the Northern York County Regional Police Department ("NYCRPD") arrived at the scene and investigated the incident. (*Id.* ¶¶ 98, 100, 107.) Christian also arrived at the scene after the incident. At the scene, Asper allegedly used insensitive language when referring to Starks—who is a "mixed-raced individual, born of a Hispanic and African-American Father and a Caucasian mother"—and to Christian—who "has dark skin and has physical features of an Asian-American individual." (*Id.* ¶¶ 11–12, 101.) Specifically, Asper allegedly referred to Starks as "foreign" and "fat guy," and called Christian the "Chinese guy, Korean guy, or whatever." (*Id.* ¶ 101.) Asper also intimated to other officers that Starks and Christian were "likely drug dealers" and that Starks was a drug user. (*Id.* ¶ 103.)

Over the next couple of weeks, the officers investigated the incident. This investigation culminated in Lebo authoring a criminal complaint and affidavit of probable cause dated June 8, 2022 ("Lebo Affidavit"). (Doc. 34-1.) The Lebo Affidavit contains Starks's account of the incident, which mostly mirrors his pleadings. (*See id.* at 2–3.) [1] The Lebo Affidavit also contains several other notable pieces of information.

#### 1. Knight's Version of Events

The Lebo Affidavit contains Knight's account of the incident, which police collected during an interview two days later. (*Id.* at 4–5.) According to Knight, he went to Paws to take pictures of land he claimed was on his family's farm but that Starks was disturbing. (*Id.* at 4.) Knight stated that he was concerned this disturbed land would wash away due to the rain occurring on the day of the incident. (*Id.*) Knight claimed that Christian had yelled at him for taking the pictures. (*Id.*) After an ensuing argument, Knight gave "Christian the middle finger" before leaving the property. (*Id.* at 5.) Knight denied threatening or intending to hurt the dogs. (*Id.*) He also denied having a firearm while at Paws; he insisted that the black object he had possessed was a camera case. (*Id.*) Knight claimed his father had asked him to return to Paws to see whether the rain was washing away the disputed land. (*See id.*) This time, Knight's father accompanied Knight. (*Id.*) Upon arriving at Paws, the pair quickly saw disturbed land, and Knight's father suggested that they return to the farm to call a lawyer. (*Id.*) Knight claimed that he took his father back to the farm at that point. (*Id.*)

As he left the farm, Knight told police that he saw Starks's vehicle on the Farm Lane between himself and Cannery Road. (*Id.*) Knight claimed that Starks was outside his vehicle in the jamb of his car door with his rifle pointing at Knight. (*Id.*) Knight claimed that Starks had commanded Knight to step out of his car and had threatened to shoot and kill him. (*Id.*) At this point, Knight claimed, he drove next to Starks's vehicle and said to Starks, "[i]f you're going to shoot me, just fucking shoot me now." (*Id.*) Knight claimed that after this encounter, he had started to drive towards Cannery Road when Starks began firing several rounds towards his car. (*Id.*) Reportedly afraid for the safety of his parents back at the farm, Knight turned his vehicle around to face Starks. (*Id.*) Knight told police that Starks had fired another shot at him as he drove back towards Starks; Knight claimed this shot had gone through his windshield and had caused him to bleed from his head. (*Id.*) Knight told police that he had responded by accelerating as fast as possible towards Starks's vehicle. (*Id.*) After making contact with Starks's vehicle, according to Knight, Starks fired several more rounds. (*Id.*) Knight denied causing more than one collision with Starks's vehicle. (*Id.*) Knight told police that the collision had disabled his vehicle. (*Id.*) Knight stated that he had crawled out of his car onto a grassy field, where Starks allegedly began beating him with a butt of his rifle before police arrived on scene. (*Id.*)

### 2. Statements and Evidence Collected from Eyewitness Tammy Diehl

***3** The Lebo Affidavit also contains statements from eyewitness Tammy Diehl ("Diehl"), who lives within sight of Paws and the Farm Lane. (*Id.* at 1, 4.) Diehl called 911 to report the incident. (*Id.* at 1.) She reported to 911 that a motor vehicle crash had occurred followed by gunshots. (*Id.*) Police interviewed Diehl the following day. (*Id.* at 4.) Diehl told police that her attention had been first pulled outside after she had heard Knight's vehicle accelerating towards the farm. (*Id.*) She reported that she then saw Starks's vehicle heading towards the farm. (*Id.*) She stated that she began taking photographs on her phone when she saw the two vehicles staring each other down. (*Id.*) Diehl claimed that she had seen Knight's vehicle drive around Starks's car towards Cannery Road. (*Id.*) She then claimed that she had witnessed Knight's vehicle turn around, accelerate towards Starks's vehicle, and strike it twice before she heard rapid gunshots. (*Id.*) It was not until after the gunfire that Diehl began recording videos on her phone. (*Id.*)

With Diehl's permission, police extracted the photographic evidence from her phone as well as video from the security cameras on Diehl's property. (*Id.*) Police reviewed this evidence on May 13. (*Id.* at 6.) Police determined that the pre-shooting photographic evidence "supported ... Knight's statement about the events leading up to the shooting and directly contradict[ed] ... Starks's statement" to police. (*Id.*)

Diehl's photographic evidence also "supported ... Knight's statements" about the incident itself "and contradicted ... Starks's statements." (*Id.* at 7.) Notably, Diehl took a photograph of Starks "standing on the" Farm Lane and "appear[ing] to be pointing a rifle towards Knight's vehicle" as it drives away towards Cannery Road. (*Id.*) Starks was on his 911 call at the moment this picture was taken. (*Id.* at 8.) The audio of that call established, according to police, that when Diehl took the picture, Starks was "charging his rifle" and then quickly fired two gunshots. (*Id.*) Law enforcement concluded, based upon this evidence, that Starks fired his weapon before any collision occurred between Knight's vehicle and Starks's, and then again following Knight's collision with Starks's vehicle. (*Id.*) Police determined that this evidence along with other evidence detailed in the Lebo Affidavit warranted criminal charges against Starks. (*Id.*)

### C. Starks's Prosecution for Attempted Murder

Police charged Starks with "criminal attempt homicide, aggravated assault, simple assault, terroristic threats, and recklessly endangering another person." (*Id.*) A preliminary hearing before a magisterial district judge was held on June 29, 2022. (Doc. 25, ¶ 122.) At that hearing, Lebo testified that he found Knight's statements credible. (*Id.*) Starks's case having met the preliminary-hearing standard, it proceeded towards trial. (*See id.* ¶ 160.). The trial, originally scheduled for October 2023, was ultimately continued to April 2024. (*Id.*)

Plaintiffs allege that prior to the October 2023 trial date, prosecutors learned that Diehl was going to testify that she had heard the gunshots before the vehicle collision, contradicting her previous statement to police. (*See, e.g., id.* ¶¶ 161–63.) At trial, Diehl ultimately testified that she heard gunshots before a vehicle collision. (*See id.* ¶ 175.) Starks characterized this known change in testimony as "impeachment material" and, thus, argued to the trial court that the prosecutors' failure to disclose it was a violation of Starks's due process rights. (*Id.* ¶¶ 175, 178.) Plaintiffs claim, and Defendants agree, that this alleged due process violation is what led the prosecutors to withdraw with prejudice the charges against Starks on April 3, 2024. (*Id.* ¶¶ 179–80; Doc. 35, p. 14.)

### D. Procedural History

On May 1, 2024, Starks and Christian filed suit in this court against Lebo, Asper, Migatulski, NYCRPD, and Heidelberg Township ("Heidelberg").[2] (Doc. 1.) Defendants then filed a motion to dismiss. (Doc. 17.) In response, Starks and Christian filed an amended complaint. (Doc. 25.) Defendants have now renewed their motion to dismiss with nearly identical arguments for dismissal. (Doc. 34.) The court has reviewed Defendants' brief in support, the Lebo Affidavit, and their reply brief, as well as Plaintiffs' brief in opposition. (Docs. 34-1, 35, 41, 47.)

***4** Plaintiffs supplemented their opposition with a motion asking the court to "exclude" the Lebo Affidavit from the Defendants' motion or, in the alternative, to convert Defendants' motion to dismiss to a motion for summary judgment. (Doc. 38.) The court has reviewed Plaintiffs' brief in support as well as Defendants' brief in opposition. (Docs. 39 & 49.) The parties' disputes are now ripe for review.

## JURISDICTION

Plaintiffs bring claims arising under the Constitution of the United States as well as claims arising under the laws of Pennsylvania. The court has subject matter jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367. Venue properly lies in this court pursuant to 28 U.S.C. 1391(b).

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

## DISCUSSION

### A. Plaintiffs' Motion to Exclude

The court must first determine whether it may consider the Lebo Affidavit—which Defendants attached to their motion to dismiss—in resolving the instant motion to dismiss. Plaintiffs insist that the court may not. They are wrong.

Generally, courts may not venture outside the pleadings to resolve a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(d). As Rule 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). Notwithstanding Rule 12(d)'s language, the Third Circuit has "held that a court may consider narrowly defined types of material without converting the motion to dismiss." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). One such exception is carved out for a "document *integral to or explicitly relied upon* in the complaint." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Another exception is for an "undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). These types of documents do not implicate the "primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff." *Burlington*, 114 F.3d at 1426. Rather, such problem "is dissipated '[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint.' " *Id.* (quoting *Waterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)).

***5** While Plaintiffs concede that the amended complaint refers to the Lebo Affidavit "in isolation," they insist that the document is not integral to their claims. (Doc. 39, p. 10.). Instead, Plaintiffs argue, "it is the cumulative effect of countless documents, video, and photographs that form the basis of the Complaint." (*Id.*) Plaintiffs are correct that the exceptions to Rule 12(d) are not applicable when a complaint merely cites a document. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

But here, it is clear that Plaintiffs do more than simply cite the Lebo Affidavit. Their malicious-prosecution and false-arrest claims heavily rely on allegations that the police officer Defendants knowingly included falsehoods in the Lebo Affidavit and/or withheld information from it to justify Starks's prosecution. (*See* Doc. 25, ¶¶ 31, 109, 123,

152, 295, 296.) These allegations are essential to Starks's malicious-prosecution and false-arrest claims. Indeed, as a general matter, affidavits of probable cause are so inherently significant to claims for malicious prosecution and false arrest that courts routinely consider them at the motion to dismiss stage. *See* *Shelley v. Wilson*, 339 F. App'x 136, 137 n.2 (3d Cir. 2009) (affirming district court's consideration of a "criminal complaint and affidavit of probable cause for an arrest warrant"); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 422–23 (M.D. Pa. 2017) (relying on "criminal complaint and affidavit of probable cause" in resolving motion to dismiss and citing several cases that do the same). [3] For these reasons, the court will deny Plaintiffs' motion to exclude and consider the Lebo Affidavit in resolving Defendants' motion to dismiss.

### B. Constitutional Claims

Plaintiffs' amended complaint presents the court with a panoply of constitutional claims against Defendants. Plaintiffs organize their § 1983 counts by defendant, rather than by cause of action. So, Plaintiffs' pleading of their constitutional claims generally include a single count for each Defendant titled "Deprivation of Rights in Violation of Federal Law." Into these counts, Plaintiffs pack a variety of references to constitutional violations and often fail to state with clarity what their § 1983 claims are, leaving the court to fill in the gaps. The court parses through the claims in turn.

#### 1. Fourth Amendment Claims

Starks claims that Lebo and Asper violated his "4th Amendment rights including to be free from searches and seizures." (Doc. 25, ¶¶ 186, 193). These alleged violations also appear to be a basis for Plaintiffs' *Monell* claims. (*See* Doc. 25, ¶¶ 207–36, 242–46.) Defendants interpret Starks's Fourth Amendment claims to be ones for malicious prosecution and false arrest. (*See* Doc. 35, pp. 18–30.) Starks's brief in opposition does nothing to refute this interpretation. Accordingly, the court proceeds on the understanding that Starks asserts Fourth Amendment claims for malicious prosecution and false arrest.

***6** The Fourth Amendment to the United States Constitution, incorporated as to the states by the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. One such "type of unreasonable seizure" is "an arrest and detention of a person based on a criminal charge lacking probable cause." *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024). Such a violation can give rise to two types of § 1983 claims: malicious prosecution and false arrest. *Id.*; *see* *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (explaining that one states a Fourth Amendment false arrest claim when one establishes that an arrest was made without probable cause).

To state a claim for false arrest under the Fourth Amendment, Starks must allege: "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James*, 700 F.3d at 680. Similarly, a Fourth Amendment malicious prosecution claim requires Starks to allege:

> (1) the defendants initiated a criminal proceeding;
>
> (2) the criminal proceeding ended in the plaintiff's favor;
>
> (3) the proceeding was initiated without probable cause;
>
> (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and
>
> (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). Fatal to both claims is the existence of probable cause. *Wheeler v. Wheeler*, 639 F. App'x 147, 150 n.8 (3d Cir. 2016)

Here, Lebo and Asper argue that they had probable cause to charge Starks and, therefore, are entitled to qualified immunity since no constitutional violation occurred. (Doc. 35, pp. 18–19.) To resolve this claim of qualified immunity, the court must (1) decide if the facts alleged "make out a violation of a constitutional right" and (2) if so, determine if the "right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If Starks failed to adequately allege that Asper and Lebo lacked probable cause, then qualified immunity will shield them from these Fourth Amendment claims.

Probable cause "is a practical, nontechnical conception" that "is incapable of precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). This is because it is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (quoting *Gates*, 462 U.S. at 232). Nevertheless, the core "substance of all the definitions of probable cause is a reasonable belief of guilt." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *accord Probable Cause*, Black's Law Dictionary (12th ed. 2024) (defining "probable cause" as "[a] reasonable ground to suspect that a person has committed or is committing a crime"). As the Third Circuit has stated, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution [to believe] that an offense has been committed by the person being arrested." *United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002); *accord Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) ("Probable case exists if there is a 'fair probability' that the person committed the crime at issue.").

***7** Here, Starks claims that the Lebo Affidavit did not establish probable cause due to material falsehoods and omissions. Such an argument must be supported by well pleaded allegations that establish: "(1) that [Lebo and Asper] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.' " *Shaffer v. City of Pittsburgh*, 650 F. App'x 111, 113–14 (3d Cir. 2016) (quoting *Wilson*, 212 F.3d at 786–87).

In analyzing these two factors, the court must perform "the reconstructive surgery required by [Third Circuit] jurisprudence." *Wilson*, 212 F.3d at 789. This procedure has two steps. First, the court "must identify any improperly asserted or omitted facts" made with the requisite intent. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016). Second, the court must "excise the offending inaccuracies" from the Lebo Affidavit, "insert the facts recklessly omitted," and then "assess whether the reconstructed affidavit would establish probable cause." *Dempsey*, 834 F.3d at 470 (quoting *Wilson*, 212 F.3d at 789).

**i. Allegedly Improper Omissions and False Statements**

The court first considers the Defendants' alleged omissions. One of the central themes of Starks's amended complaint is that Defendants failed to perform an adequate investigation and, therefore, failed to include relevant exculpatory information in the Lebo Affidavit.[4] In their opposition brief, Plaintiffs summarize a laundry list of actions that they claim Lebo failed to do, which led to material omissions from the Lebo Affidavit, including:

> (1) Lebo modified the time on Diehl's surveillance footage at his own discretion; (2) Lebo failed to do anything to amplify the sound and voices of the 911 [calls] to confirm his suspicions; (3) Lebo failed to follow up and complete a crash scene investigation; (4) Lebo failed to analyze bullets; (5) Lebo failed to mention the weapon of [Knight] and/ or allowed it to disappear; (6) Lebo never reviewed the alleged camera of [Knight]; and among other things (7) Lebo failed to verify the authenticity and reliability of the evidence.

(Doc. 41, pp. 7–8.) (footnotes omitted). The court will not consider item 1, because that allegation is not pleaded in the complaint. *See Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") The other items amount to complaints that the police did not perform an exhaustive investigation that, if done, allegedly would have exonerated Starks. Yet, Starks's emphasis on the inadequacy of law enforcement's investigation misses the mark for three reasons.

First, the Defendants could not have intentionally or recklessly withheld information if they never knew the information in the first place. *See Wilson*, 212 F.3d at 788 (explaining that omissions can only be made with reckless disregard for the truth if the withheld fact is within the officer's ken); *United States v. Larnerd*, 514 F. Supp. 3d 660, 673 (M.D. Pa. 2021) ("[T]he court cannot hold that an officer omitted a fact in reckless disregard for the truth when he did not know the fact....").

***8** Second, the law simply does not require law enforcement to conduct an exhaustive investigation once probable cause is established. *See, e.g.*, *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000) (explaining that law enforcement "was not required to undertake an exhaustive investigation in order to validate the probable cause that ... already existed"). "[O]nce a law enforcement official has sufficient evidence within his knowledge to establish probable cause, no further investigation is required." *Dintino v. Echols*, 243 F. Supp. 2d 255, 264 (E.D. Pa. 2003). Indeed, even when there is "evidence that might exonerate a defendant [that] does not defeat probable cause." *Davis v. Malitzki*, 451 F. App'x 228, 233 (3d Cir. 2011). For these reasons, an alleged "failure to investigate fully is not evidence of an affiant's reckless disregard for truth." *United States v. Brown*, 631 F.3d 638, 648 (3d Cir. 2011) (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).

Third, Defendants correctly point out that the evidence Starks wishes law enforcement uncovered would simply support his affirmative defense that he acted in self-defense. (Doc. 47, p. 6.) In essence, Starks is alleging that if Defendants conducted an exhaustive investigation, they would have realized that Starks shot at Knight in self-defense. Yet, "[p]olice officers are generally not required to consider an affirmative defense that is not 'a clear cut matter in criminal prosecutions.' " *Rittacco v. Zelechowski*, Civil Action No. 22-544, 2024 WL 2319505, at *9 (W.D. Pa. May 22, 2024). The inherently fact-intensive nature of self-defense is not a straightforward matter "fit for resolution by the charging officer" in a case like this one. *Id.* (collecting authority). For these three reasons, Plaintiffs have not identified any omissions that are relevant to the instant analysis.

The only non-conclusory allegation that arguably identifies a specific omission in the amended complaint states:

> "[T]he body worn camera of Sgt. Asper shows that NYCRPD was aware that [Starks's vehicle] was disabled at the time he was violently rammed by a vehicle with over 13g's of force, and that shots were fired after [Knight's vehicle] crashed into [Starks's vehicle] two (2) to three (3) times."

(Doc. 25, ¶ 31.) Starks emphasizes the importance of this allegation in his brief in opposition. (Doc. 41, p. 8.) Yet, the Lebo Affidavit plainly includes this information. It clearly describes Starks's statement to law enforcement that his vehicle went into "limp mode"—allowing him to drive only "2–5 MPH"—after Knight purportedly made "small contact to the rear of [Starks's] vehicle." (Doc. 34-1, p. 3.) Similarly, the Lebo Affidavit includes both Starks's statements that he only fired at Knight after Knight had thrice violently rammed Starks's vehicle. (*Id.*) Clearly, Defendants could not have intentionally or recklessly omitted information when the information is actually included in the Lebo Affidavit. Therefore, Starks has failed to adequately allege any omissions that are relevant to this analysis.

Next, the court considers alleged false statements in the Lebo Affidavit. Starks primarily contends that Defendants' failure to fully investigate the incident caused them to include many false statements in the Lebo Affidavit.[5] However, the court observes that such statements could not have been made with the requisite intent for the reasons similar omission could not have been.

***9** Excluding conclusory allegations of falsity, the amended complaint identifies two specific statements that Starks claims were false. First, Starks claims that Asper falsely spread information that Knight was shot by a shotgun, even though Knight told Asper that he was not and no other evidence supported Asper's conclusion. (Doc. 25, ¶¶ 105, 113, 116.) Second, Starks claims that Diehl's statement that she heard gunshots only after the vehicles collided was false, because she later changed her testimony at trial. (Doc. 25, ¶ 296.) Even assuming Defendants had the requisite intent in making these allegedly false statements, they are immaterial to the conclusion that probable cause existed.

### ii. Reconstructing the Lebo Affidavit

At the next step, the court considers the materiality of the identified improper omissions and false statements. Having determined that Starks failed to identify *any* omission made with the requisite intent, the court need only consider whether there was probable cause after excising the two allegedly false statements from the Lebo Affidavit. There undoubtedly was.

First, there is no mention in the Lebo Affidavit that Knight was shot by a shotgun. The Lebo Affidavit merely makes several passing references to the shotgun Starks possessed. (Doc. 34-1, pp. 1–4.) Even if Asper falsely stated that Knight was shot with a shotgun, those statements were not included in the Lebo Affidavit and, thus, were unnecessary to finding probable cause. Therefore, there is nothing for the court to excise from the Lebo Affidavit.

Second, the court will address Diehl's statements in the Lebo Affidavit suggesting that Knight was the aggressor, not Starks. By definition, such *exculpatory* evidence cannot be the basis for establishing probable cause. Therefore, excising Diehl's allegedly false statements from the Lebo Affidavit would do nothing to undermine the finding of probable cause.

The court finds that the "reconstructed" Lebo Affidavit is substantively identical to the original for the purposes of determining probable cause. The court did not insert or excise any information that undermines a finding of probable cause. As written, the Lebo Affidavit includes statements from Knight that incriminate Starks. It also includes an analysis of objective surveillance footage time-matched to audio of Starks's 911 call, which corroborates Knight's statements to police. The Lebo Affidavit contains more than "a credible report from a credible witness," which itself is sufficient to establish probable cause. *Merkle*, 211 F.3d at 790. Thus, the Lebo Affidavit clearly establishes a reasonable belief that Starks committed a crime.

This independent conclusion is further supported by the finding of probable cause at Starks's preliminary hearing. *Bingaman v. Buhay*, No. 4:06-CV-2144, 2007 WL 707026, at *5 (M.D. Pa. Mar. 2, 2007) (explaining that a "finding of probable cause at a preliminary hearing," although not conclusive, "may be evidence of probable cause"); *see also Pardue v. Gray*, 136 F. App'x 529, 533 (3d Cir. 2005) (approving of district court citing independent findings of probable cause "as evidence that supported, rather than compelled, a finding of probable cause"). Starks dismisses the significance of the preliminary hearing. He argues—without citing authority—that the purpose of a preliminary hearing is to determine if there is *prima facie* case against the defendant, not to determine if there is probable cause. (Doc. 41, p. 6.) This is simply a semantic difference without a distinction. As the Pennsylvania Supreme Court has recognized, " 'a prima facie case' entails a mere determination of probable cause." *Commonwealth v. Williams*, No. 17 EAP 2024, 2025 WL 542355, at *6 (Pa. Feb. 19, 2025) (quoting *Commonwealth v. Talley*, 265 A.3d 485, 517 (Pa. 2021)); *accord Commonwealth v. Grekis*, 601 A.2d 1284, 1292 n.10 (Pa. Super. Ct. 1992) ("The purpose of a preliminary hearing is to establish that there is probable cause to hold a defendant for trial and to protect an accused against unlawful detention.").

***10** Finally, Starks is adamant that the prosecutors' decision to withdraw with prejudice the charges against him proves, *ex post facto*, that probable cause clearly didn't exist. (*See, e.g.*, Doc. 25, ¶ 33; Doc. 41, p. 5.) The court disagrees that the prosecutors' decision is significant on this issue. Simply obtaining a favorable outcome at trial does not, *per se*, negate an earlier finding of probable cause. *See Zimmerman v. Corbett*, 873 F.3d 414, 419 (3d Cir. 2017). That is especially true where, as here, the withdrawal of the charges resulted from a change in a witness's testimony from the start of the investigation to the trial.

The court determines that Starks has not alleged a constitutional violation, because Defendants had probable cause to arrest and charge him. Accordingly, qualified immunity shields Lebo and Asper from the Fourth Amendment claims. The court will, therefore, dismiss these claims with prejudice.

To the extent that Starks's *Monell* claims against NYCRPD and Heidelberg are based on these Fourth Amendment claims, they too must fail. *See Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no [constitutional] violation in the first place, there can be no derivative municipal claim.")

So, too, Starks's state-law claim for malicious prosecution must fail. *See Tomaskevitch v. Specialty Records Corp.*, 717 A.2d 30, 33 (Pa. Commw. Ct. 1998) (stating that "[a]bsense of probable cause is an indispensable element of" a malicious-prosecution claim under Pennsylvania law).

### 2. Fourteenth Amendment Claims

Starks and Christian both assert § 1983 claims for alleged violations of their rights under the Equal Protection Clause. Plaintiffs' amended complaint requires a close reading to parse out exactly what the claim is. Plaintiffs' five-line response in opposition to Defendants' motion to dismiss these claims did not provide any additional clarity. Based on a comprehensive review of the amended complaint, the court interprets Christian's claim to be a general § 1983 equal protection claim and Starks's claim to be a selective-enforcement claim. Defendants do not make any argument that qualified immunity shields them from these claims; instead, they move to dismiss these claims pursuant to Rule 12(b)(6). (*See* Doc. 35, pp. 33–35.) The court analyzes each plaintiff's respective claim in turn.

### i. Christian's equal protection claim

Christian brings an equal protection claim against Migatulski, NYCRPD, and Heidelberg. The thrust of Christian's claim appears to be that Migatulski allegedly failed to respond promptly to Starks's 911 call because Christian was a member of a protected class. (*See* Doc. 25, ¶¶ 202–206.) To survive Defendants' motion to dismiss, Christian "must allege that he was: (1) a member of a protected class; (2) similarly situated to members of an unprotected class; and (3) treated differently from members of the unprotected class." *Green v. Chester Upland Sch. Dist.*, 89 F. Supp. 3d 682, 693 (E.D. Pa. 2015). The sine qua non of an equal protection claim is "purposeful discrimination" *Id.*

Upon review of the amended complaint, Christian fails to allege any facts to suggest that Migatulski treated him less favorably than a similarly situated person. This is fatal to his claim. *See id.* (dismissing equal protection claim when plaintiff failed to identify a similarly situated individual who received different treatment). Nothing in the amended complaint suggests that Migatulski knew that Christian was the person for whom Starks requested police assistance. There is no allegation that Christian made any of the 911 calls himself or that Migatulski spoke with Christian before responding to Starks's 911 calls or had any knowledge of Christian. Thus, it is implausible that Migatulski's allegedly delinquent response could have been the product of purposeful discrimination against Christian. Therefore, Christian's equal protection claim fails.

### ii. Starks's equal protection claim

***11** Starks claims that Defendants targeted him for criminal prosecution, rather than Knight, on the basis of Starks's race. Although not labelled as such, Starks's equal protection claim is a claim for selective enforcement. Discriminatory enforcement of race-neutral laws "has been held to violate the Equal Protection Clause of the Fourteenth Amendment since *Yick Wo v. Hopkins*." *Davis*, 451 F. App'x at 234. "[S]elective prosecution [or enforcement] may constitute illegal discrimination even if the prosecution [or enforcement] is otherwise warranted."[6] *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 425 (3d Cir. 2003). Accordingly, the court's ruling on Starks's Fourth Amendment claims is immaterial to his Equal Protection claims. *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) (finding that the absence of a Fourth Amendment violation does not bar an Equal Protection claim).

To survive Defendants' motion to dismiss, Starks's allegations "must demonstrate (1) that he was treated differently from other similarly situated individuals, and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, or some other arbitrary factor." *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)).

With respect to the first element, a similarly situated individual in this context is one who "committed the same basic crime in substantially the same manner." *United States v. Houck*, No. 22-CR-323, 2023 WL 144117, at *2 (E.D. Pa. Jan. 10, 2023) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)). Here, Starks alleges that an unprovoked Knight intentionally caused multiple violent collisions between his vehicle and Starks's while Starks was in or next to his vehicle. (Doc. 25, ¶¶ 74–86.) If true, these actions could plausibly support a finding that Knight committed the same crimes with which Starks was charged. Accordingly, Starks has sufficiently alleged that Knight is a similarly situated individual and that he received different treatment than Knight.

With respect to the second element, Starks generally alleges that Defendants in their investigation were "motivated by prejudicial, discriminatory, and non-relevant factors necessarily including his race." (Doc. 25, ¶ 91.) He supports this general allegation with more specific allegations that Defendants used racially charged language when referring to Starks and Christian. As noted above, Starks alleges that Asper referred to him as "foreign" and to Christian as the "Chinese guy, Korean guy, or whatever." (*Id.* ¶ 101.) Asper allegedly also made statements intimating that Starks was a drug user and "suggested to other officers during the investigation that ... Starks and/or his family are likely drug dealers." (*Id.* ¶ 103.) Starks alleges that Asper's statements reveal that "Asper made a rush to judgment, based in racial discrimination, without examining the evidence." (*Id.* ¶ 116.) He also alleges that Asper's statements tainted Defendants' investigation. (*Id.*) Taken together, the court finds that these allegations sufficiently support Starks's claim that he suffered from selective treatment based on race. *Cf. Watson v. Witmer*, 183 F. Supp. 3d 607, 613 (M.D. Pa. 2016) (finding plaintiff's equal protection claim survived motion to dismiss).

Therefore, the court will not dismiss Starks's equal protection claims.

### iii. Starks's *Monell* Claims against NYCRPD

***12** Starks also brings *Monell* claims against NYCRPD for the alleged violation of his equal protection rights. (Doc. 25, ¶¶ 207–36.) [7] Defendants insist that these claims should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Municipalities cannot be held "vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Instead, municipalities only become liable under § 1983 "when execution of a government's policy or custom" causes the constitutional injury. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). For his *Monell* claims to survive, Starks must plead that a "policy or custom, whether made by it lawmakers or by those whose edicts or acts may fairly be said to represent official policy inflict[ed] [his] injury." *Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa. 2016) (quoting *Monell*, 436 U.S. at 694).

NYCRPD mostly faults Starks for failing to identify any specific policy or custom that caused Starks's alleged injuries. (Doc. 35, p. 31.) Although it is true that Starks failed to identify a specific policy or custom, a plaintiff is not required to meet such an "unduly harsh" burden at the pleading stage. *Carter v. City of Philadelphia*, 181 F.3d 339, 357–58 (3d Cir. 1999). Indeed, there are multiple ways a plaintiff can plead that a policy or custom caused their constitutional injury without specifically identifying a formal policy. *Ashley v. Kosehba*, No. 1:22-CV-00982, 2023 WL 6200805, at *4 (M.D. Pa. Sept. 22, 2023). It is clear, however, that Starks's allegations entirely rely on only one such way: NYCRPD's failure to train its officers.

The Supreme Court long ago recognized that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). From *Canton*, the Third Circuit has adopted a three-part test to determine when "a municipality's failure to train or supervise ... amount[s] to deliberate indifference." *Carter*, 181 F.3d at 357 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Under the *Carter* test, Starks must allege that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (footnote omitted).

As to the first factor, the policymaker must " 'know to a moral certainty' that their officials will face a certain situation." *Jones v. County of York*, No. 1:19-CV-00229, 2020 WL 3892878, at *5 (M.D. Pa. July 10, 2020) (quoting *Carter*, 181 F.3d at 357). Here, Starks alleges that NYCRPD knew that their officers will "need to determine fault and/or criminal conduct, and/or ... need to remain neutral and non-discriminatory regarding race/color/national origin of participants/ witnesses." (Doc. 25, ¶ 222.) In essence, Starks is alleging that NYCRPD knew that officers will need to investigate potential criminal conduct and will have to do so in a non-discriminatory manner. This is a sufficient allegation to satisfy this first factor.

***13** With respect to the second factor, Starks relies on two specific allegations of past misconduct against NYCRPD. First, he alleges that NYCRPD was previously sued for constitutional violations in *Snyder v. Wallace*, No. 1:15-cv-00760 (M.D. Pa. filed Apr. 17, 2015). (*Id.* ¶ 228.) This case, however, could not have provided NYCRPD notice that its employees were engaging in racial discrimination for two reasons. *Snyder* has nothing to do with discriminatory conduct or Equal Protection violations. *See* Compl., *Snyder v. Williams*, No. 1:15-cv-00760 (M.D. Pa. Apr. 17, 2015), ECF No. 1. And, no finding of actual wrongdoing was ever made, because the case was settled. Stipulation of Dismissal, *Snyder v. Wallace*, No. 1:15-cv-00760 (M.D. Pa. Apr. 13, 2026), ECF No. 37; *see Jones*, 2020 WL 3892878, at *5 (explaining that settled "cases fail to prove that the [defendant] was on notice of wrongdoing by its employees"). Nevertheless, Starks's also alleges that NYCRPD's annual reports from 2017 through 2021 reveal that its officers had been disciplined for violations 42 times during that period. (Doc. 25, ¶ 219.) Starks does not specifically allege that any of those violations concerned racial discrimination. Yet, specific descriptions of the incidents involved are presumably not included in the annual reports or otherwise available to Starks. Given this, Starks should be permitted to proceed to discovery to test his claims.

Finally, as to the third factor, Starks alleges that if NYCRPD officers continued to racially discriminate "in performing a

police investigation, that will frequently cause the deprivation of constitutional rights." (*Id.* ¶ 233.) NYCRPD makes no argument as to why that allegation is insufficient under the *Carter* test. The court see no reason why it would be. Accordingly, Starks's pleadings satisfy the three *Carter* factors. Starks's *Monell* claims against NYCRPD will proceed as it relates to the alleged Equal Protection violation.

### 3. Conspiracy Claims

Starks and Christian also bring a § 1983 conspiracy claim against Lebo, Asper, Migatulski, and NYCRPD. For this claim to survive a motion to dismiss, Plaintiffs must allege:

> "(1) two or more persons conspire[d] to deprive any person of [constitutional rights];
>
> (2) one or more of the conspirators perform[ed] ... any overt act in furtherance of the conspiracy; and
>
> (3) that overt act injure[ed] the plaintiff[s] in his person or property or deprive[d] the plaintiff[s] of any right or privilege of a citizen of the United States ... with the added gloss under § 1983 that "the conspirators act 'under the color of state law.' "

*Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quoting *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)). Defendants argue that Plaintiffs merely proffer "boilerplate" allegations of conspiracy. (Doc. 35, p. 39.) The court agrees. Plaintiffs allege that Defendants conspired to violate Plaintiffs' constitutional rights without alleging any facts to suggest, let alone support, that Defendants agreed to violate Plaintiffs' rights. This is insufficient to state a § 1983 conspiracy claim. *Leer Elec., Inc. v. Pa. Dep't of Lab. & Indus.*, 597 F. Supp. 2d 470, 484 (M.D. Pa. 2009). Thus, the court will dismiss Plaintiffs' § 1983 conspiracy claim.

As to Starks's civil conspiracy claims under Pennsylvania law, Starks's failure to proffer allegations beyond a recitation of the cause of action's elements also necessitates the dismissal of those state law claims. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) ("To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."); *Shaffer v. Proctor & Gamble*, 604 A.2d 289, 293 (Pa. Super. Ct. 1992) (affirming dismissal of civil conspiracy claim when it was "merely conclusory rather than presenting facts").

### 4. Remaining Assortment of other Alleged Constitutional Violations

Finally, the court must parse the remaining constitutional claims from the following allegation, which Starks lodges against Lebo and Asper:

> [Officer Lebo/Sgt. Asper] while acting under color of state law deprived Richard Starks of his rights under the Constitution and law of the United States, in violation of 42 U.S.C. Section 1983, including violating his 4th amendment rights including to be free from searches and seizures, violating the duty to disclose or act upon exculpatory evidence, failing to conduct a constitutionally adequate and independent investigation of the facts and the evidence, violating the duty to gather, test, and preserve evidence, violating the rights of accused in criminal proceedings, rights under Brady v. Maryland, and rights to Due Process under the law, violating the right to bear arms and the right to travel, and in otherwise violating [sic] of his Civil Rights under both the US Constitution and the Pa. Constitution including the right against false arrest and malicious prosecution where Richard Starks was actually innocent of the charges lodged against him.

***14** (Doc. 25, ¶¶ 186, 193.) Considering these paragraphs together with the parties briefing, the court identifies four additional § 1983 claims arising respectively from: (1) alleged *Brady* violations; (2) alleged violations of Starks's due process rights; (3) alleged violations of Starks's Second Amendment rights; and (4) alleged violations of Starks's right to travel. (*See id.*) None of these claims pass muster.

As to the first two, Defendants interpret Starks's due process claim to be entirely premised on the alleged *Brady* violations. (Doc. 35, p. 30 n.6.) Starks does not dispute this interpretation. Defendants argue that both claims should fail, because none of them were alleged to have played a role in the alleged *Brady* violations. (*Id.*) The Third Circuit has recognized a § 1983 claim can be brought against police officers who "affirmatively conceal material evidence from the prosecutor." *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010). As explained above, however, Starks makes no allegation that Lebo or Asper affirmatively withheld information from prosecutors. Accordingly, Starks's due process and *Brady* claims fail. [8]

Defendants also argue that the court should dismiss Starks's Second Amendment claims for being "completely underdeveloped." (Doc. 35, p. 30 n.6.) The court agrees. Besides a single conclusory reference to a Second Amendment violation, no factual allegations in the amended complaint indicate that a Second Amendment violation occurred. Therefore, Starks's Second Amendment claim also fails.

Defendants did not ask the court to dismiss Starks's claim for violations of his right to travel. Nevertheless, there is little doubt that Starks's perfunctory, four-word reference to a such violation is insufficient to state a claim. The court will, therefore, dismiss this claim *sua sponte. See Bintliff-Ritchie v. Am. Reinsurance Co.*, 285 F. App'x 940, 943 (3d Cir. 2008) ("The District Court has the power to dismiss claims *sua sponte* under Rule 12(b)(6).")

### C. State Law Claims

Defendants also seek dismissal of Plaintiffs' Pennsylvania tort claims. Starks and Christian each bring claims against Defendants for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). The court agrees that Plaintiffs have failed to state claims for IIED and NIED.

#### 1. IIED

To state a claim for IIED under Pennsylvania law, Plaintiffs must plead: "(1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that the same was 'substantially certain' to occur." *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 439 (M.D. Pa. 2018) (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217–18 (3rd Cir. 2001)).

Defendants' argument for dismissal assumes that Plaintiffs' IIED claims are premised on their discontent with Defendants' investigation. (Doc. 35, pp. 35–36.) Plaintiffs do not refute Defendants' assumption, but rather provide a cursory response that refers the court back to its pleading. (Doc. 41, p. 14.) Upon close review of the amended complaint, the court interprets Plaintiffs' IIED claims differently than Defendants. Christian's IIED claim arises from the racially inflammatory language that Defendants' allegedly directed towards him. Similarly, Starks's claim arises from his witnessing of the IIED Defendants allegedly inflicted upon his son. *See generally* Restatement (Second) of Torts § 46(2) (describing liability when IIED is directed at a third person). Nevertheless, these IIED claims still must fail, because Defendants' alleged actions are not outrageous or extreme as a matter of law.

***15** "It is well established that only the most extreme and outrageous conduct will give rise to an IIED claim." *Amspacher v. Red Lion Area Sch. Dist.*, No. 1:23-CV-00286, 2024 WL 4631815, at *6 (M.D. Pa. Oct. 30, 2024); *accord Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (explaining that IIED claims arise from "only the most clearly desperate and ultra extreme conduct"). " '[M]ere insults, indignities, threats, annoyances, petty oppressions, and other trivialities' do not constitute extreme and outrageous conduct." *Amspacher*, 2024 WL 4631815, at *6 (quoting *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 543 (M.D. Pa. 2009)). A defendant exhibiting "callousness or insensitivity ... does not suffice to establish liability" for IIED. *Waite v. Blair, Inc.*, 937 F. Supp. 460, 474 (W.D. Pa. 1995).

Here, Defendants allegedly referred to Christian as "this Chinese guy, or Korean guy, or whatever" and referred to Starks as "foreigner." (Doc. 25, ¶¶ 269–70.) This isolated conduct alone is not so outrageous and extreme as to give rise to IIED liability. *Cf. Johnson v. Lowes Cos.*, Civil Action No. 05-6018, 2007 WL 792332, at *3 (E.D. Pa. Mar. 14, 2007) (holding that the defendant's reference to the plaintiff as "Black Lady" was "not extreme and outrageous behavior sufficient to establish liability for [IIED]"); *Dawson v. Zayre Dep't Stores*, 499 A.2d 648, 649 (Pa. Super. Ct. 1985) (determining that the defendant's use of a racial epithet

directed at plaintiff, although “derogatory and offensive,” was not sufficiently extreme to permit recovery for IIED “without other aggravating circumstances”). Having failed to allege sufficiently outrageous and extreme conduct, Plaintiffs' IIED claims must fail.

### 2. Negligent Infliction of Emotional Distress

Defendants claim that they are all immune from liability for Plaintiffs' NIED claims under Pennsylvania statutory law. The court agrees. In Pennsylvania, a “local agency” is immune from liability “for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.” 42 Pa. Con. Stat. § 8541. There are several limited exceptions to this general rule that are not applicable here. *See* 42 Pa. Con. Stat. § 8542(b). Similarly, employees of local agencies possess immunity from liability for civil damages “caused by acts of the employee which are within the scope of his office or duties” that is commensurate with “his employing local agency.” 42 Pa. Con. Stat. § 8545.[9] Defendants plainly fall within the ambit of these provisions.

Plaintiffs offer a single retort. They claim—without citation to any authority—that NYCRPD is not a “local agency.” (Doc. 41, pp. 14–15.) They posit that NYCRPD is not a local agency since “it is run by a Board of Directors, and provides services to multiple (eleven) townships or municipalities.” (Doc. 41, p. 15.) This argument is wholly unpersuasive. “Local agency” is defined by statute as “[a] government unit other than the Commonwealth government.” 42 Pa. Con. Stat. § 8501. NYCRPD squarely fits this definition. *See Galligani v. N. York. Cty. Reg'l Police Dep't*, No. 1:10-CV-1136, 2012 WL 5386131, at *1 (M.D. Pa. Nov. 1, 2012) (describing NYCRPD as a “state government agency”). Therefore, Plaintiffs NIED claims must be dismissed with prejudice, because Defendants are immune from them.

### D. Dismissal with Prejudice

***16** In addition to the claims from which Defendants are immune, the court will dismiss with prejudice Plaintiffs' other deficient claims. Starks and Christian “had the opportunity to amend” their claims “and cure [the] deficiencies” that Defendants identified in their original motion to dismiss. *Prukala v. Chase Bank, N.A.*, No. 3:19-CV-1791, 2020 WL 5351042, at *5 (M.D. Pa. Sept. 4, 2020). They failed to do so. This failure warrants dismissal with prejudice. *Ghaffari v. Wells Fargo Bank NA*, 621 F. App'x 121, 125 (3d Cir. 2015).

## CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part Defendants' motion to dismiss. The court will deny Defendants' motion with respect to Starks's Fourteenth Amendment claim. The court will grant Defendants' motion with respect to all other claims against Defendants. An appropriate order will issue.

### All Citations

Not Reported in Fed. Supp., 2025 WL 895826

## Footnotes

1 For ease of reference, the court uses the page numbers from the CM/ECF header.

2 Knight and his father, Marvin Knight, are also defendants in this case. There is currently a pending motion to substitute the Administrator of the Estate of Marvin Knight as a party. (Doc. 68.) These defendants are not implicated by the instant motion.

3 Plaintiffs contend that *Shelley* is distinguishable, because the plaintiff in that case was convicted on some charges. (Doc. 39, p. 8.) This is significant, according to Plaintiffs, because “[a]uthentcity and reliability of documents is [sic] bolstered where a conviction occurs.” (*Id.*) This argument is wholly unpersuasive. As to authenticity, nowhere else do Plaintiffs argue that the Lebo Affidavit is not the authentic document used to bring charges against Starks. As to reliability, Plaintiffs misunderstand the process by which the court would review the Lebo Affidavit. As explained below, the court must reconstruct the affidavit based upon Plaintiffs'

well-pleaded allegations. This process does not involve weighing the reliability of the Lebo Affidavit against the reliability of Plaintiffs' allegations.

4 Paragraph 152 of the amended complaint is an illustrative example of Plaintiffs' theory. That paragraph reads, "Officer Lebo and the NYCRPD knew that if they did complete the investigation of the Incident, necessarily including the accident reconstruction, bullet analysis, trajectory analysis, and physical inspection, that the story of Ken Knight would be completely contradicted and unusable; therefore, NYCRPD did not complete the investigation, and consciously withheld the information from the prosecution in order to have Mr. Starks arrested and prosecuted for attempted murder." (Doc. 25, ¶ 152.)

5 Paragraph 31 of the amended complaint is illustrative. It reads, "Officer Lebo, and NYCRPD all knowingly provided false information to the Prosecutor in that they stated that the evidence supported the statements of Ken Knight where the evidence was not reviewed or analyzed." (Doc. 25, ¶ 31.)

6 A "selective enforcement" claim has virtually identical standards as a "selective prosecution" claim; the former is pleaded "when a plaintiff's grievance is directed solely at police misconduct," rather than prosecutorial misconduct. *Davis*, 451 F. App'x at 234 n.11.

7 Starks also brings a *Monell* claim against Heidelberg. (Doc. 25, ¶¶ 242–46.) The court interprets this as an alternatively pleaded claim that would be operative "to the extent that NYCRPD is a sub-unit and/or agency or part of" Heidelberg. (*Id.* ¶ 245.) It seems that Starks brought the *Monell* claim against Heidelberg in case NYCRPD was not the proper entity to sue. The parties are directed to confer as to whether Heidelberg is a necessary defendant in this case and, if not, file a stipulation of dismissal.

8 One could interpret Starks's due process claim as being premised on law enforcement's allegedly deficient investigation. Such a claim, however, "if cognizable, could only arise under the Fourth Amendment." *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018) (citing *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)). Therefore, Starks cannot save his faulty Fourth Amendment claim by framing it as a due process claim.

9 Employees of local agencies, however, are not immune for actions deemed to be "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Con. Stat. § 8550. Plaintiffs do not allege that Defendants' actions giving rise to the NIED claim fall within any of these categories.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 10

2024 WL 1747645
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Cecil THOMPSON, Plaintiff,
v.
CITY OF WILLIAMSPORT, et al., Defendants.

No. 4:22-CV-01159
|
Signed April 23, 2024

**Attorneys and Law Firms**

J. Conor Corcoran, Law Office of J. Conor Corcoran, Philadelphia, PA, for Plaintiff.

Shawna R. Laughlin, William J. Ferren & Associates, Hartford, CT, for Defendants City of Williamsport, Jason P. Bolt.

Austin White, Stephen Hartley, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County.

**MEMORANDUM OPINION**

Matthew W. Brann, Chief United States District Judge

**I. BACKGROUND**

***1** In June 2023, Plaintiff Cecil Thompson filed a seven-count amended complaint against the City of Williamsport (“Williamsport”), Lycoming County (“Lycoming”), Jason P. Bolt, Sherry Clark, Dayna Sierra, Zaria Cooper, and Rose View SNF, LLC, doing business as Roseview Nursing and Rehabilitation Center (“Rose View”).[1] Cooper and Rose View were subsequently dismissed from the suit.[2] In November 2023, this Court dismissed Thompson's claims against Williamsport, Bolt, and Lycoming but granted Thompson leave to amend his complaint.[3] Thompson filed a second amended complaint in December 2023.[4] In December 2023, Lycoming filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[5] Williamsport and Bolt also filed a motion to dismiss.[6] The motions are now ripe for disposition.

1 Amended Complaint, Doc. 37.

2 Order, Doc. 59.

3 Order, Doc. 61.

4 Second Amended Complaint, Doc. 62.

5 Lycoming County's Motion to Dismiss, Doc. 63.

6 City of Williamsport and Jason P. Bolt's Motion to Dismiss, Doc. 64.

**A. Motion to Dismiss Standard**

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to “state a claim upon which relief can be granted.” Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[7] and *Ashcroft v. Iqbal*,[8] “[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’ ”[9] The United States Court of Appeals for the Third Circuit has instructed that “[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps”: (1) “take note of the elements the plaintiff must plead to state a claim”; (2) “identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth”; and (3) “assume the[ ] veracity” of all “well-pleaded factual allegations” and then “determine whether they plausibly give rise to an entitlement to relief.”[10]

7 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

8 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

9 *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

10 *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

**B. Facts Alleged in the Second Amended Complaint**

**1. The incident**

On May 18, 2020, Dayna Sierra and her mother Sherry Clark returned to their shared double home after running errands.[11]

While unloading groceries, Sierra alerted Clark that she noticed a tall, thin black male watching them from behind a tree in an alleyway (the "perpetrator"). [12] The perpetrator was wearing a light blue surgical mask and a gray hoodie with black stripes. [13] While Sierra was next door, Clark was inside her home putting groceries away. [14] The perpetrator knocked on Clark's back door while she was upstairs. [15] Clark's ten-year-old granddaughter Jada answered, and the perpetrator asked: "Is Lisa home?" [16] When Clark's grandson Christian Rivera came to the door, the perpetrator asked him the same question. [17] Rivera informed the perpetrator that no one named Lisa lived there. [18]

11 Second Amended Complaint, Doc. 62 ¶11.

12 *Id.* ¶¶11-12.

13 *Id.* ¶11.

14 *Id.* ¶13.

15 *Id.*

16 *Id.* ¶14.

17 *Id.* ¶15.

18 *Id.*

***2** The perpetrator then brandished a gun from his waistband and held it against Rivera, stating that he would shoot Rivera and his two sisters if they did not "get on the ground and be quiet." [19] He led the children upstairs to the bedroom, where Clark was, and pointed the gun at Clark's head. [20] He again stated that he would kill Clark and her grandchildren unless they sat down and remained quiet. [21]

19 *Id.* ¶16.

20 *Id.*

21 *Id.*

Clark feigned sitting on her bed, reached for a hidden "flashlight/billy club," and struck the perpetrator's arm. [22] She began repeatedly striking his body, beginning a physical struggle which continued as the pair moved to the hallway. [23] The perpetrator began stepping on Clark's legs and feet after knocking her to the floor, telling her to stop striking him. [24] Clark regained her footing and chased the assailant down the stairs, where he left his handprint on a picture frame. [25] The struggle continued in Clark's kitchen, until Clark pushed the perpetrator out of her back door. [26] Clark called the police immediately. [27]

22 *Id.* ¶17.

23 *Id.* ¶¶17-18.

24 *Id.*

25 *Id.* ¶18.

26 *Id.*

27 *Id.* ¶19.

Meanwhile, Cecil Thompson was having a less eventful evening playing Xbox at his home. [28]

28 *Id.* ¶73.

### 2. The investigation

Sierra and Clark, and their families gave statements to police officers that same day. [29] In the aftermath of the incident, Williamsport police officers extracted photographs of the assailant from a surveillance camera outside of the victims' residence and distributed those images to officers. [30] On May 21, 2020, two days after the incident, Deputies Warden, Whipple and Heath of the Lycoming County Sheriff's Department were driving near Sierra and Clark's double home when they observed Thompson walking along the street. [31] Thompson was wearing a black hooded sweatshirt with gray stripes, and like the perpetrator, is a tall, thin, black male. [32] As Deputy Warden believed that Thompson matched the perpetrator's general profile, he contacted officers at the Williamsport Police Department. [33] Warden received one of the extracted security camera photographs of the perpetrator via text message. [34]

29 *Id.* ¶19.

30 *Id.* ¶20.

31 *Id.* ¶22.

32 *Id.* ¶23.

33 *Id.* ¶¶23-24.

34 *Id.* ¶24.

After the deputies stopped Thompson and asked for his identification, Thompson explained that he was walking home from his shift at Rose View, a nearby nursing home; he was released from the stop without arrest.[35] After the stop, Warden wrote in his incident report that Thompson appeared younger than the perpetrator, and wore distinct clothing.[36] He also wrote that "the photos [he] received are somewhat pixelated and it was hard to see any distinct facial features other than black glasses."[37] Over the subsequent two months, between May 21, 2020 and July 28, 2020, Clark, Sierra, and other members of their households saw Thompson passing their homes and believed that he was the perpetrator. They sent law enforcement officers at least five photographs of Thompson.[38]

35 *Id.* ¶33.

36 *Id.* ¶¶29-30.

37 *Id.* ¶24; *id.* at 6.

38 *Id.* ¶38.

On June 25, 2020, Bolt and other Williamsport officers "raided" Rose View "with rifles and/or other weapons drawn."[39] The officers approached Human Resources employee Zaria Cooper, "specifically said they were looking for Plaintiff Cecil Thompson," and asked if the photograph of the perpetrator depicted him.[40] Cooper agreed that Thompson was shown in the photograph.[41]

39 *Id.* ¶¶38, 81 ("They came in with, with um rifles and they were looking for, for him because of the crime that he um committed. And all I did was point out the employee that they were looking, looking for.").

40 *Id.*

41 *Id.*

### 3. The arrest and prosecution

***3** On July 28, 2020, Bolt filed an affidavit of probable cause to arrest Thompson.[42] Thompson contests the affidavit's truthfulness[43] and alleges that "Bolt simply inserted the Plaintiff's name as "THOMPSON" in boilerplate fashion in the Affidavit ... without ascertaining any corroborating evidence from Defendants Clark and Sierra," "simply based upon the multiple photographs and/or videos sent to him" of Thompson walking past Sierra and Clark's double-home.[44] The affidavit reads as follows:

> On Monday, May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home invasion/robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with the victim SHERRY CLARK, who stated that a B/M [later identified as CECIL THOMPSON, D.O.B. [redacted]] had knocked on the rear door and asked her 10-year- old granddaughter to see "Lisa." When the juveniles replied that no one by that name lived there and began to close the door, THOMPSON forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles [a 9-yr old female, 10-yr old female and 15-yr old male] and told them to "get on the ground and be quiet" or he would shoot them. After asking about the other occupants in the residence, THOMPSON then paraded the trio of juveniles to a second-floor bedroom where CLARK was. THOMPSON then pointed the firearm at CLARK before telling her and the juveniles to all "be quiet and sit down" inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at THOMPSON, which then began a brief altercation in which THOMPSON struck CLARK in the head, knocking her to the floor. THOMPSON continuously told CLARK that he would shoot her, however CLARK continued to strike THOMPSON in the legs. THOMPSON eventually ran from the bedroom and fled out of the residence.
>
> While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing the recordings THOMPSON could be observed in a grey/black hooded sweatshirt, blue jeans and white sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. THOMPSON is observed to stop and watch CLARK and another adult female carrying groceries into house, after which he raises his mask onto his face and approaches the residence.

On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed THOMPSON walking past the residence in work clothing and immediately recognized him. A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as THOMPSON.

Based on this information I request that a warrant be issued for THOMPSON and that he be brought before the courts to answer for these charges.[45]

42 *Id.* ¶44.

43 *Id.* ¶88.

44 *Id.* ¶¶ 48-50.

45 Affidavit of Probable Cause, Doc. 62-3 at 7-8.

On July 29, 2020, Bolt and other Williamsport officers arrested Thompson during his workday at Rose View.[46] Thompson then consented to a buccal swab, which was sent for comparison with the crime scene DNA.[47] Meanwhile, Thompson was charged with five felonies and eleven misdemeanors by the Lycoming County District Attorney's Office.[48]

46 Second Amended Complaint, Doc. 62 ¶53-54.

47 *Id.* ¶55.

48 *Id.* ¶54.

A preliminary hearing was held on August 4, 2020.[49] Every testifying witness who saw the perpetrator agreed that he had a unique, distinctive forehead.[50] Bolt agreed based on his review of security footage.[51] Clark's testimony also showed that she had poor eyesight and that the perpetrator wore a face mask during the incident.[52] Sierra testified that she never saw the perpetrator during the crime.[53] Thompson remained in jail as he was unable to pay the $750,000 bail.[54]

49 *Id.* ¶¶58-62.

50 Preliminary Hearing Transcript, Doc. 62-5 at 27:14–28:13 (Clark); 48:17–49:9 (Sierra); 76:14–77:9 (Rivera).

51 Second Amended Complaint, Doc. 62 ¶62; Preliminary Hearing Transcript, Doc.62-5 at 91-92.

52 *Id.* ¶58; Preliminary Hearing Transcript, Doc. 62-5 at 19, 25, 27-28.

53 Second Amended Complaint, Doc. 62 ¶59; Preliminary Hearing Transcript, Doc. 62-5 at 42-44, 48-49.

54 Second Amended Complaint, Doc. 62 ¶63.

***4** On September 29, 2020, two fingerprint examiners concluded that Thompson's fingerprints did not match those taken from the picture frame and flashlight/billy club.[55] Although this analysis was sent to Bolt that same day,[56] Thompson was not informed about the results until it was disclosed on November 20, 2022.[57] Upon this disclosure, Thompson's public defender sought to reduce his bail to $25,000.[58] Thompson paid the reduced bail and was released from imprisonment.[59] In total, Thompson was imprisoned for approximately four months.[60]

55 *Id.* ¶¶64-65; Fingerprint Analysis Report, Doc. 62-6.

56 Second Amended Complaint, Doc. 62 ¶67; Fingerprint Analysis Report, Doc. 62-6 (“ATTN: Jason Bolt”).

57 Second Amended Complaint, Doc. 62 ¶68.

58 *Id.* ¶70.

59 *Id.*

60 *Id.* ¶69.

Because Thompson's prosecution continued, his counsel sent a letter titled “Notice of Claim and Intent to Sue” to the Defendants in this case on December 3, 2020, stating that Thompson intended to pursue a civil action against them.[61] After the letter, even more exonerating evidence was produced. An affidavit obtained from a Microsoft employee on December 27, 2020, confirmed that Thompson was playing Xbox during the time of the crime.[62] And on February 23, 2021, the Pennsylvania State Police provided a DNA analysis confirming that Thompson's DNA did not match the DNA retrieved from the crime scene.[63] Despite these developments, the District Attorneys continued

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to prosecute Thompson's case for two additional years, allegedly in retaliation for Thompson's Notice of Claim letter.[64] Thompson contends that personnel from the District Attorney's Office offered to withdraw his criminal charges if Thompson agreed to dismiss this civil lawsuit.[65]

61 *Id.* ¶72; Notice of Claim and Intent to Sue, Doc. 62-7.

62 Second Amended Complaint, Doc. 62 ¶73; Xbox Affidavit, Doc. 62-8.

63 Second Amended Complaint, Doc. 62 ¶75; DNA Analysis Report, Doc. 62-4.

64 Second Amended Complaint, Doc. 62 ¶76.

65 *Id.* ¶86.

This Court stayed Thompson's civil proceedings while his prosecution was pending.[66] In September 2022, Thompson's criminal case was nol prossed by Order of the Court of Common Pleas of Lycoming County.[67] Thompson then filed a Status Report in March 2023, informing this Court that his prosecution had concluded.[68] In April 2023, after this Court lifted the stay,[69] Zaria Cooper telephoned Bonnie Schriner, who is employed by Schriner Process Service and Investigations.[70] Cooper stated that "police officers" had repeatedly come to her home and told her not to testify in this civil lawsuit.[71] Thompson also alleges that Williamsport and Lycoming provided no training or supervision to their police officers and attorneys concerning the timely provision of *Brady* material and the necessity of providing truthful statements in affidavits of probable cause.[72]

66 Motion to Stay, Doc. 4.

67 Second Amended Complaint, Doc. 62 ¶79.

68 Status Report, Doc. 6.

69 Order, Doc. 7.

70 Second Amended Complaint, Doc. 62 ¶82.

71 *Id.*

72 *Id.* ¶¶95-99.

Thompson now sues Bolt, Sierra, Clark, Williamsport, and Lycoming for witness intimidation under 42 U.S.C. § 1985(2), conspiracy to deprive him of civil rights under 42 U.S.C. § 1985(3), and various constitutional violations under 42 U.S.C. § 1983; he also brings state law claims of false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against Bolt, Sierra and Clark.

## II. ANALYSIS

### A. Section 1985 Claims Against All Defendants

Thompson's second amended complaint pleads two civil rights conspiracy claims under Section 1985, both based upon the allegation that officers told Zaria Cooper not to testify in this civil case.[73]

73 Second Amended Complaint, Doc. 62 at 24-25.

***5** The elements of a Section 1985(3) claim are "(1) a conspiracy of two or more persons; (2) motivated by racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of person to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or to the deprivation of any right or privilege of a citizen of the United States."[74]

74 *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001).

A plaintiff asserting a § 1985(3) claim must allege "that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[75] Thompson makes no allegation of race-based animus, but argues that he "is clearly a member of a class – American citizens charged with a crime, who are entitled to the effectuated protections of the U.S. Constitution."[76] But Thompson has not cited, nor has the Court discovered, any authority suggesting that "American citizens charged with a crime" is a class covered by Section 1985(3). Nor do Thompson's pleadings suggest any animus towards "American citizens charged with a crime." So the 1985(3) claim is dismissed with prejudice.

75 *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272-73, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

76 Brief in Opposition to Williamsport and Lycoming's Motion to Dismiss, Doc. 72 at 14.

“A Section 1985(2) witness intimidation claim required ‘(1) a conspiracy between two or more persons (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiffs.” [77] Unlike other Section 1985 claims, witness intimidation claims do not require allegations of racial or class-based discriminatory animus. [78] However, this claim is not yet ripe for review.

77 *Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 356 (3d Cir. 1986).

78 *Kush v. Rutledge*, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983).

“Ripeness is a justiciability doctrine that derives from Article III of the United States Constitution ... the doctrine is inextricably tied to Article III's requirement of a case or controversy.” [79] “The function of ripeness doctrine is to determine whether a party has brought an action prematurely.” [80] Ripeness involves a court's consideration of (1) “the fitness of the issues for judicial decision” and (2) “the hardship to the parties of withholding court consideration.” [81]

79 *Jie Fang v. Dir. United States Immigration & Customs Enforcement*, 935 F.3d 172, 185-86 (3d Cir. 2019).

80 *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003).

81 *Abbott Labs. v. Gardner*, 387 U.S. 136,148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Peachlum*, 333 F.3d at 433-34 (setting out considerations underpinning ripeness analysis).

Section 1985(2) witness intimidation claims require an injury to the plaintiff's case; either the witness is deterred from testifying in court in the action, or the witness intimidation occurs at the pre-trial stage, causing some other cognizable injury. [82] There is no way to determine whether Thompson will actually suffer the injury of Cooper not testifying, or not assisting in discovery, until this suit runs its course. If Cooper cooperates and testifies despite the officers' actions, then Thompson suffers no injury and his 1985(2) claim fails. Accordingly, while this claim is dismissed without prejudice, the Court declines to grant Thompson leave to amend his complaint to replead it in this suit.

82 *Malley-Duff*, 792 F.2d 341, 355-56 (3d Cir. 1986), *aff'd* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (explaining that witness intimidation at pretrial stage can impact her willingness or ability to provide discovery and thereby affect the outcome of a case).

### B. Section 1983 Claims Against Bolt

***6** Title 42 U.S.C. § 1983 provides a cause of action for violations of the United States Constitution under color of state law. [83] Thompson now alleges that Bolt has violated his Fourth, Fifth, and Fourteenth Amendment rights.

83 *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).

#### 1. Fifth Amendment Claim

Thompson pleads a Fifth Amendment claim, but it is unclear what theory he is alleging. He refers to the Fifth Amendment claim as relating to “criminal due process” and his Fourteenth Amendment claim as relating to “due process.” [84] As the Fourteenth Amendment incorporated the Fifth Amendment's due process rights against the states [85] and Thompson only provides arguments relating to an alleged *Brady* violation, I construe these claims together and analyze whether Thompson has plausibly alleged a Section 1983 claim based on a *Brady* violation under the Fourteenth Amendment.

84 Brief in Opposition to Williamsport and Bolt's Motion to Dismiss, Doc. 72 at 7.

85 *See Tarapchak v. Lackawanna Cnty*, 173 F.Supp. 3d 57, 78 (M.D. Pa. 2016) (“[T]hese Defendants are state actors and the Fifth Amendment does not restrict their actions as it only limits federal government action.”).

#### 2. Fourteenth Amendment *Brady* Claim

In *Brady v. Maryland*, the Supreme Court of the United States held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution."[86] The Government has an affirmative duty to disclose exculpatory evidence if suppressing it would be "of sufficient significance to result in the denial of the defendant's right to a fair trial."[87] "Police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor."[88] "There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued."[89]

86 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

87 *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

88 *Gibson v. Superintendent of New Jersey Dep't of Law & Public Safety-Division of State Police*, 411 F.3d 427, 443 (3d Cir. 2005).

89 *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Thompson alleges that "Defendant Bolt and/or Defendant City's police department and/or Defendant Lycoming County's district attorney office failed to provide the exculpatory Brady and/or Giglio evidence" for two months.[90] He also alleges that Bolt received the exonerating fingerprint analysis on September 29, 2020.[91] It is plausible that the fingerprint evidence is exculpatory, that Bolt willfully or inadvertently failed to disclose it for two months,[92] and that this caused the alleged injury of an extended term of imprisonment.

90 Second Amended Complaint, Doc. 62 ¶71.

91 *Id.* ¶68; Fingerprint Analysis Report, Doc. 62-6.

92 Thompson does not directly allege that Bolt failed to disclose this evidence to the prosecutor, but this fact can plausibly be construed in Thompson's favor based upon the facts in the second amended complaint.

***7** But an increased term of imprisonment due to a delayed bail reduction is not the kind of prejudice contemplated under *Brady*, so Thompson's claim is unavailable as a matter of law. "The obligation to disclose such 'Brady material' is 'not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial.' "[93] "To constitute a Brady violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant."[94] "No denial of due process occurs if Brady material is disclosed to [defendant] in time for its effective use at trial."[95]

93 *United States v. Bashir*, 738 F.App'x 743, 748 (3d Cir. 2018) (unpublished) (quoting *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983)); *see also Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (1999) (quoting *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555) ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the *verdict.*' ") (emphasis added).

94 *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984).

95 *Higgs*, 713 F.2d at 44.

Thompson's case was never tried because his prosecution was nol prossed.[96] And because he did receive the fingerprint evidence, Thompson would have been able to use it if a trial had been held.[97] This Court is skeptical that *Brady* protects a criminal defendant's due process rights at a bail hearing. Even if it did, the fingerprint evidence was only available to Bolt after the initial bail hearing. And, the eventual disclosure of this evidence allowed Thompson to effectively use it to secure a bail reduction at the subsequent hearing. Because Thompson suffered no prejudice to his right to a fair trial, or even a fair bail hearing, Thompson's Fifth and Fourteenth Amendment claims are dismissed with prejudice.

96 *See* Second Amended Complaint, Doc. 62 ¶79.

97 *See Bashir*, 738 F.App'x at 749 ("[W]hether a defendant's due process rights are violated ...

depends on whether the information is material and has been disclosed in time for the defendant to effectively use it.”).

### 3. Federal and State Law False Arrest, False Imprisonment, and Malicious Prosecution Claims

Thompson's Section 1983 Fourth Amendment claims against Bolt are based on theories of false arrest, false imprisonment, and malicious prosecution; he also brings equivalent claims under Pennsylvania state law. As this Court stated previously, “[e]ach of these constitutional torts shares the core element that probable cause must be lacking.”[98] And as before, probable cause is the only element of these torts disputed by the parties.

98 Memorandum Opinion, Doc. 60 at 14. False arrest and false imprisonment are generally interchangeable, requiring that the plaintiff was arrested or imprisoned without probable cause. *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020); *Wallace v. Kato*, 549 U.S. 384, 389, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). *See also Cesnalis*, 973 F.3d at 206 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)) (setting out five elements to malicious prosecution claims).

Thompson's Federal claims also require him to rebut Bolt's qualified immunity defense. “Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was ‘clearly established’ at the time of the challenged conduct.”[99] “A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.”[100]

99 *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

100 *Id.* at 741, 131 S.Ct. 2074 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (cleaned up).

***8** Because Bolt's affidavit was approved by a neutral magistrate and it is not obviously deficient, qualified immunity would ordinarily bar his Federal claims.[101] The exception to this bar applies where the officer (1) “knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that create a falsehood in applying for a warrant,” and (2) “such statements or omissions are material, or necessary, to the finding of probable cause.”[102] Under such circumstances, “the protection afforded by the magistrate's review [of the affidavit] is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are.”[103] The Court conducts a “three-step procedure ... First, we assess the evidence the plaintiff asserts was recklessly omitted from the affidavit. Next, we reconstruct an affidavit that includes any recklessly omitted information. And finally, we assess the materiality of the omitted information to the probable cause determination.”[104] The same analysis controls with respect to Thompson's Pennsylvania state law claims for false arrest, false imprisonment, and malicious prosecution.[105]

101 *See* Memorandum Opinion, Doc. 60 at 15; *Messerchmidt v. Millender*, 565 U.S. 535, 546-57, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012).

102 *Wilson*, 212 F.3d at 786-87 (citing *Sherwood v. Mulvill*, 113 F.3d 396, 399 (3d Cir. 1997)).

103 *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).

104 *Id.* at 470.

105 *See Rusoli v. Salisbury Twp.*, 126 F.Supp. 821, 869 (E.D. Pa. 2000) (citing *Patzig v. O'Neil*, 577 F.2d 841, 851 (3d Cir. 1978)) (“Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive both as to elements of proof and elements of damages.”); *Commonwealth v. Taylor*, 850 A.2d 684, 688-89 (Pa. Super. Ct. 2004) (Superior Court “adopt[ing] as [its] own the circuit court's reasoning regarding omissions” in an affidavit of probable cause in *Wilson v. Russo*).

Thompson's principal argument is that Bolt was “deliberately indifferent to the trifecta of exonerating, exculpatory Brady/Giglio evidence about the Plaintiff,”[106] but as this evidence was induced after Bolt wrote his affidavit of probable cause, failing to include it in the affidavit is neither misrepresentation nor omission. Just because Bolt could have discovered this exonerating information more speedily does not mean that he


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

intentionally or recklessly omitted it.[107] A court does "not evaluate probable cause in hindsight."[108]

106 Brief in Opposition to Williamsport and Bolt's Motion to Dismiss, Doc. 72 at 10-11.

107 *See Baker v. McCollan*, 443 U.S. 137, 145-45, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (quoting *Patterson v. New York*, 432 U.S. 197, 208, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.").

108 *Florida v. Harris*, 568 U.S. 237, 249, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).

That renders Thompson's later-discovered "trifecta" of exonerating evidence relevant only under the theory that it induced probable cause to dissipate after an initially lawful arrest. Some in-Circuit authority has suggested this theory's viability.[109] But four days after this Court's prior opinion, the Third Circuit considered the argument that "officers, following a valid arrest, [were obligated] to respond in some way to new information that dissipated the probable cause justifying that arrest" in an unpublished opinion.[110] The Third Circuit noted that it has twice punted on this "difficult question" and determined that such violations were not "clearly established" during the 2019-2021 period in which the relevant conduct occurred.[111] While unpublished decisions of the Court of Appeals are not binding on this Court, they do carry persuasive authority.[112] Consequently, I defer to the Third Circuit's recent qualified immunity determination in *Rivera*, and reject any Fourth Amendment argument premised upon later-discovered evidence.

109 *See* Memorandum Opinion, Doc. 60 at 18 (citing *Kelly v. Jones*, 148 F.Supp. 395 (E.D. Pa. Apr. 17, 2015) ("*Kelly I*") (motion to dismiss denied where a prosecuting officer's failure to investigate caused unconstitutionally prolonged period of imprisonment despite initially lawful arrest pursuant to valid warrant) *order vacated*, *Kelly v. Jones*, No. 14-cv-4317, 2015 WL 5144187, 2015 U.S. Dist. LEXIS 116433 (E.D. Pa. May 13, 2015), *order reinstated*, 148 F.Supp. 3d 406 (E.D. Pa. Nov. 24, 2015) ("*Kelly II*") (thoroughly analyzing the defendant's qualified immunity defense and finding this violation to be clearly established)).

110 *Rivera v. Dir. Ronald P. Edwards*, No. 23-1286, 2023 WL 8058753 at *3, 2023 U.S. App. LEXIS 30942 at *9 (3d Cir. Nov. 21, 2023).

111 *Id.*

112 *See Maracco v. Kuder*, No. 08-713 (NLH), 2009 WL 235469 at *3, 2009 U.S. Dist. LEXIS 6757 at *8 (D.N.J. Jan. 30, 2009) (explaining that unpublished opinions of the Third Circuit are not precedential but carry "considerable persuasive authority.").

***9** A host of other evidence is absent from Bolt's affidavit, but Thompson does not always explicitly allege Bolt's knowledge, or reckless disregard towards the truth, of this evidence when authoring the affidavit. Nevertheless, it can be inferred that Bolt intentionally or recklessly omitted three key facts at the time of the arrest.

First, Bolt was present during Zaria Cooper's identification and therefore aware of the suggestive procedure used. Officers confronted Cooper with "rifles drawn," showed her the pixelated image of the perpetrator, and asked if it depicted Thompson.[113] In contrast, Bolt's affidavit states that "[a] photo of the suspect was later shown to his employer [Cooper], who identified the individual that entered the residence as Thompson."[114] This omits the photograph's poor quality and the fact that Thompson was suggested to Cooper before she identified him.

113 Second Amended Complaint, Doc. 62 ¶40.

114 Affidavit of Probable Cause, Doc. 62-3 at 9.

Second, Bolt states that he reviewed the surveillance footage of the perpetrator.[115] Bolt was therefore aware that the footage was of poor quality and did not clearly depict the perpetrator's face.[116] By averring that "[i]n reviewing the recordings Thompson could be observed," and by inserting Thompson's name into his description of the crime, Bolt misrepresents the footage's quality and omits the uncertainty clouding this review of the photographs and recordings.[117]

115 *Id.* at 7. Bolt also described his review of this footage at the subsequent preliminary hearing.

Preliminary Hearing Transcript, Doc. 62-5 at 80-83.

116 Second Amended Complaint, Doc. 62 ¶¶24-30, 40. The quality of these photographs and videos is a factual issue construed in Thompson's favor. *See also* Deputy Warden Incident Report, Doc. 62-2.

117 Affidavit of Probable Cause, Doc. 62-3 at 7; Second Amended Complaint, Doc. 62 ¶¶48-49.

Third, at the preliminary hearing conducted after Thompson's arrest, every testifying witness who saw the perpetrator in person—Clark, [118] Sierra, [119] and Christian Rivera [120]—testified that the perpetrator's forehead was distinctive. Bolt's subsequent testimony also shows his awareness of this fact. He testified that based on his review of the surveillance footage, the perpetrator's forehead was “prominent,” “noticeable,” and “unique,” concluding that “it would be very helpful to identify someone with that forehead, that is correct, that it would be memorable, which is why everyone seems to remember it.” [121] It is therefore plausible both that the perpetrator's forehead was so unique that it was observed by and known to Bolt, and so unique as to be materially exculpatory.

118 Preliminary Hearing Transcript, Doc. 62-5 at 27:14–28:13 (“He had a weird forehead .... He has two like bumps on each side of his forehead on the top ... it goes straight up and then there's a bump here, and there's like a little separation in between ... I think he was born that way.”).

119 *Id.* at 48:17–49:9 (The perpetrator “had an off forehead. His forehead was odd to me. There was more of distinct physical features than most people's foreheads ... he seemed to have sort of a bump or kind of ridged his forehead.”).

120 *Id.* at 76:14–77:9 (Testifying that it was unique how the perpetrator's “forehead had been shaped,” and that it “didn't seem like ... something that you'd normally see ... it was like shaped like a little weird by how it was, but then also he had ... a line going across”).

121 *Id.* at 91:9–92:7.

***10** Finally, Sierra and Clark's photographic identifications of Thompson while he passed their homes are never mentioned in Bolt's affidavit; Bolt only states that “Clark's family” observed Thompson passing by and “immediately recognized him.” [122] While other Circuits have instructed courts to examine missing inculpatory information when reconstructing affidavits, [123] the Third Circuit's instruction in *Dempsey v. Bucknell University* was more limited:

> In the normal course, the next step of our analysis would be to reconstruct the affidavit, including the recklessly omitted [exculpatory] information, so that we may proceed with a materiality analysis. In some cases, however, there will be other information in the record that gives context to or affects the weight to be accorded the recklessly omitted information, such that it also should be considered by the reviewing court in determining materiality. [124]

122 Affidavit of Probable Cause, Doc. 62-3 at 7.

123 *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004); *Ganek v. Leibowitz*, 874 F.3d 73, 85 n.6 (2d Cir. 2017); *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022); *see also Butler v. Smith*, 85 F.4th 1102, 1120-21 (11th Cir. 2023) (Carnes, J., Concurring).

124 *Dempsey*, 834 F.3d at 474 (citing *United States v. Frost*, 999 F.2d 737 (3d Cir. 1993)) (emphasis added); *see also St. Clair v. Harris*, No. 21-1837, 2023 WL 4086286 at *6, 2023 U.S. Dist. LEXIS 108153 at *22 (W.D. Pa. June 20, 2023) (Lenihan, M.J.).

While the parties provide briefing on the reliability of Sierra and Clark's photographic identifications of Thompson, the identifications are unrelated to Cooper's identification, the surveillance footage's quality, or the perpetrator's distinctive forehead. So because this inculpatory evidence does not provide context to or affect the weight of recklessly omitted information, it is not inserted into the reconstructed affidavit.

In sum, it is plausible from the second amended complaint that Bolt intentionally or recklessly misrepresented the nature of Cooper's identification, misrepresented the surveillance

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

footage's quality, and omitted the discrepancy between the perpetrator's forehead and Thompson's. Each of these omissions is “a fact in [Bolt's] ken that ‘any reasonable person would have known that ... a judge would wish to know.’ ”[125] So the Court must next “perform a word-by-word reconstruction of the affidavit.”[126] And if it is plausible that Bolt lacked probable cause when considering this reconstructed affidavit, Thompson's claim survives dismissal.[127]

125 *Wilson*, 212 F.3d at 787 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

126 *Dempsey*, 834 F.3d at 470.

127 In an unpublished opinion, the Third Circuit cast doubt upon performing this analysis at the motion to dismiss stage. *Noviho v. Lancaster Cnty. of Pa.*, 683 F.App'x 160, 164 (3d Cir. 2017). The *Noviho* court did not overturn a district court which failed to reconstruct the affidavit at dismissal and noted that “our cases directing the District Court to reconstitute the probable cause affidavit generally arise on summary judgment, not dismissal.” *Id.* But in the March 12, 2024 case of *Pinkney v. Meadville*, the Third Circuit *did* explain how it would reconstruct the affidavit, and conduct this part of the analysis, when affirming the district court's denial of a motion to dismiss. 95 F.4th 743, 749 (3d Cir. 2024) (Bibas, J.). This Court defers to the approach taken by the Third Circuit's more recent, and published, opinion.

***11** The reconstructed affidavit reads as follows:[128]

> On Monday, May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home invasion/robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with the victim SHERRY CLARK, who stated that a B/M [later identified as CECIL THOMPSON, D.O.B. [redacted]] had knocked on the rear door and asked her 10-year- old granddaughter to see “Lisa.” When the juveniles replied that no one by that name lived there and began to close the door, ~~THOMPSON~~ **[the perpetrator]** forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles [a 9-yr old female, 10-yr old female and 15-yr old male] and told them to “get on the ground and be quiet” or he would shoot them. After asking about the other occupants in the residence, ~~THOMPSON~~ **[the perpetrator]** then paraded the trio of juveniles to a second-floor bedroom where CLARK was. ~~THOMPSON~~ **[The perpetrator]** then pointed the firearm at CLARK before telling her and the juveniles to all “be quiet and sit down” inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at ~~THOMPSON~~ **[the perpetrator]**, which then began a brief altercation in which ~~THOMPSON~~ **[the perpetrator]** struck CLARK in the head, knocking her to the floor. ~~THOMPSON~~ **[The perpetrator]** continuously told CLARK that he would shoot her, however CLARK continued to strike ~~THOMPSON~~ **[the perpetrator]** in the legs. ~~THOMPSON~~ **[The perpetrator]** eventually ran from the bedroom and fled out of the residence.
>
> While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing the recordings ~~THOMPSON~~ **[the perpetrator]** could be observed in a grey/black hooded sweatshirt, blue jeans and white sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. ~~THOMPSON~~ **[The perpetrator]** is observed to stop and watch CLARK and another adult female carrying groceries into house, after which he raises his mask onto his face and approaches the residence. [**The video footage was too pixelated and grainy to clearly discern the perpetrator's face. And in much of the footage, the perpetrator's head was covered by his hood, and his face was covered by a surgical face mask, so that only the upper half of his face was visible. However, your affiant did observe, based on some of the video footage, that the perpetrator had a unique and prominent forehead.]**
>
> On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed ~~THOMPSON~~ **[the perpetrator]** walking past the residence in work clothing and immediately recognized him. ~~A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as CECIL THOMPSON.~~ [**On June 25, 2020, your affiant, alongside other officers, raided Rose View nursing home, CECIL THOMPSON's place of employment**. **With rifles drawn, officers showed THOMPSON's employer the pixelated photograph of the perpetrator and asked whether it depicted CECIL THOMPSON. She stated that the photograph did depict THOMPSON. However, THOMPSON lacked**

**the unique and prominent forehead your affiant observed in the surveillance footage of the perpetrator.**]

***12** Based on this information I request that a warrant be issued for THOMPSON and that he be brought before the courts to answer for these charges.

Based on this reconstructed affidavit, it is plausible that Bolt lacked probable cause to arrest Thompson.

128 Insertions are bolded and bracketed. Deletions are marked with a strikethrough.

Probable cause is a "totality of the circumstances" analysis.[129] "Probable cause exists if, at the moment the arrest was made, 'the facts and circumstances within the arresting officers' knowledge ... were sufficient to warrant a prudent man in believing that [suspect] had committed or was committing an offense.' "[130] Evidence supporting probable cause need not be as strong as would be needed to support a conviction, and the officer need not make his determination based upon "the fine resolution of conflicting evidence required at trial,"[131] but there must at least be a " 'fair probability' that a person committed the relevant crime."[132]

129 *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

130 *Southerland v. Commonwealth*, 389 F.App'x 166, 168 (3d Cir. 2010) (quoting *Snell v. City of York*, 564 F.3d 659, 671 (3d Cir. 2009)) (cleaned up).

131 *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (cleaned up).

132 *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005).

"[I]t is 'well-established' that 'probable cause may be based on a single and reasonably reliable witness eyewitness identification.' "[133] But "[a] single witness identification, without more, must have at least basic signs of reliability to amount to probable cause."[134] For the same reasons this Court stated in its prior Opinion, Cooper's identification is "entirely void in the probable cause analysis."[135] Cooper's identification is so suggestive that it cannot be considered reliable because officers simply presented her one photograph and suggested Thompson's name to her.[136]

133 *Johnson v. City of Phila.*, No. 13-6616, 2015 WL 2157479 at *4, 2015 U.S. Dist. LEXIS 60458 at *11-12 (E.D. Pa. May 8, 2015) (quoting *Greene v. City of Phila.*, No. 97-4262, 1998 WL 254062, at *7, 1998 U.S. Dist. LEXIS 6954, at *20-21 (E.D. Pa. May 8, 1998)); *see also Wilson*, 212 F.3d at 794 (citing *Greene*).

134 *Pinkney*, 95 F.4th 743, 749.

135 Memorandum Opinion, Doc. 60 at 27.

136 *See id.* at 27-28 (setting out reasoning based on same allegations of fact); *United States v. Ladson*, 238 F.App'x 874, 877 (3d Cir. 2007) ("The suggestiveness of a photo array is determined by examining the totality of the circumstances.") (citing *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003)); *Lawrence*, 349 F.3d at 115 (The ultimate inquiry is whether "the circumstances surrounding the array unduly suggest who an identifying witness should select."); *Manson v. Braithwaite*, 432 U.S. 98, 133, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("single-suspect procedures have 'been widely condemned' ") (quoting *Stovall v. Denno*, 388 U.S. 298, 302 (1976)).

The reconstructed affidavit also states that Bolt "was contacted by CLARK's family, who stated that they again observed ~~THOMPSON~~ **[the perpetrator]** walking past the residence in work clothing and immediately recognized him."[137] The affidavit never specifies who recognized the perpetrator, how she recognized him, or whether she was an eyewitness to the original incident. More importantly, even if the affidavit explained that a victim eyewitness recognized the perpetrator, the reconstructed affidavit does not explain how this identification was connected to Thompson.

137 Doc. 62-3 at 7.

***13** By dispelling the misrepresentation that Thompson could clearly be observed in the surveillance footage, the reconstructed affidavit exposes that Bolt never described how Thompson was identified. According to the second amended complaint, Bolt connected Warden's incident report with Sierra and Clark's pictures of Thompson. But he excluded this truthful account of Thompson's identification from his affidavit. Because of this gap, the facts as set forth in the reconstructed affidavit provide no account of how Thompson

was reliably identified and connected to the crime, and therefore give a reasonable magistrate no basis on which to conclude that there is a "fair probability" that Thompson committed the crime.[138]

138 As explained above, the Court does not insert the full inculpatory context of this identification into Bolt's affidavit. Even if it did, it is plausible that probable cause was lacking from the reconstructed affidavit because "glaring discrepancies ... can undermine the reliability of an eyewitness who provides a positive identification." *Andrews v. Scuilli*, 853 F.3d 690, 702 (3d Cir. 2017) (quoting *Wilson*, 212 F.3d at 791). It is plausible that the perpetrator's forehead "fall[s] well outside commonsense margins of error that typically apply to witness' subjective observations involving estimation or approximation." *Id.* at 702 n.14; *see also Pinkney*, 95 F.4th 743, 749 (reconstructed affidavit lacked probable cause where among other exculpatory facts the suspect, based upon witness's description, had distinct hair from the plaintiff). A "brighter light" is also cast on identifications where "only one witness as the source of information about a crime and perpetrator." *Id.* at 704; *see also Pinkney*, 95 F.4th 743, 749 (citing *Andrews* for this proposition).

Bolt's qualified immunity defense does not bar Thompson's Section 1983 false arrest, false imprisonment, and malicious prosecution claims. The Third Circuit has dismissed qualified immunity defenses in other reconstructed affidavit cases with little analysis, stating that "[t]here is no question that ... the right to be free from arrest except on probable cause, [is] clearly established," and "grounded in well-settled law."[139] "Similarly, the right to be free from prosecutions on criminal charges that lack probable cause was also known and clearly established."[140] "And no reasonable officer would have covered up a lack of probable cause by recklessly disregarding the truth in an affidavit."[141] Therefore, Bolt's qualified immunity defense is unavailable, and his motion to dismiss Thompson's Section 1983 Fourth Amendment claims is denied.

139 *Andrews*, 853 F.3d at 705.

140 *Id.*; *Donahue v. Gavin*, 280 F.3d 371, 379 (3d Cir. 2002).

141 *Pinkney*, 95 F.4th 743, 750 (citing *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993)).

**C. Municipal Section 1983 Claims**

A municipal body is a "person" which can be liable under Section 1983.[142] Municipalities are only liable for their own acts, not the acts of their employees. Municipalities act through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[143] This includes practices "so permanent and well settled as to constitute a custom or usage with the force of law."[144] It also includes a municipality's "deliberate indifference to constitutional rights" through deficient training or supervision.[145] A Section 1983 claim against a municipality must show (1) an underlying constitutional violation (2) caused by the municipality's execution of municipal policy, custom or training[146] (3) causing the constitutional harm.[147]

142 *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality and its departments are treated as a single entity. *Jackson v. City of Erie Police Dep't*, 570 F.App'x 112, 114 (3d Cir. 1997); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997).

143 *Id.*

144 *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117, 108 S.Ct. 915, 99 L.Ed.2d 107 (1978).

145 *City of Canton v. Harris*, 489 U.S. 378, 388, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)

146 *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).

147 *Canton*, 489 U.S. at 385, 109 S.Ct. 1197.

**1. Section 1983 Claims Against Williamsport**

***14** Thompson pleads a Section 1983 claim against the City of Williamsport for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Most of these claims require little discussion. First, as explained above, Thompson's second amended complaint shows no underlying Fifth or Fourteenth Amendment violation. Second, this Court

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

explained in its prior Opinion that it could conceive of no set of facts supporting Bolt's personal involvement in Thompson's retaliatory prosecution or excessive bail under the First and Eighth Amendments.[148] The second amended complaint still ties neither Thompson's prosecution nor his bail to any act or policy by Williamsport or its agents.[149] It only details actions by the District Attorney's Office in Thompson's prosecution and bail. As such, Thompson's First, Fifth, Eighth, and Fourteenth Amendment claims against Williamsport are dismissed with prejudice. That leaves Thompson's Fourth Amendment claims.

148 Officers can be liable where they cause bail to be excessive by "manipulating," "helping to shape, and exercising significant influence over, the bail decision." *Wagenmann v. Adams*, 829 F.2d 196, 211-12 (1st Cir. 1987) (Selya, J.); *James v. York Cnty Police* Dep't, 160 F.App'x 126, 133 (3d Cir. 2005) (unpublished) (citing *Wagenmann* for this proposition). But this Court is unaware of any case even approaching the unique circumstances here: where an officer's delayed disclosure of exculpatory evidence, discovered *after* an initial bail hearing, renders the already-set bail excessive and thereby prolongs imprisonment.

149 *See supra* n.97.

An official decisionmaker's act can be considered policy attributable to the municipality,[150] but Thompson's argument that Bolt is a policymaker falls flat. Even township police chiefs are not policymakers under Pennsylvania law,[151] nor does Thompson allege that Bolt is "responsible for establishing final government policy"[152] respecting any activity which could cause his Fourth Amendment harms. Thompson's argument that Bolt's conduct has created a custom attributable to Williamsport[153] also fails because Thompson only pleads one plausible constitutional violation by Bolt.[154] "A policy cannot ordinarily be inferred from a single instance of illegality such as a first arrest without probable cause."[155]

150 *Parker v. Sch. Dist. of Phila.*, 364 F.Supp. 3d 738 (E.D. Pa. 2018).

151 *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (citing 53 Pa. Cons. Stat. Ann. § 66902).

152 *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

153 Brief in Opposition to Williamsport and Lycoming's Motion to Dismiss, Doc. 72 at 8 (quoting *Losch v. Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984)).

154 See *Connick v. Thompson*, 563 U.S. 1, 63 n.7, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011).

155 *Losch*, 736 F.2d at 911.

A failure to train or supervise can also support municipal liability if that failure amounts to a "deliberate indifference" to the rights of persons with whom employees will come into contact.[156] " '[D]eliberate indifference' is a stringent standard of fault."[157] "A pattern of similar constitutional violations" is ordinarily necessary "to demonstrate deliberate indifference for purposes of failure to train."[158] Thompson's argument that Bolt's actions evidence a pattern of similar violations,[159] like Thompson's custom argument, fails because one violation does not create a plausible inference of a pattern of violations.

156 *Canton*, 489 U.S. at 385, 109 S.Ct. 1197.

157 *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

158 *Connick*, 563 U.S. at 62, 131 S.Ct. 1350.

159 *Id.*

Absent a pattern of violations, municipal liability only attaches if the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[160] Liability in such "single-incident" cases depends upon "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[161]

160 See *Canton*, 489 U.S. at 390 n.10, 109 S.Ct. 1197.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

161 *Bryan Cnty*, 520 U.S. at 409, 117 S.Ct. 1382.

***15** Thompson alleges that Williamsport provides no training to its officers "concerning the constitutional necessity to provide truthful statements within Affidavits of Probable Cause, and/or to avoid misstatements such as those" present in Bolt's affidavit.[162] While writing an affidavit of probable cause does not require "split-second" decision-making,[163] the Third Circuit has held that failing to train on the warrant-creation process can cause similar Fourth Amendment violations. In *Berg v. County of Allegheny*, summary judgment was denied despite a lack of similar violations where an untrained court clerk accidentally transposed two numbers, resulting in an erroneously issued warrant causing the plaintiff's arrest.[164]

162 Second Amended Complaint, Doc. 62 ¶96.

163 *Connick*, 563 U.S. at 64, 131 S.Ct. 1350 ("Armed police must sometimes make split-second decisions with life-or-death consequences.").

164 219 F.3d 261, 266 (3d Cir. 2000).

As in *Berg*, Williamsport's alleged failure to train on the warrant-creation process would foreseeably cause similar violations to recur as officers author more affidavits in the future. "Attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles."[165] That is why failing to train officers on disclosing exculpatory *Brady* material, for example, plausibly supports municipal liability under a single-incident theory.[166] Similarly, deciding what information is material to the probable cause analysis is fact-intensive and legally demanding. Without training on the importance of including material exculpatory information in affidavits, it is foreseeable that officers would recklessly omit that information to secure arrest warrants, causing similar constitutional violations. In an opinion issued earlier this month by my colleague, the Honorable Jennifer P. Wilson, this Court denied dismissal under the same failure to train theory.[167]

165 *Connick*, 563 U.S. at 69-70, 131 S.Ct. 1350; *see also Thomas v. Cumberland Cnty*, 749 F.3d 217, 225 (3d Cir. 2014).

166 *Watson v. Witmer*, 183 F.Supp. 3d 607, 615 (M.D. Pa. 2016)

167 *Roberts v. Lau*, No. 1:21-CV-1140, 2024 WL 1386032 at *4, 2024 U.S. Dist. LEXIS 59973 at *12-13 (M.D. Pa. Apr. 1, 2024) ("While this is a single-incident theory, it is obvious that detectives run a high risk of violating an individual's constitutional rights when drafting affidavits of probable cause, which initiate criminal proceedings against an individual, such that failing to train officers in what to include in an affidavit of probable cause poses such an obvious risk that it could be considered deliberate indifference.").

Because the failure to train officers on what to include in affidavits of probable cause plausibly supports Williamsport's deliberate indifference to similar constitutional violations, Williamsport's motion to dismiss is denied with respect to Thompson's Section 1983 Fourth Amendment claims.

### 2. Section 1983 Claims Against Lycoming County

While prosecutorial decision-making is protected by absolute immunity,[168] this protection does not extend to policymaking or administrative acts.[169] Thompson seeks Section 1983 relief for the District Attorney's Office's delay in uncovering and disclosing exculpatory evidence, its reliance on unreliable eyewitness identification, its retaliatory prosecution, and his excessive bail, by arguing that these injuries resulted from the District Attorney's policies, customs, inadequate training, or inadequate supervision.[170] All claims fail without reaching the merits because Thompson does not plausibly allege that the District Attorney's Office was deliberately indifferent to the risk of such violations.

168 *Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

169 *White v. Brown*, Civil Action No. 08-606-ER, 2010 WL 1740717, at *8, 2010 U.S. Dist. LEXIS 41583, at *25-26 (D. Del. Apr. 28, 2010).

170 Second Amended Complaint, Doc. 62 at 20-22.

***16** Thompson claims that his injuries were caused by the District Attorney's "policies," but his allegation is that the lack of policies caused the injury. These claims then sound in a training or supervision theory.[171] Such claims fail. Thompson has not alleged any pattern of similar violations. His so-called "noxious cascade of sequential events"[172]

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

relates to alleged violations of different rights and does not provide any notice to the District Attorney's Office.[173] Moreover, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [county] and the opportunity to conform to constitutional dictates.' "[174]

171 *See Canton*, 489 U.S. at 388-389, 109 S.Ct. 1197.

172 Brief in Opposition to Lycoming County's Motion to Dismiss, Doc. 71 at 9.

173 See *Connick*, 749 F.3d at 62-63 (Despite four reversals in the same prosecutor's office due to Brady violations within the past ten years, none of those cases involved failure to disclose physical or scientific evidence, so they provided no notice of similar violations).

174 *Connick*, 563 U.S. at 63 n.7, 131 S.Ct. 1350.

As with Thompson's claims against Williamsport, liability may only be had on a single-incident liability theory.[175] But as prosecutors are legally trained, a failure to train or supervise them can never support a municipality's deliberate indifference to constitutional violations.[176] Absent such a pattern, all of Thompson's claims based on the District Attorney's Office's actions fail. Because Thompson has already had "two bites at the apple" yet pleads no new evidence of a pattern of violations, an opportunity to amend would be futile.[177] All Section 1983 claims against Lycoming County are dismissed with prejudice.

175 See *Canton*, 489 U.S. at 390, 109 S.Ct. 1197.

176 *Connick*, 563 U.S. at 63, 131 S.Ct. 1350. Courts have criticized this logic, but the "grim reality" is that "this Court must abide by the precedential constraints placed on it," even if plaintiffs are deprived of "redress for constitutionally unsound prosecutions that wreaked unimaginable havoc in their lives." *Smith v. Silvernail*, No. 22-cv-00045, 2024 WL 665571 at *12, 2024 U.S. Dist. LEXIS 27415 at *38-39 (S.D. Ohio Feb. 16, 2024).

177 *See Lemons v. Meguerian*, No. 23-1090, 2024 WL 1328311 at *4, 2024 U.S. App. LEXIS 7316 at *11 (3d Cir. Mar. 28, 2024) (unpublished) (citing *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)).

**D. State Law Intentional Infliction of Emotional Distress Claim Against Bolt**

Though Thompson's IIED claim now requires closer scrutiny, it remains deficient as it is not plausible that Bolt engaged in extreme or outrageous conduct. "The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another."[178] The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[179]

178 *Carson v. City of Phila.*, 133 Pa.Cmwlth. 74, 574 A.2d 1184 (Pa. Cmwlth. 1990).

179 *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 754 (Pa. 1998); *Reedy*, 615 F.3d at 231-32.

"Courts that have found that a claim existed for intentional infliction of emotional distress in connection with an arrest have done so where the plaintiff was physically injured by the officers, or where the officer's conduct was otherwise exceptionally reprehensible."[180] IIED claims have been supported by "alleg[ations] that [an] [o]fficer commenced criminal charges against [a plaintiff] knowing that they were false and without probable cause," where accompanied by additional outrageous facts.[181] For example, IIED claims survive where the "nature as well as the number" of charges "suggest an intent to sensationalize the issue."[182]

180 *Shaffer v. City of Pittsburgh*, No. 14-1674, 2015 WL 4878497 at *10, 2015 U.S. Dist. LEXIS 107963 at *24 (W.D. Pa. July 7, 2015) (Mitchell, M.J.) (citing cases), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 107315, *aff'd*, 2016 U.S. App. LEXIS 9581 (3d Cir. July 7, 2016) (unpublished); *see also Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979). ("Intolerable professional conduct" can be considered extreme and outrageous).

181 *Sheare v. Borough of Olyphant*, 2012 WL 2527022, at *9, 2012 U.S. Dist. LEXIS 90370, at *5, *22-23; *Dempsey*, 2012 U.S. Dist. LEXIS 62043, at *70-71; *Bayas v. Lower Bucks Hosp.*, 293 Pa.Super. 122, 437 A.2d 1236 (Pa. Super. Ct. 1981); *Valdetarro v. Vollrath*, Civil Action No. 02-CV-2870, 2002 WL

32107615 at *3, 2002 U.S. Dist. LEXIS 25266 at *11 (E.D. Pa. Dec. 24, 2002); *Watson v. Haverford Twp. Police Dep't*, No. CIV.A. 10-6731, 2011 WL 2200306 at *1, 2011 U.S. Dist. LEXIS 60858 at *16-17 (E.D. Pa. June 6, 2011); *Watson v. Abington Twp.*, No. CIV.A.01-5501, 2002 WL 32351171 at *9, 2002 U.S. Dist. LEXIS 16300 at *1, 9 (E.D. Pa. Aug. 15, 2002); *Gilbert v. Feld*, 788 F.Supp. 854, 857 (E.D. Pa. 1992); *McCoy-Jones v. Ind. Borough*, Civil Action No. 12-152, 2012 WL 3686773 at *8, 2012 U.S. Dist. LEXIS 120737 at *20-23 (W.D. Pa. Aug. 24, 2012). *See also* Rest. 2d Torts § 46, cmt. k.

182 *Gleeson v. Robson*, No. 3:CV-02-1747, 2005 WL 1210948 at *30, 2005 U.S. Dist. LEXIS 43310 at *24-25, 30 (M.D. Pa. May 6, 2005) (Vanaskie, J.).

***17** But the threshold for successful IIED claims is extraordinarily high.[183] As "the definition of 'outrageousness' is subjective and nebulous ... the availability of recovery for IIED is 'highly circumscribed.' "[184] In IIED cases, "it has not been enough [to allege] that the defendant has acted with an intent which is tortious or even criminal" to show extreme and outrageous conduct.[185] Falsely initiating a criminal prosecution without probable cause ordinarily does not support a cause of action for IIED, even where the false arrest was intentionally orchestrated.[186]

183 *See DeHart v. Homeq Servicing Corp.*, 47 F.Supp. 3d 246 (E.D. Pa. 2014).

184 *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa. Super. Ct. Aug. 30, 2016) (citing *Kazatzky v. King Memorial Park*, 515 Pa. 183, 527 A.2d 988, 995 (Pa. 1987)).

185 *Hoy*, 720 A.2d at 754 (quoting Rest. 2d Torts § 46 cmt. d (1977)).

186 *See, e.g., Motheral v. Burart*, 400 Pa.Super. 408, 583 A.2d 1180, 1190 (Pa. Super. Ct. 1990); *Simmons v. Poltrone*, No. Civ. A. No. 96-8659, 1997 WL 805093, at *4, 1997 U.S. Dist. LEXIS 20512, at *4-5 (E.D. Pa. Dec. 17, 1997); *Sugermann v. RCA Corp.*, 639 F.Supp. 780, 788 (M.D. Pa. 1985); *Griffin v. Municipality of Kingston*, No. 08-2290, 2009 WL 1794775, at *11, 2009 U.S. Dist. LEXIS 53076, at *11 (M.D. Pa. June 23, 2009); *United States ex rel. Magid v. Barry Wilderman, M.D., P.C.*, Civil Action No. 96-CV-4346, 2005 WL 469590 at *5, 2005 U.S. Dist. LEXIS 2926 at *17-18 (E.D. Pa. Feb. 28, 2005); *Kuper v. Colonial Penn Ins. Co.*, Civ. A. No. 99-172, 1999 WL 317077 at *5, 1999 U.S. Dist. LEXIS 7179 at *16-17 (E.D. Pa. May 18, 1999).

If intentionally manufacturing false charges often does not qualify as "extreme and outrageous," the lesser evil of intentionally or recklessly omitting facts from an affidavit will rarely, if ever, qualify. In *Mastromatteo v. Simock*, the Eastern District of Pennsylvania held that where an officer manufactured facts to support his affidavit of probable cause, this conduct, while "certainly deplorable," "does not sink to the level that can properly be termed 'atrocious and utterly intolerable in a civilized society.' "[187] Subsequent courts have found similarly.[188]

187 866 F.Supp. 853, 859 (E.D. Pa. 1994) (quoting *Salerno v. Phila. Newspapers*, 377 Pa.Super. 83, 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988)).

188 *Simmons*, 1997 WL 805093, at *4, 1997 U.S. Dist. LEXIS 20512, at *4-5; *Wise v. City of Phila.*, No. 97-2651, 1998 WL 464918 at *4, 1998 U.S. Dist. LEXIS 12149 at *14-15 (E.D. Pa. July 31, 1998); *Tarbox v. Butler Twp.*, No. 3:14-CV-01346, 2015 WL 6157173 at *9, 2015 U.S. Dist. LEXIS 141833 at *23 (M.D. Pa. Oct. 19, 2015); *Moffitt v. Britton*, No. 3:21-cv-109, 2023 WL 1863314 at *6, 2023 U.S. Dist. LEXIS 24406 at *16 (W.D. Pa. Feb. 9, 2023).

Existing case law shows that Bolt's intentional or reckless omissions do not rise to an extreme or outrageous level; no additional outrageous facts are pled aside from the omissions themselves. Thompson does not plead that Bolt fabricated evidence or charges, or that he intentionally sensationalized Thompson's arrest. Nor does he allege that Bolt knew Thompson was not the true perpetrator. Thompson's IIED claim is therefore dismissed with prejudice.

### E. Defendants Sierra and Clark

When Thompson filed his initial complaint in July 2022, Sierra and Clark were named as Defendants.[189] Following this Court's March 2023 Order lifting the stay upon Thompson's case,[190] service was attempted.[191] In April 2023, the service processor discontinued attempting service on Sierra and Clark.[192] Throughout Thompson's complaints,

he has continued to name Sierra and Clark as Defendants,[193] yet has taken no further action to effect service.

189 Complaint, Doc. 1.

190 Order, Doc. 7.

191 Summons Returned Unexecuted as to Dayna Sierra, Doc. 15; Summons Returned Unexecuted as to Sherry Clark, Doc. 17.

192 *Id.*

193 Amended Complaint, Doc. 37; Second Amended Complaint, Doc. 62.

***18** "Federal Rule of Civil Procedure 41(b) permits a District Court to [*sua sponte*] dismiss a plaintiff's case for failure to prosecute."[194] "The failure by a plaintiff to timely serve a complaint upon the defendant(s) will be deemed a failure to prosecute."[195] But "dismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits."[196] The Court must "justify its decision under the multi-factor balancing test stated" by the Third Circuit in *Poulis v. State Farm Fire & Casualty Co*[197] and "provide the plaintiff with an opportunity to explain [his] reasons for failing to prosecute the case or comply with its orders prior to dismissing a case."[198] Accordingly, Thompson shall show cause why this Court should not dismiss his claims against Sierra and Clark for failure to prosecute by May 14, 2024.

194 *Briscoe v. Klaus*, 538 F.3d 252, 258 (3d Cir. 2008).

195 *Eve v. Lynch*, Civil No. 1:11-CV-01131, 2013 WL 664620 at *5, 2013 U.S. Dist. LEXIS 24538 at *20 (M.D. Pa. Feb. 22, 2013) (citing *Hamilton v. GSA*, No. 3:CV-10-1494, 2010 WL 5421317 at *1, 2010 U.S. Dist. LEXIS 136592 at *3 (M.D. Pa. Dec. 1, 2010)).

196 *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) (citing *Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund*, 29 F.3d 863, 870 (3d Cir. 1994)).

197 *Nieves v. Thorne*, 790 F. App'x 355, 357 (3d Cir. 2019) (citing *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984)).

198 *Briscoe*, 358 F.3d at 258 (citing *Emerson*, 296 F.3d at 191).

## III. CONCLUSION

All Defendants' motions to dismiss Thompson's Section 1985(3) claims are granted with prejudice, and all defendants' motions to dismiss Thompson's 1985(2) claims are granted without prejudice. Bolt's motion to dismiss is denied as to Thompson's Section 1983 Fourth Amendment claims; it is also denied as to Thompson's related state law false arrest, false imprisonment, and malicious prosecution claims. The motion to dismiss is granted with prejudice as to Thompson's Fifth and Fourteenth Amendment claims. Williamsport's motion to dismiss Thompson's Section 1983 claims is denied as to Thompson's Fourth Amendment claims and granted with prejudice as to Thompson's remaining Section 1983 claims. Lycoming's motion to dismiss Thompson's Section 1983 claims is granted with prejudice.

"Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[199] A complaint is "futile" if, as amended, it would fail to state a claim upon which relief could be granted.[200] Excepting Thompson's Section 1985(2) claim, no further amendment will be permitted regarding the dismissed claims as another opportunity to plead them would be futile.[201]

199 *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

200 *Id.*

201 *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1747645

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 11

KeyCite Yellow Flag
Disagreed With by Kovalev v. City of Philadelphia, E.D.Pa., February 28, 2017

2005 WL 469590
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

UNITED STATES OF AMERICA
ex rel. Deborah Riva Magid
v.
Barry WILDERMAN, M.D., P.C., Barry Wilderman, M.D., Eric Gerwirtz, M.D., Steven Palloni, M.D.

No. Civ.A.96-CV-4346.
|
Feb. 28, 2005.

**Attorneys and Law Firms**

John F. Innelli, Innelli Robertson, Philadelphia, PA, for Plaintiff.

Arthur R. Shuman, West Fenwick, DE, Alfred J. Monte, Jr., Monte & McGraw, Skippack, PA, Frederick C. Horn, Fox Rothschild O'Brien & Frankel LLP, Lansdale, PA, Michelle T. Wirtner, Grant & Eisenhofer, P.A., Wilmington, DE, for Defendants.

William D. Schroeder, Jr., Colmar, PA, pro se.

*MEMORANDUM & ORDER*

SURRICK, J.

***1** Presently before the Court is Relator's Motion for Judgment on the Pleadings (Doc. No. 154). For the following reasons, Relator's Motion will be granted.

## I. BACKGROUND

Relator Deborah Riva Magid, Ph.D., M.D., ("Relator") brought this qui tam action under the False Claims Act, 31 U.S.C. §§ 3729-3733, on behalf of herself and the United States. Relator worked as an anesthesiologist from July, 1994, through May, 1996, for Defendant Barry Wilderman, M.D., P.C. ("Wilderman, P.C."), a corporation that provided anesthesia-related services. (Doc. No. 1.) Defendants Barry Wilderman, M.D., Eric Gewirtz, M.D., and Steven Palloni, M.D., all worked with Relator as anesthesiologists for Wilderman, P.C.

On June 13, 1996, Relator filed a Complaint against Defendants,[1] alleging that the Defendants violated the False Claims Act by submitting false claims for Medicare reimbursement for anesthesia services from 1990 to 1996.[2] (Compl.¶¶ 3, 13-14.) Defendants filed an Answer and Counterclaim on January 20, 1998, alleging claims of malicious use of process (Count One), malicious abuse of process (Count Two), defamation (Count Three), punitive damages (Count Four), and intentional infliction of severe emotional distress (Count Five). The instant Motion seeks to dismiss all counterclaims under Federal Rule of Civil Procedure 12(c).[3]

1 Relator's Complaint also named North Penn Hospital ("North Penn") as a defendant. (Doc. No. 1.) On April 29, 2004, we granted North Penn's motion for summary judgment on all of Relator's claims. *United States ex rel. Magid v. Wilderman,* Civ. A. No. 96-4346, 2004 U.S. Dist. LEXIS 8459 (E.D.Pa. Apr. 29, 2004).

2 The Complaint was filed under seal in accordance with 31 U.S.C. § 3730(b)(2), and was unsealed by the Honorable Robert F. Kelly on November 10, 1997. (Doc. No. 4.)

3 We note that Defendants failed to timely respond to Relator's Motion. Under Local Rule 7.1(c), any party opposing a motion must submit a response within fourteen (14) days after the motion's service. E.D. Pa. R. 7.1(c). As of the date of this Memorandum and Order, we have received no response from Defendants.

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is judged under the same standards as a motion to dismiss pursuant to Rule 12(b)(6). *Turbe v. Gov't of the V.I.,* 938 F.2d 427, 428 (3d Cir.1991). We may dismiss a claim in a Rule 12 motion only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H. J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *see also*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) ("Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved."). When considering a motion to dismiss, we must "accept as true all of the allegations in the [counterclaim] and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). We need not, however, credit a party's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

## III. DISCUSSION

### A. Malicious Use of Process and Malicious Abuse of Process

Defendants' first two counterclaims allege that Relator has committed the torts of malicious use of process and malicious abuse of process with respect to her False Claim Act claims. (Doc. No. 6 ¶¶ 30-39.) Defendants assert that Relator wrongfully initiated process in this case knowingly and intentionally, and that Relator was aware that her allegations were false. (*Id.* ¶ 33.) Defendants also assert that after instituting this action, Relator knowingly and intentionally perverted it for an improper and illegal purpose. (*Id.* ¶¶ 37-38.)

***2** Although often confused, in Pennsylvania, the common law torts of malicious use of process and malicious abuse of process are separate and distinct claims. *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020, 1023 (Pa.1987) (citing *Publix Drug Co. v. Breyer Ice Cream Co.,* 347 Pa. 346, 32 A.2d 413 (Pa.1943)). Malicious use of process " 'arises when a party institutes a lawsuit with a malicious motive and lacking probable cause.' " *Hart v. O'Malley,* 781 A.2d 1211, 1219 (Pa.Super.Ct.2001) (quoting *Rosen v. Am. Bank of Rolla,* 426 Pa.Super. 376, 627 A.2d 190, 191 (Pa.Super.Ct.1993)). Abuse of process, on the other hand, involves a perversion of the legal process to accomplish some unlawful purpose for which it was not designed. *Al Hamilton Contracting Co. v. Cowder,* 434 Pa.Super. 491, 644 A.2d 188, 191 (Pa.Super.Ct.1994). "The classic example" of abuse of process "is the initiation of a civil proceeding to coerce the payment of a claim completely unrelated to the cause of action sued upon." *Triester v. 191 Tenants Ass'n,* 272 Pa.Super. 271, 415 A.2d 698, 712 (Pa.Super.Ct.1979).

In Pennsylvania, the tort of malicious use of process, also known as wrongful use of civil proceedings, has been codified and modified by the Dragonetti Act, 52 Pa. Cons.Stat. Ann. §§ 8351-8354. *See, e.g., Ritzel v. Pa. Soc'y for the Prevention of Cruelty to Animals,* Civ. A. No. 04-2757, 2005 U.S. Dist. LEXIS 1904, at *15 (E.D.Pa. Feb. 9, 2005). The relevant portion of the Dragonetti Act provides that:

> A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:
>
> > (1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
> >
> > (2) The proceedings have terminated in favor of the person against whom they are brought.

42 Pa. Cons.Stat. Ann. § 8351(a) (West 1998). In order to prevail in an action for wrongful use of civil proceedings, a party must prove that: (1) the underlying proceedings terminated in his or her favor; (2) the defendant caused those proceedings to be instituted without probable cause; and (3) the proceedings were instituted for an improper purpose. *Bannar v. Miller,* 701 A.2d 242, 247 (Pa.Super.Ct.1997). If a successful claim is made, the Dragonetti Act provides for recovery of "[t]he expense, including any reasonable attorney fees, that [a party] has reasonably incurred in defending himself against the proceedings." 42 Pa. Cons.Stat. Ann. § 8353(3) (West 1998).

Malicious abuse of process, however, remains a separate and distinct common law tort.[4] *Werner v. Plater-Zyberk,* 799 A.2d 776, 785 (Pa.Super.Ct.2002); *Al Hamilton Contracting Co.,* 644 A.2d at 191-92. The elements of a claim for abuse of process are: (1) that a party used a legal process against another party; (2) the legal process was used primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the other party. *McGee,* 535 A.2d at 1026; *Rosen,* 627 A.2d at 192; *see also* Restatement (Second) of Torts § 682 (1977) ("One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process."). "The word process 'has been interpreted broadly, and encompasses the entire range of procedures incident


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

to the litigation process.' " *Access Fin. Lending Corp. v. Keystone State Mortg. Corp.,* Civ. A. No. 96-191, 1996 U.S. Dist. LEXIS 14073, at *9 (W.D.Pa. Sept.4, 1996) (quoting *Rosen,* 627 A.2d at 192). To establish a claim for abuse of process, Pennsylvania courts have stated that "[i]t is not that the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive. Rather, there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action." *Al Hamilton Contracting Co.,* 644 A.2d at 191-92 (citations omitted).

4 We note that in *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 394 (3d Cir.2002), the Third Circuit stated in passing that the torts of malicious use of process and malicious abuse of process are both subsumed under the general scope of the Dragonetti Act. It appears, however, that Pennsylvania courts continue to view the two torts as distinct causes of action. *See, e.g., In re Larsen,* 532 Pa. 326, 616 A.2d 529, 587, 592-93 (Pa.1992) ("The common law tort of malicious prosecution has been codified and modified as a statutory cause of action.... Abuse of process differs from malicious [civil] prosecution...."); *Werner,* 799 A.2d at 785 ("Abuse of process is a state common law claim. However, allegations of malicious prosecution invoke Pennsylvania's statutory law in the form of the wrongful use of civil proceedings statute or 'Dragonetti Act.' ").

***3** Relator argues that Defendants' counterclaims of malicious use of process and malicious abuse of process should be dismissed because they are not ripe for adjudication. We agree. A claim of wrongful use of civil proceedings "requires that the proceeding alleged to be the misuse of legal process terminate in favor of the defendants before the defendant's claim for wrongful use of civil proceedings is ripe for adjudication." *Zappala v. Hub Foods, Inc.,* 683 F.Supp. 127, 131 (W.D.Pa.1988). Because "defendants cannot possibly make the required allegation in their counterclaim [while] this action is still pending," *id.,* the counterclaim for wrongful use of civil proceeding have not matured and must be dismissed without prejudice for failure to state a claim. *See Access Fin. Lending Corp.,* 1996 U.S. Dist. LEXIS 14073, at *12 ("Claims for malicious use of process must be dismissed if the underlying proceedings have not been terminated in favor of the complaining party.")

Defendants' counterclaim of abuse of process is also unripe. Here, Defendants allege that Relator's use of this action "constitutes a perversion of legitimate, lawful process for an illegal or improper purpose." (Doc. No. 6 ¶ 37.) However, a claim that a plaintiff has perverted the purpose of the entire action, when alleged in the first pleading after the filing of the Complaint, is not a claim ripe for adjudication. "The assertion, by way of a counterclaim, that the underlying litigation as a whole constitutes an abuse of process fails to state a claim which is ripe for adjudication. By definition, a lawsuit in its entirety cannot constitute an abuse of process when it has not yet been concluded." *Access Fin. Lending Corp.,* 1996 U.S. Dist. LEXIS 14073, at *13-14.

In addition, Defendants' abuse of process claim fails to allege that Relator acted with an improper purpose barred by the tort. As previously mentioned, assertions that a party had "bad or malicious intentions" or that it "acted from spite or with an ulterior motive" in filing litigation are insufficient to establish abuse of process; rather, the claim must allege that the filing party committed "an act or threat not authorized by the process, or [that] the process [was] used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action." *Al Hamilton Contracting Co.,* 644 A.2d at 191-92; *see also Rosen v. Tesoro Petroleum Corp.,* 399 Pa.Super. 226, 582 A.2d 27, 32 (Pa.Super.Ct.1990) (" '[T]there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.' " (quoting *Di Sante v. Russ Fin. Co.,* 251 Pa.Super. 184, 380 A.2d 439, 441 (Pa.Super.Ct.1977))). In their abuse of process claim, Defendants allege that Relator initiated this proceeding "for the purpose of retaliation for her dismissal and for personal profit," and that the use of this action for such purposes was improper and illegal. (Doc. No. 6 ¶¶ 35-36.) Allegations of bad motive alone, however, are insufficient to state a claim for abuse of process. Defendants' counterclaim for abuse of process therefore must also be dismissed.

B. Defamation

***4** The next counterclaim alleges that Relator defamed Defendants by falsely accusing them of dishonesty and fraud in the conduct of their anesthesiology practice to unnamed administrators of North Penn Hospital. (Doc. No. 6 ¶¶ 41-44.) Relator asserts that this counterclaim should be dismissed because a claim of defamation must be brought within one year of the alleged defamatory statement. (Doc. No. 154 ¶ 7.) Again, we agree. A statute of limitations defense may be raised in a motion to dismiss if it appears from the face of the

pleadings that the cause of action has not been commenced within the limitations period. *Linker v. Custom-Bilt Mach., Inc.,* 594 F.Supp. 894, 903 (E.D.Pa.1984); *see also Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 n. 1 (3d Cir.1994) ("While the language of Fed.R.Civ.P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."). Under Pennsylvania law, the statute of limitations for defamation is one year from the date of the alleged defamatory statement. 42 Pa. Cons.Stat. Ann. § 5523(1) (West 2004); *see also Barclay v. AMTRAK,* 343 F.Supp.2d 429, 433 (E.D.Pa.2004). Although Defendants do not allege a specific date for Relator's alleged defamatory statements, after reviewing the allegations in the counterclaims, we are satisfied that the statements were made no later than the end of 1996. Defendants assert that Relator made the allegedly defamatory statements after Relator was notified that her contract with Wilderman, P.C. would not be renewed. (Doc. No. 6 ¶ 26.) According to Defendants, Relator was notified that her contract would not be renewed in July, 1995. (*Id.* ¶ 23.) Defendants also aver that the statements were made to North Penn in conjunction with the commencement of this action. (*Id.* ¶ 26.) Relator's Complaint was filed on June 7, 1996. (Doc. No. 1.) Defendants' defamation counterclaim was filed on January 20, 1998, over one year from the end of 1996. (Doc. No. 6.) Thus, we conclude that Defendants' counterclaim is barred by Pennsylvania's statute of limitations.

C. Intentional Infliction of Severe Emotional Distress

Next, Relator seeks to dismiss Defendants' counterclaim for the intentional infliction of severe emotional distress. Although the Pennsylvania Supreme Court has repeatedly stated that it has not expressly recognized the tort of intentional infliction of emotional distress, and thus has never formally adopted Section 46 of the Restatement (Second) of Torts, *see, e.g., Taylor v. Albert Einstein Med. Ctr.,* 562 Pa. 176, 754 A.2d 650, 652 (Pa.2000), courts in the Third Circuit " 'ha[ve] repeatedly held that Pennsylvania [law] does recognize the tort, in spite of 'speculation' to the contrary.' " *Echevarria v. Unitrin Direct Ins. Co.,* Civ. A. No. 02-8384, 2003 U.S. Dist. LEXIS 4680, at *7 (E.D.Pa. Mar.17, 2003) (quoting *Weinstein v. Bullick,* 827 F.Supp. 1193, 1203 (E.D.Pa.1993)); *see also Brown v. Muhlenberg Township,* 269 F.3d 205, 217 (3d Cir.2001) (predicting that "the Supreme Court of Pennsylvania would recognize the tort of intentional infliction of emotional distress as described in Restatement (Second) of Torts § 46"); *Hunger v. Grand Cent. Sanitation,* 447 Pa.Super. 575, 670 A.2d 173, 177 (Pa.Super.Ct.1996) (stating that the Superior Court recognizes a cause of action for intentional infliction of emotional distress under § 46). Section 46 provides that:

> ***5** (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> > (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> >
> > (b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1977); *see also Taylor,* 754 A.2d at 652 (quoting Section 46). A party claiming the tort of intentional infliction of emotional distress must allege facts sufficient to establish that the alleged conduct: (1) was "extreme and outrageous"; (2) was performed intentionally or recklessly; and (3) caused severe emotional distress. *Bradshaw v. Gen. Motors Corp. .,* 805 F.2d 110, 113-14 (3d Cir.1986) (citing *Chuy v. Phila. Eagles Football Club,* 595 F.2d 1265, 1274-76 (3d Cir.1979)). In addition, if the alleged conduct is directed at a third party, then the Relator must also allege that he was present at the time the allegedly extreme and outrageous conduct was committed. *See Taylor,* 754 A.2d at 653 ("Presence is ... an essential clement which must be established to successfully set forth a cause of action for intentional infliction of emotional distress.").

In this case, the factual allegations in Defendants' counterclaim are insufficient to constitute a claim for intentional infliction of emotional distress. Defendants fail to allege that Relator committed extreme and outrageous conduct. In the counterclaim, Defendants assert that Relator reported false allegations to the United States government; that as a result of Relator's allegations, a federal investigation of Defendants' anesthesiology practice was undertaken; and that the allegations and initiation of the investigation were outrageous. (Doc. No. 6 ¶¶ 53-55.) Under Pennsylvania law, extreme and outrageous conduct is defined as actions that are " 'so outrageous in character, and so extreme in

degree as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Hunger,* 670 A.2d at 182 (quoting Restatement (Second) of Torts § 46 cmt. d (1977)). Even assuming Defendants' allegations are true, as we must for a Rule 12(c) motion, Relator's alleged actions do not constitute extreme or outrageous conduct under Pennsylvania law. Mere allegations of criminal conduct are insufficient to establish that a person acted in an extreme or outrageous manner. *See, e.g., Kuper v. Colonial Penn Ins. Co.,* Civ. A. No. 99-172, 1999 U.S. Dist. LEXIS 7179, at *16-17 (E.D.Pa. May 18, 1999) ("While being falsely accused of a crime ... is an unfortunate experience, such conduct does not rise to the level of extreme and outrageous conduct that has been found to permit a recovery for intentional infliction of emotional distress."); *Sugarman v. RCA Corp.,* 639 F.Supp. 780, 788 (M.D.Pa.1985) (finding that false charges of theft, even when made in front of plaintiff's coworkers, was not outrageous); *see also* Restatement (Second) of Torts § 46 cmt. d (1977) (stating that "[i]t has not been enough [to allege] that the defendant has acted with an intent which is tortious or even criminal" to establish that a party engaged in extreme and outrageous conduct); *Jones v. Trump,* 971 F.Supp. 783, 787 (S.D.N.Y.1997) (finding that plaintiff's allegations of " 'defendants' false criminal charges against plaintiff and subsequent false arrest, false investigation, and false imprisonment' " were legally insufficient to qualify as extreme and outrageous conduct), *aff'd,* No. 97-9017, 1998 U.S.App. LEXIS 23531 (2d Cir. Sept. 21, 1998); *Estate of Smith v. Town of West Hartford,* No. 7CV020080891S, 2003 Conn.Super. LEXIS 2163, at *13 (Conn.Super.Ct. July 28, 2003) ("Extreme and outrageous conduct means behavior exceeding all bounds usually tolerated by decent society.... False accusations of crime have been held insufficient to meet this definition.") (citations omitted).

D. Punitive Damages

***6** Defendants' final counterclaim is for punitive damages. (Doc. No. 6 ¶¶ 50-51.) Pennsylvania law does not recognize an independent cause of action for punitive damages. *See, e.g., Mest v. Cabot Corp.,* Civ. A. No. 01-4943, 2004 U.S. Dist. LEXIS 9112, at *18 (E.D.Pa. May 17, 2004); *Peer v. Minn. Mut. Fire & Cas. Co.,* Civ. A. No. 93-2338, 1993 U.S. Dist. LEXIS 18008, at *17 (E.D.Pa. Dec. 21, 1993) ("There is no independent cause of action for punitive damages under Pennsylvania law. Punitive damages are an element of damages that must be tied to a specific cause of action." (citing *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800, 802 (Pa.1989))). As the Pennsylvania Supreme Court has stated, "[i]f no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is only an element of damages." *Kirkbride,* 555 A.2d at 802 (emphasis omitted); *see also Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp.,* 855 A.2d 818, 833 n. 33 (Pa.2004) (restating this rule). Defendants' independent counterclaim for punitive damages must also be dismissed.

An appropriate Order follows.

*ORDER*

AND NOW, this 28th day of February, 2005, upon consideration of Relator's Motion for Judgment on the Pleadings (Doc. No. 154, No. 96-CV-4346), it is ORDERED that the Motion is GRANTED and Defendants' Counterclaims are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 469590

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 12

2022 WL 970757
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

The WEISER LAW FIRM, P.C., et al., Plaintiffs,
v.
Michael HARTLEIB, Defendant.

CIVIL ACTION NO. 2:19-cv-02728-KSM
|
Filed 03/31/2022

**Attorneys and Law Firms**

Philip S. Rosenzweig, Silverang, Rosenzweig & Haltzman, LLC, King of Prussia, PA, for Plaintiffs.

Eamon C. Merrigan, Goldberg, Miller & Rubin, P.C., Philadelphia, PA, for Defendant.

**MEMORANDUM**

MARSTON, District Judge

***1** This case spawns from a years long dispute between Plaintiffs, the Weiser Law Firm, P.C. (the "Law Firm") and Robert Weiser, Esquire, and Defendant Michael Hartleib. Plaintiffs claim that Hartleib has embarked on a campaign to disparage them to judges, members of the legal community, and current and prospective clients. (*See* Doc. No. 69.) Plaintiffs assert claims for defamation, intentional infliction of emotional distress ("IIED"), commercial disparagement, and false light invasion of privacy. (*Id.*) Presently before the Court is Hartleib's motion to dismiss. (Doc. No. 72.) For the reasons below, Hartleib's motion is granted in part and denied in part.

## I. BACKGROUND

### *A. Factual Background*

Taking the allegations in the Amended Complaint as true, the relevant facts are as follows.

The Law Firm specializes in shareholder class actions and shareholder derivative actions. (Doc. No. 69 ¶ 7.) Weiser is the founder and principal of the Law Firm, and his practice focuses primarily on shareholder derivative litigation. (*Id.* ¶ 10.)

#### 1. Hartleib Is Introduced to Plaintiffs

In November 2008, Hartleib emailed Bruce Murphy, Esquire, an attorney who had previously referred clients to Weiser and the Law Firm. Hartleib explained that he owned shares in Sprint Corporation and Nextel Communications, which lost value when the two companies merged. (*Id.* ¶¶ 11–12; *see also* Doc. No. 69-1.) Murphy forwarded Hartleib's email to Weiser and asked if Weiser thought a shareholder derivative action could be brought on Sprint's behalf. (Doc. No. 69 ¶ 13.) After conducting some research, Weiser told Murphy that he did not recommend filing a derivative lawsuit at that time. (*Id.* ¶ 14.)

A few months later, in March 2009, another law firm filed a securities class action against Sprint based on the Sprint/Nextel merger. (*Id.* ¶ 15.) Several other similar securities class actions were also filed, and the cases were consolidated in the U.S. District Court for the District of Kansas (the "Sprint Securities Class Action"). (*Id.* ¶ 16.)

The same day the first securities class action was filed against Sprint, Murphy followed up with Weiser about potential shareholder derivative claims that could be brought on Sprint's behalf. (*Id.* ¶ 18.) At that point, the Law Firm concluded that Sprint may have potential claims against its current and/or former officers and directors and asked Murphy if Hartleib or any other potential client was interested in initiating the lawsuit. (*Id.* ¶¶ 19–20.) Murphy responded that Hartleib and other potential clients were interested. (*Id.* ¶ 21.) On March 13, 2009, Weiser sent a draft shareholder derivative complaint to Murphy, and Murphy circulated it to his actual or potential clients, which the Law Firm understood included Hartleib. (*Id.* ¶¶ 23–24.)

Weiser and Hartleib spoke for the first time on March 26, 2009. (*Id.* ¶ 27.) Hartleib claimed to have spent "hundreds of hours" investigating Sprint in connection with the Securities Class Action and explained that he was interested in serving as the lead plaintiff in the case. (*Id.* ¶¶ 28–29.) He also strongly suggested that he would be interested in sharing any attorneys' fees the Law Firm may recover if it represented Hartleib in connection with a shareholder derivative suit brought on Sprint's behalf. (*Id.* ¶ 30.) Weiser found Hartleib's proposal "extremely troubling." (*Id.* ¶ 32.)

***2** Following their conversation, Weiser decided that the Law Firm could not represent Hartleib in a derivative action

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

brought on behalf of Sprint due to a potential conflict of interest. (*Id.* ¶ 31.) Specifically, Weiser reasoned that any role Hartleib played in launching or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint. (*Id.* ¶ 31.) Weiser communicated his decision to Murphy, and Murphy informed Hartleib that neither his firm nor Weiser's Law Firm would represent Hartleib in a shareholder derivative action brought on behalf of Sprint. (*Id.* ¶¶ 33–36; *see also* Doc. No. 69-2.)

Thereafter, the Law Firm decided to represent another Sprint shareholder, Monica Ross-Williams, in a shareholder derivative action filed in Kansas State Court (the "Sprint Litigation"). (*Id.* ¶ 37.) And another law firm filed a separate shareholder derivative action on Sprint's behalf and named Hartleib as the representative plaintiff. (*Id.* ¶ 38.)

### 2. Hartleib Reconnects with Plaintiffs

In March 2011, two years after they last spoke, Hartleib reached out to Weiser in connection with a *pro se* derivative action he and several other plaintiffs filed on behalf of Sirius XM Satellite Ratio, Inc. (*Id.* ¶¶ 39–40.) Hartleib asked whether the Law Firm would represent the plaintiffs in the Sirius derivative action, but Weiser declined because he felt the plaintiffs' legal theories were weak. (*Id.* ¶ 43.) Hartleib renewed his request several months later, but Weiser never responded. (*Id.* ¶¶ 44–45.) In February 2012, Hartleib contacted Weiser again, asking whether they were "going to do some business together or what?" (*Id.* ¶ 46; *see also* Doc. No. 69-7.) Weiser did not respond to Hartleib's inquiry, and the Law Firm has never engaged in any business with or represented Hartleib. (Doc. No. 69 ¶ 47.)

### 3. The Sprint Litigation Settles

In 2016, a majority of the Sprint shareholder derivative lawsuits pending in the Kansas courts (including the Law Firm's Ross-Williams's suit) achieved a collective settlement. (*Id.* ¶ 48.) When the Law Firm and others sought the court's final approval of the terms of the settlement, including attorneys' fees for plaintiffs' counsel, Hartleib filed a *pro se* objection. (*Id.* ¶ 50.) Hartleib also called Weiser on May 20, 2016, about a week before the final approval hearing, and proposed to withdraw his objection if Weiser entered into a "consulting agreement" with Hartleib. (*Id.* ¶¶ 51–53.) Hartleib suggested that he would provide the Law Firm with ideas for initiating lawsuits against corporate defendants in exchange for hundreds of thousands of dollars. (*Id.* ¶ 53.) Weiser was again troubled by Hartleib's proposition and declined to enter into such an arrangement. (*Id.* ¶ 54.)

On May 26, 2016, Hartleib appeared at the final approval hearing before the Honorable James Vano in support of his objection. (*Id.* ¶ 55.) In mid-June 2016, Judge Vano approved the Sprint Derivative Settlement, but only awarded approximately ten percent of the attorneys' fees requested, and the parties appealed. (*Id.* ¶¶ 61–62.)

In February 2017, during the pendency of the appeal, the Law Firm discovered that Jeffrey Silow,[1] one of its contract attorneys who performed approximately 7,000 hours of document review for the Law Firm's Sprint Litigation over four years, had been disbarred in Pennsylvania decades earlier. (*Id.* ¶¶ 59, 63, 66.) Silow had been placed with the Law Firm through Abelson Legal Search, a Philadelphia legal recruitment and placement firm. (*Id.* ¶ 59.) Abelson had been "responsible for vetting the credentials and bar status of the attorneys it placed" and "held Silow out ... as a licensed attorney in good standing." (*Id.* ¶ 60.) After learning of Silow's disbarment, the Law Firm immediately alerted Judge Vano and the Kansas Court of Appeals,[2] which was reviewing the fee award. (*Id.* ¶ 66.) The Court of Appeals ultimately affirmed the reduced fee award. (*Id.* ¶ 67.)

1 Silow used his son's name, Alexander, "to perpetrate his deception." (*Id.* ¶ 63.)

2 Weiser and the Law Firm also notified "the courts sitting in every action in which Silow's hours were included as part of an 'attorney time' lodestar calculation." (Doc. No. 69 ¶ 64.)

***3** Once the Silow controversy was brought to light, Hartleib proceeded to "unleash[ ] a deluge of abuse upon the Plaintiffs." (*Id.* ¶ 68.) For example, on March 6, 2017, Hartleib emailed Weiser and copied eleven attorneys, as well as Judge Vano's administrative assistant, stating:

> Rob! I am a little confused! ... It seems your statements to the Appellate Court were disingenuous at best. Shocking! ... Ethical obligation, what a Saint [sic] ... Your attempts, [sic]

> to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case! This lawyer driven litigation must and will cease. Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is quite frankly astonishing and provoking wrath.

(*Id.* at ¶ 69; *see also* Doc. No. 69-12.)

That same day, Hartleib called Ross-Williams, the Law Firm's named plaintiff in the Sprint Litigation, and "verbally harassed and threatened" her. (Doc. No. 69 ¶¶ 70–71.) Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder. (*Id.* ¶ 71.) Ross-Williams felt "shocked, disturbed, harassed and threatened" during the call and asked Hartleib not to contact her again.[3] (*Id.* ¶¶ 73–74.) Nonetheless, the following day, Hartleib directly emailed Ross-Williams and copied fifteen attorneys and Judge Vano's administrative assistant about the call, stating:

> Dear Ms. Williams, it was a pleasure speaking with you this evening ... I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a[n] unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorney has now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court ... I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to report their criminal acts. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints ... As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et al. is just as guilty as Mr. Silow. This is just the tip of the iceberg.

(*Id.* ¶ 77; *see also* Doc. No. 69-14.)

3 Ross-Williams asked Hartleib to direct any future correspondence through her counsel, the Law Firm. (Doc. No. 69 ¶ 72.)

Plaintiffs sent Hartleib a cease-and-desist letter, which he ignored. (Doc. No. 69 ¶ 79.) The same day, Hartleib emailed Weiser, fifteen members of the bar, and the Judge Vano's administrative assistant, stating:

> For you to characterize [the phone call with Ross-Williams and follow-up email] as harassment is another blatant attempt to distract and obfuscate your fraudulent acts and bastardization of the judicial system. I caution you, that by coercing your 'client' to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called 'client' is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist. As far as your not so vailed [sic] threat that Ms. Williams 'reserves all of her rights', if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect! Instead of

> wasting my time, I would suggest you consult an ethics attorney, that's right, you already have!

***4** (Doc. No. 69 ¶ 79; Doc. No. 69-14.)

Because of Hartleib's harassing conduct, the Kansas Court of Appeals issued a protective order prohibiting Hartleib from contacting Ross-Williams. (Doc. No. 69 ¶ 80.) On two separate occasions, Hartleib sought to have the protective order lifted, but those motions were denied. (*Id.* ¶¶ 81–82.) After the Law Firm opposed one such attempt, Hartleib emailed Weiser and copied eight other members of the bar (including other employees of the Firm), stating:

> Rob, your ability to set the bar at new lows, never disappoints! ... Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve! ... Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!

(*Id.* ¶ 83; Doc. No. 69-15.)

On June 2, 2018, Hartleib emailed Weiser, eleven other attorneys, and Judge Vano's administrative assistant, stating:

> Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. Much like the fraud Weiser et al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. At present, it appears Weiser et. al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.
>
> I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases. I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. The actions of Weiser et al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.

(Doc. No. 69 ¶ 94; *see also* Doc. No. 69-19.)

### 4. Hartleib Intervenes in Other Litigations

Beginning in 2018, Hartleib began inserting himself into the Law Firm's pending litigations, including litigations in which he had no stake.[4] (*Id.* ¶¶ 95–96.) First, Hartleib filed an amicus brief in *In re Equifax, Inc. Derivative Litigation* (N.D. Ga.), where Plaintiffs sought to be appointed as Co-Lead Counsel in the action. (*Id.* ¶ 101; *see also* Doc. No. 69-21.) In doing so, Hartleib unleashed a host of allegations, including that the Law Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," operated a "criminal enterprise," and displayed "hubris and utter contempt for the Court." (Doc. No. 69 ¶¶ 102–03.) Hartleib posited, "[W]hat is going on at the Weiser firm? Either they are corrupt, or entirely inept[.]" (*Id.* ¶ 105.) Hartleib also spoke in support of his amicus brief at the hearing on the motions for appointment of lead counsel. (*Id.* ¶ 108.) Ultimately, the court denied the Law Firm's motion to be appointed co-lead counsel, and Hartleib "took credit for this result." (*Id.* ¶ 109.)

4 Additionally, on April 25, 2017, the Plaintiffs allege that Hartleib mailed several copies of an "anonymous" letter riddled with profanities to six judges for the Chester County Court of Common Pleas. (Doc. No. 69 ¶¶ 89–92; *see also* Doc. No. 69-17.)

***5** Second, Hartleib attempted to interject in another derivative action involving the Law Firm, *In re Big Lots, Inc. Shareholder Litigation*, No. 12-cv-445 (S.D. Ohio) (the "Big Lots Litigation"), after the court had already preliminarily approved the settlement. In the opinion finally approving the settlement, the Honorable Michael H. Watson noted that

Hartleib had emailed the court to raise concerns about the Law Firm's billing practices:

> On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm ... Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case ... Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.

(*Id.* ¶¶ 110–15; *see also* Doc. No. 69-25.)

Next, Hartleib targeted the Law Firm in *In re CenturyLink Sales Practices and Securities Litigation* (D. Minn.) (the "CenturyLink Litigation"), a consolidated derivative action. (Doc. No. 69 ¶ 116.) The law firm of Bragar Eagle & Squire, P.C. moved to be appointed lead counsel and proposed that the Weiser Law Firm be included as part of its support structure. (*Id.* ¶¶ 117–18; *see also* Doc. No. 69-26.) Hartleib filed an amicus brief in opposition to the Law Firm's appointment to "inform [the] Court of ongoing troubling actions by" the Law Firm. (Doc. No. 69 ¶¶ 117–18.) On March 6, 2019, Hartleib reiterated his accusations against the Law Firm at a hearing before the Court, stating, "I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of the litigation.... These firms, when these firms are up to no good, when they are billing illusory hours...." (*Id.* ¶¶ 129, 131; *see also* Doc. No. 69-27.)

After the hearing, Hartleib forwarded his amicus brief to Judge Vano's administrative assistant and copied other attorneys who had been involved in the Sprint derivation action, writing: "I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues." (Doc. No. 69 ¶¶ 134–36; *see also* Doc. No. 69-28.) Ultimately, the *CenturyLink* court appointed as lead counsel Bragar Eagle & Squire, whose proposed support structure included the Law Firm. (Doc. No. 69 ¶ 143.)[5]

5 Additionally, on August 17, 2018, Hartleib sent Weiser an email regarding another shareholder derivative suit filed in the Central District of California. (Doc. No. 69 ¶ 97; *see also* Doc. No. 69-20.) Hartleib asked whether Weiser was attending an upcoming hearing and expressed regret that he had invested in stocks because he kept being "forced to deal" with Weiser. (Doc. No. 69 ¶ 97.) He concluded, "If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!" (*Id.*) Plaintiffs do not allege that Hartleib made any statements to third parties about Weiser or the Law Firm in connection with this specific lawsuit.

### 5. Hartleib's Fixation on Plaintiffs Continues

In addition to inserting himself in the Law Firm's pending litigations, Hartleib also contacted individuals in law enforcement and the legal field to discuss Plaintiffs and even initiated a lawsuit against Plaintiffs.

***6** In February 2018, after the Law Firm filed a lawsuit against Abelson Legal Search for its placement of disbarred attorney Silow with the Law Firm, Hartleib contacted Abelson Legal Search. (*Id.* ¶ 157.) After the call, Hartleib emailed Cathy Abelson, the President of Abelson Legal Search, explaining that he could "facilitate a cross-complaint that could lead to the demise of the Weiser Firm" and promised to provide "contacts" to convince Abelson that Weiser was "corrupt and inept." (*Id.* ¶ 160; *see also* Doc. No. 69-35.)

Abelson never responded to Hartleib's email, but Hartleib emailed her again on February 22, 2018, stating:

> I am the person who has exposed the fraud committed by the Weiser firm in the case that has brought Mr. Silow's criminal past and disbarred status into focus ... Their actions in this case are truly unconscionable ... they have filed multiple purjurious [sic]

> declarations and will stop at nothing to protect their duplicitous acts and criminal enterprise ... I am hopeful that we can work together and facilitate a cross-complaint against the Weiser firm ... I know where the bodies are buried and intend to dig them up.

(Doc. No. 69 ¶ 162; *see also* Doc. No. 69-36.) Two days later, Hartleib emailed Joyce Feinstein, an employee at Abelson Legal Search, stating that he was preparing an *amicus curiae* brief to "inform the court of [Weiser's] criminal acts in the Sprint case." (Doc. No. 69 ¶ 163; *see also* Doc. No. 69-37.) He explained that he felt Weiser "unfit to be lead Counsel in any representative suit" and that he was trying to have Weiser "removed as lead plaintiff counsel in said case." (Doc. No. 69 ¶ 163.) Hartleib emailed Abelson again on June 2, 2018, stating, "Cathy, are you interested in working together to commence an action against the Weiser firm? Why won't you have your attorney's [sic] contact me." (*Id.* ¶ 164; *see also* Doc. No. 69-38.)

Around the same time, in March 2018, Hartleib contacted Detective Sergeant Thomas J. Goggin of the Chester County, Pennsylvania District Attorney's Office. (Doc. No. 69 ¶ 165; *see also* Doc. No. 69-39.) On March 13, 2018, Hartleib told Detective Goggin "the Weiser firm is claiming to be victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow['s] fraud and conspiracy against the court." (Doc. No. 69 ¶ 166.) The following day, Hartleib responded to Detective Goggin's follow-up questions, emphasizing that "the Weiser firm knew exactly who Silow was and the Weiser [sic] was lying." (*Id.* ¶ 167; *see also* Doc. No. 69-40.) A week later, on March 22, Hartleib told Detective Goggin: "Weiser knew exactly who Silow was! I was hopeful [Abelson] would want to work together but I have not heard back from there [sic] lawyers. I am going to bring a civil suit against Weiser. Were you able to find the misdemeanor charges against Silow!" (Doc. No. 69 ¶ 168; *see also* Doc. No. 69-41.) Detective Goggin informed Hartleib that he did not "have anything new to report" but would "get back to [him]." (Doc. No. 69 ¶ 168.)

About two months later, in May 2018, Hartleib sent Detective Goggin the opinion from the Kansas Court of Appeals upholding the reduced attorneys' fees award and asked: "Were you ever able to find the charges filed against Silow? I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k ... Alexander Silow [Jeffrey Silow's son] knew and was likely receiving payments from Weiser." (*Id.* ¶ 169; *see also* Doc. No. 69-42.) Hartleib also said that he was going to file a Bar complaint and commence a civil action, though he did not specify whether such action would be taken against Weiser or Alexander Silow. (Doc. No. 69 ¶ 169.) Six months later, Hartleib emailed Detective Goggin "to see if any action was taken by [Goggin's] department." (*Id.* ¶ 171; *see also* Doc. No. 69-43.)

***7** Finally, on December 12, 2018, Hartleib initiated a lawsuit against Plaintiffs, asserting claims for legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act, and abuse of process. (*Id.* ¶ 159; Doc. No. 69-33.) The U.S. District Court for the District of Kansas dismissed the case, and the U.S. Court of Appeals Tenth Circuit affirmed the dismissal. *See Hartleib v. The Weiser Law Firm, P.C.*, Case No. 19-2099-EFM-JPO, 2020 WL 3412480 (D. Kan. June 22, 2020), *aff'd*, 861 F. App'x 714 (10th Cir. 2021).

### *B. Allegedly Disparaging Statements*

Plaintiffs identify seventeen statements that Hartleib made from 2017 through 2019 in order "to injure Plaintiffs' business and professional reputations."[6]

- **Statement No. 1**: A March 6, 2017 email from Hartleib to Judge Vano's administrative assistant and eleven attorneys stating that Weiser "made statements to the Appellate Court [which] were disingenuous at best" and accusing Weiser of "attempt[ing] to obfuscate [his] chicanery" and being "[one of] the corrupt parties." (Doc. No. 69 ¶ 183(a).)

- **Statement No. 2**: A March 6, 2017 email from Hartleib to Ross-Williams stating that the Law Firm was a "criminal enterprise." (*Id.* ¶ 183(b).)

- **Statement No. 3**: A March 7, 2017 email from Hartleib to Ross-Williams, Judge Vano's administrative assistant, and fifteen attorneys stating that they were "unwitting victim[s] of [the Law Firm's] fraud committed against the Court" and that the Law Firm had "admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court." (*Id.* ¶ 183(c).)

- **Statement No. 4**: A March 7, 2017 email to Judge Vano's administrative assistant and fifteen attorneys accusing

Weiser of making "self-serving misrepresentations," committing "fraudulent acts and bastardization of the judicial system," and having "little credibility." (*Id.* ¶ 183(d).)

- **Statement No. 5**: An April 12, 2017 email from Hartleib to Judge Vano's administrative assistant and eleven attorneys calling Weiser "an embarrassment to the bar." (*Id.* ¶ 183(e).)

- **Statement No. 6**: An April 7, 2018 email from Hartleib to Weiser and eight other attorneys accusing Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records" and of making "personal attacks [that] smack of desperation." (*Id.* ¶ 183(f).)

- **Statement No. 7**: A May 9, 2018 email from Hartleib to "numerous" attorneys stating, "Plaintiff Counsel, ... when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous!" (*Id.* ¶ 183(g).)

- **Statement No. 8**: A June 2, 2018 email from Hartleib to "a host" of attorneys calling the Law Firm's work in the Sprint Litigation "the very definition of Racketeering." (*Id.* ¶ 183(h).)

- **Statement No. 9**: A March 14, 2019 email to Judge Vano's chambers asking Judge Vano to "set[ ] the record straight" in the CenturyLink Litigation. (*Id.* ¶ 183(i).)

- **Statement No. 10**: An April 25, 2017 letter from Hartleib to members of the Chester County, Pennsylvania Court of Common Pleas stating that Judge Vano caught the Law Firm "in the act" of falsifying its bills. (*Id.* ¶ 184(a).)

- **Statement No. 11**: An August 24, 2018 email from Hartleib to Judge Watson raising "concerns over Weiser's billing practices in [a] prior case." (*Id.* ¶ 184(b).)

- **Statement No. 12**: A March 5, 2019 *amicus curiae* brief Hartleib filed in the CenturyLink Litigation opposing the Law Firm's role in the case and stating that the Law Firm used "deceased parties, friends and family members [who] lacked standing" as Plaintiffs and that the Law Firm "generat[ed] thousands of billable hours for illusory work, submit[ted] fraudulent time logs and [sought] hundreds of millions in unjust fees in cases across the country." (*Id.* ¶ 184(c).)

***8** • **Statement No. 13**: A March 6, 2019 statement Hartleib made at a hearing in the CenturyLink Litigation stating that the Law Firm was "up to no good" and was "billing illusory [hours]." (*Id.* ¶ 184(d).)

- **Statement No. 14**: A February 22, 2018 email from Hartleib to Abelson stating that he had "exposed the fraud committed by the Weiser firm," decrying the Law Firm's actions as "unconscionable," and accusing the Law Firm of filing "multiple purjurious [sic] declaration[s] ... to protect their duplicitous acts and criminal enterprise." (*Id.* ¶ 185(a).)

- **Statement No. 15**: A February 24, 2018 email from Hartleib to Feinstein describing Weiser as "corrupt and inept." (*Id.* ¶ 185(b).)

- **Statement No. 16**: A February 24, 2018 email from Hartleib to Feinstein informing her that the Law Firm was "unfit to be lead Counsel in any representative suit." (*Id.* ¶ 185(c).)

- **Statement No. 17**: March 14, 2018 and May 14, 2018 emails from Hartleib to Detective Goggin stating that Weiser "knew of Mr. Silow['s] fraud and conspiracy" and expressing disbelief that Weiser could "commit perjury and try to defraud the court and Sprint and walk away." (*Id.* ¶ 185(d).)

6 Plaintiffs state that they identified "eighteen instances ... in which Hartleib made a defamatory statement" (Doc. No. 69 ¶ 186); however, the Amended Complaint identifies only seventeen such statements (*id.* ¶¶ 183–85).

### *C. Procedural History*

Plaintiffs initiated this lawsuit on June 24, 2019, asserting claims for abuse of process, defamation, IIED, negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract. (Doc. No. 1.) Plaintiffs also sought a vexatious litigant order to enjoin Hartleib from filing any action against Plaintiffs; from making any filing or submission in any case, derivative suit, class action suit, or qui tam suit that involves Plaintiffs; and from contacting any individual or entity about Plaintiffs, without first obtaining leave of the court. (*Id.* at ¶ 170.)

On August 23, 2019, Hartleib, a California resident, moved to dismiss the complaint for lack of personal jurisdiction

and improper venue. (Doc. No. 9.) The Court dismissed Plaintiffs' request for a vexatious litigant order and claims for negligent misrepresentation, intentional interference with contractual relations, and tortious interference for lack of personal jurisdiction and dismissed Plaintiffs' claim for abuse of process for improper venue. (Doc. No. 35.) The Court denied Hartleib's motion to dismiss as to the defamation and IIED claims. (*Id.*) Following the entry of the Court's Order, Hartleib sought leave to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 40.) The Court granted Hartleib leave to file a motion to dismiss the complaint pursuant to Rule 12(b)(6). (Doc. No. 41.)

Before Hartleib could file a Rule 12(b)(6) motion, Plaintiffs sought leave to amend their complaint. (Doc. No. 50.) The Court permitted Plaintiffs to amend their complaint (Doc. No. 68), and Plaintiffs filed the Amended Complaint on January 21, 2021 (Doc. No. 69). Plaintiffs continue to assert the defamation and IIED claims and added claims for commercial disparagement and false light invasion of privacy. (*Id.*)

***9** On February 9, 2021, Hartleib moved to dismiss the Amended Complaint for failure to state a claim. (Doc. No. 72.) Hartleib argues that the defamation, commercial disparagement, and false light claims fail because many of the allegedly defamatory statements on which these claims are based are not actionable because they are time barred and judicially privileged. (*Id.* at 26.) He also argues that Plaintiffs have failed to state a claim for defamation, commercial disparagement, or false light as to any of the statements. (*Id.* at 20.) Hartleib argues that the IIED claim fails because the alleged conduct is not outrageous. (*Id.* at 30.) Plaintiffs oppose Hartleib's motion. (Doc. No. 73.) They contend that they have stated a claim for defamation, commercial disparagement, and false light and that these claims are not time barred or based on privileged statements.[7] (*Id.* at 8.) Plaintiffs also contend that they stated a claim for IIED. (*Id.* at 24.)

7 Plaintiffs also assert that the Court may consider all of Hartleib's allegedly defamatory statements "regardless of their timeliness" in evaluating the totality of Plaintiffs' claims. (Doc. No. 73 at 8.)

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up). Similarly, the Court "may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. ANALYSIS

The Court addresses each of Plaintiffs' claims in turn.

### *A. Defamation*

Plaintiffs claim that Hartleib made 17 defamatory statements that have "injure[d] Plaintiffs' business and professional reputations." To state a claim for defamation under Pennsylvania law, a plaintiff must allege:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. & Cons. § 8343(a).

Hartleib argues that Plaintiffs' defamation claim fails because most of the statements on which it is based are time barred, other of the statements are protected by the judicial privilege, and Plaintiffs did not suffer harm from any of the statements. (Doc. No. 72 at 20–30.)

### 1. Statute of Limitations

***10** Pennsylvania has a one-year statute of limitations on defamation claims. *See* 42 Pa. Stat. & Cons. § 5523(1). Plaintiffs initiated this suit on June 24, 2019, so any statements made prior to June 24, 2018 are time barred.

Plaintiffs argue that Hartleib "engaged in an ongoing, concerted and intentional course of conduct, the intent of which, collectively, was to defame and damage Plaintiffs," so the continuing violation exception applies, rendering all seventeen statements actionable, regardless of when they were made. (Doc. No. 73 at 9.) Under the exception, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).

The continuing violation exception does not, however, render all seventeen statements actionable because the exception does not apply to actions for defamation. *Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 304–05 (E.D. Pa. 2006) ("Federal courts almost universally decline to apply the continuing tort doctrine to defamation claims. A cause of action for defamation accrues immediately upon the occurrence of the tortious act and, thus, is not appropriate for the continuing violation exception." (cleaned up)); *Porta v. Fee*, No. CIV. A. 98–2094, 1998 WL 334355, at *2 (E.D. Pa. June 24, 1998) ("The 'continuing violation theory' can not toll the statute of limitations for Plaintiff's defamation claim."); *see also Deangelo Bros., Inc. v. Platte River Ins.*, Civil Action No. 3:09–CV–1198, 2010 WL 2635983, at *7 (M.D. Pa. June 29, 2010) ("[T]he continuing violations doctrine does not apply to actions for defamation."); *Samuel Dowling, Sr. v. Phila. Newspapers, Inc.*, No. 3031, 1995 WL 1315957, at *142 (Pa. Commw. Feb. 6, 1995) ("[T]here is no 'continuing tort' exception to Pennsylvania's one-year statute of limitations for actions for defamation....").

Plaintiffs also argue that the discovery rule "preserves certain of [Hartleib's] statements that might otherwise be considered untimely." (Doc. No. 73 at 11.) "The discovery rule tolls the accrual of the statute of limitations when a plaintiff is unable, '*despite the exercise of due diligence*,' to know of the injury or its cause." *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). "Under the rule, ... the statute of limitations does not begin to run until 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.' " *Id.* (quoting *Debiec v. Cabot Corp.*, 352 F.3d 117, 129 (3d Cir. 2003)). Unlike the continuing violation exception, the discovery rule may toll the statute of limitations on a defamation claim where the allegedly defamatory statements were "published in a format that the plaintiff is not likely to discover." *See Coviello v. Berkley Publishing Grp.*, CIVIL NO: 1:15-CV-01812, 2017 WL 891323, at *11 (M.D. Pa. Jan. 19, 2017) (citing *Gallucci v. Phillips & Jacobs, Inc.*, 614 A.2d 284 (Pa. Super. Ct. 1992)).

Plaintiffs contend that the discovery rule applies to Hartleib's email communications with Detective Goggin. (Doc. No. 73 at 12.) Hartleib emailed Goggin about "filing criminal charges" against Silow. (Doc. No. 69-39 at 2.) Hartleib told Goggin he "[could not] believe that the [Law Firm] can commit perjury and try to defraud the court and Sprint and walk away with 450k." (Doc. No. 69-41 at 2.) These emails were not broadly publicized; in fact, Plaintiffs only learned of their existence during a limited discovery phase in this case.[8] (Doc. No. 73 at 12.) Plaintiffs did not know and could not have known about these statements until they were handed over in discovery, so the defamation claim is not time barred insofar as it arises out of Hartleib's email communications with Goggin. *See Gallucci*, 614 A.2d at 314 (holding that the discovery rule applied in a defamation action where the plaintiff's former employer allegedly made defamatory statements to the FBI). *Contra Wolk v. Olson*, 730 F. Supp. 2d 376, 378–79 (E.D. Pa. 2010) (holding that the discovery rule did not toll the statute of limitations for a defamation claim based on statements published on a mass-media website).

8 On June 16, 2020, the Court permitted the parties to engage in limited discovery "related to the

jurisdictional and venue issues in this case." (Doc. No. 30.)

***11** In sum, the continuing violation exception does not apply to defamation claims, and the discovery rule tolled the statute of limitations only as to Hartleib's emails to Goggin (Statement No. 17), so the Court dismisses the defamation claim to the extent it is based on Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16, which were made prior to June 24, 2018.

### 2. Judicial Privilege

"It has long been the law of Pennsylvania that statements made by judges, attorneys, witnesses and parties in the course of or pertinent to any stage of judicial proceedings are absolutely privileged and, therefore, cannot form the basis for liability for defamation." *Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. Ct. 1991). The Commonwealth affords this privilege because it recognizes an interest in allowing "[a]ll persons involved in a judicial proceeding ... to speak frankly and argue freely without danger or concern that they may be required to defend their statements in a later defamation action." *Smith v. Griffiths*, 476 A.2d 22, 24 (1984). The judicial privilege applies only to statements (1) "issued as a matter of regular course of the proceedings"; and (2) "pertinent and material to the proceedings." *Bochetto v. Gibson*, 860 A.2d 67, 73 (Pa. 2004). "[T]he privilege extends not only to communications made in open court, but also encompasses pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest." *Richmond v. McHale*, 35 A.3d 779, 785 (Pa. Super. Ct. 2012).

The judicial privilege applies broadly. *Id.* "The existence of the privilege does not depend upon the motive of the defendant in making the allegedly defamatory statement. The privilege is absolute and cannot be destroyed by abuse." *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 247 (E.D. Pa. 2012) (cleaned up). "[A]ll doubt as to whether the alleged defamatory communication was indeed pertinent and material to the relief or redress sought is to be resolved in favor of pertinency and materiality." *Richmond*, 35 A.3d at 785 (citing *Greenburg v. Aetna Ins. Co.*, 235 A.2d 576, 578 (Pa. 1967)).

Hartleib argues that the allegedly defamatory statements made to judges or in connection with the Sprint, CenturyLink, or Big Lots litigations are protected by the judicial privilege. (Doc. No. 72 at 23.) Plaintiffs respond that none of Hartleib's statements are protected by the judicial privilege because they were "not made in the regular course of proceedings and [were] extraneous to the relief being sought in those litigations" given that he lacked standing in those cases. (Doc. No. 73 at 16.) The Court will now consider whether the judicial privilege protects each of the remaining statements.

*Statement No. 9.* On March 14, 2019, Hartleib emailed Judge Vano's chambers asking the judge to intervene in the CenturyLink Litigation and accusing the Law Firm of engaging in "sinister" behavior. (Doc. No. 69 ¶ 183(i).) Hartleib does not expressly claim that this statement is judicially privileged, but he argues, at a high level, that "his statements in filings or hearings are subject to the absolute judicial privilege." (Doc. No. 72 at 23.) The judicial privilege does not protect this statement. Hartleib sent this communication to Judge Vano, who had presided over the Sprint Litigation, asking him to intervene in the CenturyLink Litigation. The mere fact that Hartleib made this statement to a member of the judiciary does not mean the judicial privilege applies. Neither of the two prerequisites is satisfied as to this letter. An individual's plea for one proceeding judge to intervene in *another judge's* pending cases is certainly not made "in the regular course" of either proceeding, and, similarly, such a request is not pertinent or material to the proceedings in either litigation. *See Post v. Mendel*, 507 A.2d 351, 356 (Pa. 1986) (holding that a defamatory letter sent to a judge was not protected by the judicial privilege because it was not relevant to the pending proceedings and transmittal of the letter would not "logically have been expected to affect the course of trial"); *id.* at 357 ("[I]t would not be pertinent, material, and in the regular course of procedure to send copies of the [allegedly defamatory] letter to Judge Kelton," nor would allegations "describing plaintiff as an unprofessional attorney and a nefarious piranha and liar ... be relevant to a perjury proceeding").

***12** *Statement No. 11.* On August 24, 2018, Hartleib emailed Judge Watson, the judge presiding over the Big Lots Litigation, raising concerns over the Law Firm's billing practices. Similar to Statement No. 9, this statement is an email from a third party who admits that he is not "a shareholder ... or otherwise an interested party in this case." (Doc. No. 69 ¶ 184(b).) Given Hartleib's admitted lack of interest in the case, this statement was not made in the regular course of the proceedings and is not protected by the judicial privilege. *See Post*, 507 A.2d at 356.

*Statements No. 12 and 13.* On March 5, 2019, Hartleib filed an *amicus curiae* brief opposing the Law Firm's involvement in the CenturyLink Litigation. (*Id.* ¶ 117.) The Law Firm was not moving to be named lead counsel; rather, it was part of the support structure proposed by a third-party firm in its motion to serve as lead counsel. (*Id.*) At a hearing on the motion the very next day, the court allowed Hartleib to argue. Hartleib rehashed the same arguments in his brief. Specifically, Hartleib argued that because of the Law Firm's history of engaging in fraudulent billing practices, the court should reject the Law Firm's role in the lead plaintiff's support structure. Hartleib contends that these allegedly defamatory statements (contained in his brief and during oral argument) are privileged because the judicial privilege protects "statements in filings" such as this. (Doc. No. 72 at 23.) In response, Plaintiffs counter that Hartleib's involvement in the CenturyLink Litigation was "highly irregular," in part because Hartleib's status as a CenturyLink shareholder was not established. (Doc. No. 73. at 16.) Regardless of whether Hartleib was a CenturyLink shareholder, the Court finds that the judicial privilege applies. He made these statements in an amicus brief, which was filed in the ordinary course of the litigation.[9] These statements accusing the Law Firm of having fraudulent billing practices are also very likely to have been relevant to the court's decision whether to grant a motion that would allow the Law Firm to play some role in the CenturyLink Litigation. *See Richmond*, 35 A. 3d at 784–85 ("[A]ll doubt as to whether the alleged defamatory communication was indeed pertinent and material to the relief or redress sought is to be resolved in favor of pertinency and materiality."). And even if Hartleib filed this brief and appeared at the hearing "under false pretenses in order to shame and embarrass Plaintiffs among their peers," a defendant's bad motive does not render the privilege inapplicable. *Schatzberg*, 877 F. Supp. 2d at 247.

9 The District of Minnesota, the judicial district in which the CenturyLink Litigation was heard, does not have any rules prohibiting amicus briefs. *See generally* D. Minn. Local Rules.

*Statement No. 17.* In March and May 2018, Hartleib emailed Detective Goggin "to seek filing criminal charges against Alexander Silow and his father Jeffrey Mark Silow." (Doc. No. 69-39 at 2.) Hartleib argues that any allegedly defamatory statements contained in these communications are judicially privileged because Hartleib "specifically express[d] his interest in pursuing criminal charges." (Doc. No. 72 at 29.) Plaintiffs argue that these statements are not privileged because "Detective Goggin replied only once" and "did not investigate or seek prosecution of Plaintiffs for any criminal act." (Doc. No. 73 at 18.) The judicial privilege protects "statements made to law enforcement officials for the purpose of persuading those officials to initiate criminal proceedings." *Schanne v. Addis*, 121 A.3d 942, 947–48 (Pa. 2015); *see also Pawlowski v. Smorto*, 588 A.2d 36, 41–42 (Pa. Super. Ct. 1991) (holding that statements "made solely to law enforcement officials in which an accusation of a crime ... is made and which are made for the purpose of inducing those officials to bring criminal charges against the accused, are absolutely privileged").

***13** Hartleib made these statements to Detective Goggin with the express intent of initiating criminal proceedings against the Silows. (Doc. No. 69-39 at 2.) The fact that Hartleib sent these emails only to Detective Goggin bolsters this finding. *Contra Miller v. County of Centre*, 702 F. App'x 69, 73 (3d Cir. 2017) (holding that the judicial privilege did not apply to statements made for reasons other than "to start or aid a criminal prosecution"). Although Chester County never initiated criminal proceedings against the Silows, it is clear to the Court that Hartleib made these statements for the purposes of initiating criminal proceedings, so these statements are judicially privileged. *See Pawlowski*, 588 A.2d at 41–42; *see also Sacks v. Stinsky*, No. 18-cv-3500, 2019 WL 2521635, at *4 (E.D. Pa. June 19, 2019) (holding that the defendant's statements "report[ing] what he believed were terroristic threats" to the police were judicially privileged regardless of the defendant's motive because "an individual's motives for making statements are not relevant in deciding whether those statements are privileged"); *Jackson v. Trustees of Univ. of Pa.*, CIVIL ACTION No. 17-4645, 2019 WL 309729, at *7 n.6 (E.D. Pa. Jan. 23, 2019) ("To the extent Mr. Jackson's complaint can be interpreted as asserting a libel claim against Ms. Chikaonda for reporting him to Penn Police, the claim is dismissed because statements to law enforcement officials accusing someone of criminal activity are absolutely privileged under Pennsylvania Law.").

* * *

In sum, the Court finds that Statements No. 12, 13, and 17 are protected by the judicial privilege and cannot be the bases for Plaintiffs' defamation claim.

### 3. Defamatory Nature of Statements, Publication, and Harm

Hartleib argues that the remaining two statements cannot serve as the basis for the defamation claim because one was not actually defamatory, the other was published to a limited audience, and neither caused Plaintiffs any harm. (Doc. No. 72 at 18, 22.)

*Statement No. 9.* On March 14, 2019, Hartleib emailed Judge Vano's chambers and fourteen other attorneys involved in the Sprint Litigation accusing the Law Firm of "us[ing] several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam suits." (Doc. No. 69-28 at 3.) He also informed Judge Vano that he had "initiated legal action against Weiser" and, in the same paragraph, promised that his "quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continue[d]." (*Id.* at 2.) Plaintiffs allege that this statement has "injure[d] Plaintiffs' business and professional reputations." (Doc. No. 69 ¶ 188.) Hartleib argues that these statements are not defamatory because he "qualifie[d] the reliability of information as being sourced by an unknown third-party" and because the recipients were already aware of Hartleib's qualms with Weiser's billing practices given their involvement in the Sprint Litigation. (Doc. No. 72 at 29.)

Plaintiffs have sufficiently alleged a claim of defamation as to this statement. First, this statement is defamatory even though Hartleib explained that the statement was based on information from an "anonymous letter"—statements based on information from anonymous sources can still give rise to defamation claims. *See Castellani v. Scranton Times, L.P.*, 124 A.3d 1232, 1241 (Pa. 2015) (demonstrating that a newspaper article based on an anonymous tip could serve as the basis for a defamation claim).

Second, Plaintiffs have alleged that this statement damaged their professional reputation. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Thomas Merton Ctr. v. Rockwell Int'l Corp*, 442 A.2d 213, 215 (Pa. Super. Ct. 1981); *see also Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 456 (E.D. Pa. 2021) ("For Plaintiff to prevail, it is not enough that he be the victim of the slings and arrows of outrageous fortune, be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society."). This is the first time Hartleib accused Defendants of engaging in fraudulent conduct in connection with qui tam lawsuits. (Doc. No. 69 ¶ 136.) Thus, even if Hartleib had already told the attorneys on the distribution list that Defendants were engaged in fraudulent *billing* practices, he had not told them that Hartleib was engaged in fraudulent *information-gathering* practices, so the statements in this email may have further injured Defendants' reputation. *See Marcone v. Penthouse Int'l Magazine for Men*, 745 F.2d 1072, 1079 (3d Cir. 1985) (acknowledging that some plaintiffs' reputations may be so sullied that the plaintiffs cannot possibly be harmed further by additional defamatory statements but explaining that the "doctrine is narrow" and courts cannot determine whether a plaintiff is "libel proof" as a matter of law).

***14** Accordingly, the Court finds that these statements, which were published to Judge Vano and fourteen other lawyers (and perhaps even more legal professionals, because one of the recipients was a "docketing" listserv), could have irretrievably harmed Plaintiffs' standing in the legal community. *See Goldfarb*, 539 F. Supp. 3d at 461–62 (holding that the defendant's Tweet that the plaintiff was "part of a noxious group of physicians who seek to hide abuse and protect abusers" caused the defendant harm because they "imput[e]d business misconduct"); *Kilmaski v. Parexel Int'l*, Civil Action No. 05–cv–0298, 2008 WL 2405006, at *5 (E.D. Pa. June 13, 2008) (holding that statements accusing the plaintiff of mismanaging or misappropriating money could have harmed the plaintiff's professional standing as an accountant); *Rockwell v. Allegheny Health, Educ. & Research Found.*, 19 F. Supp. 3d 401, 408 (E.D. Pa. 1998) (holding that statements the defendant made to the plaintiff's supervisors that the plaintiff "abused time off" "produced personal humiliation, mental anguish and suffering sufficient to satisfy the harm element").

*Statement No. 11.* On August 24, 2018 Hartleib emailed Judge Watson, the judge presiding over the Big Lots Litigation, raising concerns over the Law Firm's billing practices. (Doc. No. 69 ¶ 184(b).) Judge Watson mentioned Hartleib's concern on a conference call with the parties in the Big Lots case and gave James Ficaro, an attorney at the Law Firm, the opportunity to respond to Hartleib's allegations. (Doc. No. 69-25 at 11 n.2.) In his opinion approving the settlement, Judge Watson indicated that he was "fully satisfied that the hours billed by Weiser were reasonable in this case" and said he saw "no similarities to the billing issues that may have occurred in the case involving Hartleib." (*Id.*) Hartleib argues

that Plaintiffs have not alleged that the email was widely published or that they suffered any harm from this statement, particularly because Judge Watson approved their fee petition over Hartleib's objections. (Doc. No. 72 at 25.) Plaintiffs respond that the contents of the email were published on the call with attorneys for all the parties in the Big Lots Litigation, which harmed Plaintiffs' reputation in the legal community. [10] (Doc. No. 73 at 19.)

10 The Court takes judicial notice of the docket sheet in the Big Lots Litigation and notes that thirty attorneys entered an appearance in the case. *See generally In re Big Lots, Inc. Shareholder Litig.*, No. 2:12-cv-00445-MHW-KAJ (S.D. Oh.).

The Court finds that Plaintiffs have alleged defamation as to this statement. First, the fact that Hartleib initially sent this email to Judge Watson alone is of no import because this statement was later passed on to the other attorneys in the Big Lots Litigation (and was eventually published in the opinion filed on the public docket approving the settlement). *See Pendergrass v. ChoicePoint, Inc.*, Civil Action No. 08–188, 2008 WL 5188782, at *4 (E.D. Pa. Dec. 10, 2008) (acknowledging that the defendant could be held liable for allegedly defamatory statements he made to one individual who later passed that information along to other individuals, thereby causing the plaintiff harm); *Green v. Mizner*, 692 A.2d 169, 171–72 (Pa. Super. Ct. 1997) (reversing trial court's dismissal of a defamation claim against an individual who authored a private letter containing allegedly defamatory statements, which he sent to the Attorney General of Pennsylvania and then forwarded to a newspaper). Second, Plaintiffs have pleaded sufficient allegations to support a finding of harm. Judge Watson repeated Hartleib's claims about the Law Firm's billing practices on a call with many attorneys on the Big Lots Litigation, and there is nothing to suggest that any of these attorneys had ever been told that the Law Firm may have had a *history* of engaging in fraudulent billing practices. (Doc. No. 69-25 at 11 n.2.) The fact that so many attorneys learned such professionally damning information would unquestionably harm Plaintiffs' reputation in the legal community. *See Goldfarb*, 539 F. Supp. 3d at 461–62; *Kilmaski*, 2008 WL 2405006, at *5; *Rockwell*, 19 F. Supp. 3d at 408.

* * *

***15** Certain statements identified in the Amended Complaint cannot serve as the bases for Plaintiffs' defamation claim because they are barred by the statute of limitations or are protected by the judicial privilege, so the Court grants Hartleib's motion to dismiss the defamation claim as to Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, and 17. Plaintiffs have, however, stated a claim for defamation as to Statements No. 9 and 11.

### *B. Intentional Infliction of Emotional Distress*

Weiser alone brings a claim for IIED. (Doc. No. 69 ¶ 191.) He claims that Hartleib's "insults, jeers, slurs, taunts, lies, affronts and abuses" are "indecent, dishonest, outrageous, malicious, atrocious and should not be tolerated." (*Id.* ¶ 193.) He also claims that he has suffered "enormous stress, anxiety, sleep deprivation, anger and torment" as a result of Hartleib's statements. (*Id.* ¶ 194.)

"To state a claim for IIED, a plaintiff must show extreme and outrageous conduct that is deliberate or reckless and causes severe emotional distress." *Fugarino v. Univ. Servs.*, 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000) (citations omitted). Pennsylvania courts "have been chary to allow recovery for a claim of intentional infliction of emotional distress." *See Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998). Liability for IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Burke v. Kubicek*, No. 1015 EDA 2020, 2021 WL 4307031, at *6 (Pa. Super. Ct. Sept. 22, 2021). The conduct alleged must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 754. "A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference to the interests of others." *Sprague v. Walter*, 656 A.2d 890, 923 (Pa. Super. Ct. 1995). In assessing whether a plaintiff has stated a claim for IIED, the court must consider the complaint as a whole. *See Allen v. Lackawanna Cty. Bd. of Comm'rs*, 3:18-CV-209, 2019 WL 4644244, at *7 (M.D. Pa. Sept. 23, 2019). Hartleib argues that Weiser has failed to state a claim for IIED because Hartleib's conduct was not "extreme and outrageous." (Doc. No. 72 at 31–32.) Weiser responds that the Amended Complaint's allegations detail an ongoing course of conduct to destroy Weiser's professional career such that a reasonable person could find Hartleib's conduct extreme and outrageous. (Doc. No. 73 at 24.)

Here, Weiser alleges that over the course of two years Hartleib made at least seventeen statements accusing Weiser and the Law Firm of being unethical, running a "criminal enterprise," and "engaging in fraudulent billing practices." (Doc. No.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

69 ¶¶ 198–200.) Further, Weiser claims that Hartleib made these statements with the intent to harm Weiser—specifically, Hartleib sought to malign Weiser's professional reputation and make it more difficult for Weiser to maintain a successful career in the derivative action plaintiffs' bar. (*Id.* ¶ 204.) Given the allegations in the Amended Complaint, the Court cannot at this stage say that Weiser is incapable of asserting IIED claims against Hartleib—Hartleib's near-constant haranguing in professional settings could rise to the level of "outrageous." *See Sprague*, 656 A.2d at 923 (holding that a reporter acted "outrageously" when he published a series of defamatory statements about the plaintiff where the reporter "was outspoken ... regarding his intention to destroy [the plaintiff's] career" and was ultimately successful, causing permanent damage to the plaintiff's reputation and "destroy[ing] all hope of future public service employment").

***16** Accordingly, the Court denies Hartleib's motion to dismiss Weiser's IIED claim.

### *C. Commercial Disparagement*

Plaintiffs also bring a commercial disparagement claim on the basis of the seventeen statements Hartleib made regarding the Law Firm's integrity and billing practices. (Doc. No. 69 ¶ 46.) To state a claim for commercial disparagement, a plaintiff must allege that the defendant made a statement and (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity (actual malice). *Brooks Power Sys., Inc. v. Ziff Commc'ns Inc.*, No. CIV.A. 93-3954, 1994 WL 444725, at *2 (E.D. Pa. Aug. 17, 1994) (citing *Menefee v. Columbia Broad. Sys., Inc.*, 329 A.2d 216 (Pa. 1974)). "The distinction between actions for defamation and disparagement turns on the harm towards which each is directed." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990). "An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant protect an entity's interest in character and reputation." *Id.*

Hartleib argues that Plaintiffs' commercial disparagement claim fails for the same reason the defamation claim fails—certain of the statements are time barred, the judicial privilege applies to certain of the statements, and Plaintiffs have failed to allege that any remaining statements caused them harm. (Doc. No. 72 at 20–30.) Plaintiffs respond that the Amended Complaint sets forth "legally sufficient claims for [commercial disparagement]" and that the commercial disparagement claim is timely. (Doc. No. 73 at 5–6.)

As a threshold matter, the commercial disparagement claim is time barred to the extent it is based on any statements made prior to June 24, 2018. Commercial disparagement is a defamation-based claim, so a one-year statute of limitations applies, and the continuing violation exception does not apply to make otherwise time-barred statements actionable. *See Pro Golf Mfg., Inc. v. Tribune Reviews Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002); *see also Logan v. Salem Baptist Church of Jenkintown*, Civil Action No. 10–cv–0144, 2010 WL 3364203, at *6 (E.D. Pa. Aug. 17, 2010) (explaining that the same statute of limitations applies to claims for defamation and commercial disparagement). Accordingly, the following statements cannot serve as the bases for the commercial disparagement claim: Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16. Similarly, the judicial privilege applies in commercial disparagement cases as in defamation cases, *see Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004), so Statements No. 12, 13, and 17 cannot serve as the bases for Plaintiffs' commercial disparagement claim.

The Court must now determine whether Plaintiffs have stated a claim for commercial disparagement as to the two remaining statements, Statements No. 9 and 11. A commercially disparaging statement is one that is intended "to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, *or upon their quality.*" *U.S. Healthcare*, 898 F.2d at 924 (emphasis added). Again, "an action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability," whereas an action for defamation is "meant to protect an entity's interest in character and reputation." *Id.*

***17** Here, the remaining statements arguably call into question the marketability of Plaintiffs' legal services. (Doc. No. 69 ¶¶ 183(i), 184(b).) In Statement No. 9, Hartleib implies that Plaintiffs are "corrupt[ ]" and accuses Weiser of engaging in a fraudulent, "sinister" scheme, which could imply that his legal work is of shoddy quality and/or unethical. (Doc. No. 69-28 at 2–3.) Similarly, in Statement No. 11, Hartleib "raise[s] concerns over Weiser's billing practices," and prospective clients may be less likely to retain a lawyer known to inflate his bills. (Doc. No. 69-25 at 12 n.2.) Because

the two remaining statements arguably attack the quality of Plaintiffs' legal services, they are actionable for commercial disparagement. *See U.S. Healthcare*, 898 F.2d at 926 (holding that a statement criticizing a competitor's health plan could support a claim for commercial disparagement); *Am. Bd. of Internal Med. v. Von Muller*, Civil Action No. 10–CV–2680, 2011 WL 857337, at *6 (E.D. Pa. Mar. 10, 2011) (holding that a statement that a doctor "cheated on a certification examination" could be commercially disparaging because it implied that the doctor was not qualified to practice medicine).

Accordingly, the Court denies Hartleib's motion to dismiss the commercial disparagement claim as to Statements No. 9 and 11.

***D. False Light***

Finally, Plaintiffs claim that Hartleib published the seventeen allegedly defamatory and disparaging statements "in order to cast a negative light upon Weiser's professional reputation." (Doc. No. 69 ¶ 210.) "Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action." *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (citing *Graboff v. Colleran Farm*, No. CIV. A. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013), *aff'd*, 744 F.3d 128 (3d Cir. 2014)). To state a claim for false light, a plaintiff must allege that the defendant published material about the plaintiff that "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136. Hartleib argues that Plaintiffs' false light claim fails because the majority of the statements on which the claim is based are time barred or privileged and because Plaintiffs have failed to state a claim as to the remaining statements. (Doc. No. 72 at 20–30.) Plaintiffs respond, arguing that the false light claim is timely and legally sufficient. (Doc. No. 73 at 5–6.)

As a threshold matter, the majority of the claims are time barred. False light, like commercial disparagement, is rooted in defamation, so it carries a one-year statute of limitations, and the continuing violation exception does not apply. *See Tomlinson v. Borough of Norristown*, Civil Action No. 09-3711, 2010 WL 1337724, at *3 (E.D. Pa. Apr. 5, 2010) (citing 42 Pa. Stat. & Cons. § 5523); *Lavellier v. City of Philadelphia*, Civil Action No. 12–1357, 2012 WL 2500980, at *7 (E.D. Pa. June 29, 2012) (holding that the continuing violation exception did not apply to the plaintiff's false light/invasion of privacy claim). This means that Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16 are time barred. Similarly, the judicial privilege protects statements made in the course of judicial proceedings from being the basis of defamation-based claims, such as false light. *See Schatzberg*, 877 F. Supp. 2d at 246–47 ("To the extent that Dr. Schatzberg's claim is based on Mr. Goldberg's conduct or statements in prosecuting the particular lawsuits raised in the Complaint, the Court concludes that such statements are protected by absolute judicial privilege."). So Statements No. 12, 13, and 17 are privileged.

The Court now considers whether Plaintiffs have stated a false light claim as to the remaining two statements. False light differs from defamation in that it requires a showing that the statements would have been "highly offensive to a reasonable person" but does not require a showing of harm. *Mallory*, 168 F. Supp. 3d at 777. Put differently, false light protects one's "right to be left alone," while defamation protects one's "interest in a good reputation." *Id.* Hartleib does not argue that the statements he made were true (or that he did not know the statements he made were not true). And, as discussed above, *see supra* Section III.A.3, the Amended Complaint alleges that Hartleib published these statements even though he knew them to be untrue. Thus, the Court need only consider whether Statements No. 9 and 11 would have been highly offensive to a reasonable person to determine whether Plaintiffs have stated a claim for false light.

***18** Statements No. 9 and 11 accuse Plaintiffs of employing fraudulent schemes to drum up frivolous lawsuits and of engaging in fraudulent billing practices to earn higher fees. (Doc. No. 69 ¶¶ 183(i), 184(b).) The legal profession is one that prides itself on integrity, and these statements cast Plaintiffs as greedy, dishonest, and unethical. Further, Hartleib published these statements to judges, judicial staff, and other attorneys in the derivative action bar—everyone in this audience knows that lawyers are held to the highest of ethical standards and are not permitted to engage in the alleged practices. These attacks on Plaintiffs' professional character, particularly in light of the audience, could have been highly offensive to a reasonable person. *See Krajewski v. Gusoff*, 53 A.3d 793, 809–10 (Pa. Super. Ct. 2012) (holding that statements that a city councilwoman was "systematically pilfering the public purse" and "accessing money that did not belong to [her]" supported a claim for false light); *Banks v. Columbia Broadcasting Co.*, 63 F. Supp. 3d 501, 508 n.6 (E.D. Pa. 2014) (holding that statements that a doctor provided his patients with heart stents they did not need could form the bases of a false light claim); *Fanelle v. LoJack Corp.*,

79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) ("Being falsely labeled a criminal could be highly offensive to a reasonable person....").

Accordingly, the Court denies the motion to dismiss the false light claim as to Statements No. 9 and 11 and grants the motion to dismiss the false light claims as to Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, and 17

**IV. CONCLUSION**

For the reasons above, the Court denies Defendant's motion to dismiss as to Statements 9 and 11 as to Plaintiffs' defamation, commercial disparagement, and false light claims and as to Plaintiff Weiser's IIED claim. Defendant's motion to dismiss is granted as to all other statements in connection with Plaintiffs' defamation, commercial disparagement, and false light claims.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 970757

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 5219737
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

The WEISER LAW FIRM, P.C.;
Robert B. Weiser, Esquire, Appellants
v.
Michael HARTLEIB

No. 23-1889
|
Submitted under Third Circuit
L.A.R. 34.1(a) on May 6, 2024
|
(Opinion filed: December 26, 2024)

On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. No. 2-19-cv-02728), District Judge: Honorable Karen S. Marston

**Attorneys and Law Firms**

Kevin D. McGowan, Jr., Esq., Philip S. Rosenzweig, Esq., Silverang Rosenzweig & Haltzman, King of Prussia, PA, for Appellants.

Eamon C. Merrigan, Esq., Goldberg Miller & Rubin, Philadelphia, PA, for Michael Hartleib.

Before: PORTER, MONTGOMERY-REEVES and ROTH, Circuit Judges

OPINION [*]

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

ROTH, Circuit Judge

***1** Robert Weiser and the Weiser Law Firm, P.C. filed a host of tort claims against Michael Hartleib. In five separate orders, the District Court dismissed three of Weiser's claims for lack of personal jurisdiction and one claim for improper venue, dismissed all but two of his defamation-based claims as untimely or barred by the judicial privilege, and declined to quash third-party subpoenas for Weiser's medical records. We will reverse the October 9, 2020 (ECF No. 36), order and affirm the four remaining orders.

## I. Background and Procedural History

This appeal comes before us after more than a decade of acrimony between the parties. [1] Weiser, a Pennsylvania resident, runs the Weiser Firm in Berwyn, Pennsylvania, that offers representation in shareholder class actions and derivative litigation. Hartleib is a resident of California. Weiser alleges that after the Weiser Firm declined to represent Hartleib in a shareholder derivative suit, Hartleib embarked on an extensive smear campaign against him and his firm.

1 We write for the parties and therefore recite only those facts necessary to our disposition. We take as true all well-pleaded allegations in Weiser's complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Hartleib and Weiser first came into contact to discuss filing a shareholder derivative suit on behalf of the mobile phone service provider Sprint. Weiser concluded that the Weiser Firm could not represent Hartleib in a derivative suit on Sprint's behalf because of Hartleib's role in a different pending securities class action against Sprint. Weiser was also "extremely troubl[ed]" by Hartleib's proposal to share any attorneys' fees that the Weiser Firm might recover in the action. [2] Weiser ultimately brought a Sprint derivative suit in Kansas state court on behalf of another plaintiff, Monica Ross-Williams. [3] After the Sprint litigation reached a settlement, Hartleib filed an objection, which he offered to withdraw if the Weiser Firm hired him to consult on future securities litigations. Weiser declined Hartleib's offer, and the Kansas state court approved the settlement. [4]

2 Appx Vol. 1 11.

3 Ross-Williams is a resident of Michigan.

4 Although the court approved the settlement, it awarded approximately ten percent of the requested attorneys' fees. That award was affirmed on appeal.

Things came to a head after Weiser discovered that contract attorney Jeffrey Silow, who had worked for the Weiser Firm during the Sprint litigation, had previously been disbarred in Pennsylvania. Weiser alerted the court of the issue, but

Hartleib also found out and pressed it further. He emailed Weiser, copying eleven attorneys involved in the litigation and the administrative assistant of the Kansas state court, and accused Weiser of misleading the courts. [5] That same day, Hartleib called Ross-Williams, "verbally harassed and threatened her," and assailed the Weiser Firm as a "criminal enterprise." [6] Hartleib then emailed Ross-Williams, copying fifteen attorneys and the administrative assistant of the Kansas state court, and once again accused the Weiser Firm of fraud and criminal conduct. [7] Hartleib sent similar missives both before and after the Kansas court issued a protective order barring him from contacting Ross-Williams.

5 Those copied on the email included two Weiser Firm attorneys, Brett Stecker and James Ficaro, and Alfred Yates, an attorney based in Pittsburgh.

6 Appx Vol. 1 14.

7 Hartleib copied Weiser, Stecker, Ficaro, and Yates on this email as well.

***2** Weiser further alleges, and Hartleib did not refute, that Hartleib provided a tip to a *Wall Street Journal* reporter, which led to a widely circulated article about Silow's disbarred status, his work in the Sprint action as a document reviewer, and the fact that the court awarded just 10 percent of the requested attorneys' fees in the Sprint settlement. Thereafter, Weiser contends that it was Hartleib who sent an anonymous, profanity-laced letter to six Chester County, Pennsylvania, judges urging disciplinary action against the Weiser Firm. The letter attached a summary of the *Wall Street Journal* article about Silow's disbarred status while working for the Weiser Firm, and the 90 percent reduction in attorneys' fees in the Sprint litigation.

Hartleib's efforts continued when he contacted Abelson Legal Search, the Philadelphia-based legal recruitment firm that had placed the disbarred attorney at the Weiser Firm, and accused Weiser and his firm of fraud. Then, hoping to prompt a criminal investigation, Hartleib made similar allegations to Detective Sergeant Thomas Goggins of the Chester County, Pennsylvania District Attorney's Office. Finally, Hartleib raised similar accusations to various courts in which Weiser had pending litigation. [8]

8 For example, Hartleib filed an amicus brief in a derivative action in the District of Minnesota in which lead counsel had moved for the Weiser Firm to be included in the litigation support structure. The court ultimately approved the proposed litigation support structure.

Weiser sued Hartleib in the District Court for the Eastern District of Pennsylvania, asserting a range of tort claims. This appeal primarily concerns three orders (ECF Nos. 36, 151, 173) issued by the District Court in the course of that litigation. [9] Hartleib first moved to dismiss for lack of personal jurisdiction and improper venue, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), and the District Court granted the motion in part. Weiser amended the complaint, and Hartleib then moved to dismiss for failure to state a claim, which the District Court again granted in part. [10] Finally, Hartleib served various third-party subpoenas for Weiser's medical records. Weiser moved to quash the subpoenas, and the District Court denied his motion. Weiser voluntarily dismissed his remaining claims with prejudice, and then appealed the District Court's orders.

9 Weiser also appeals two related orders (ECF Nos. 154, 181). In the first, the court clarified that a statement made by Hartleib in the Georgia litigation could not support a defamation claim. In the second, the court denied Weiser's motion to reconsider his motion to quash. Our analysis of the main orders applies to these supplemental orders as well.

10 The court dismissed Weiser's defamation-based claims to the extent they were based on fifteen allegedly defamatory statements made by Hartleib.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's dismissal of Weiser's claims for lack of personal jurisdiction, [11] failure to state a claim, [12] and improper venue. [13] We review the District Court's decision not to quash a subpoena for abuse of discretion. [14]

11 *See Laurel Gardens, LLC v. McKenna*, 948 F.3d 105, 113 n.5 (3d Cir. 2020) ("[T]he plaintiff bears the burden of demonstrating the facts that establish personal jurisdiction." (citation omitted)).

12 *See Child.'s Health Def., Inc. v. Rutgers, the State Univ. of N.J.*, 93 F.4th 66, 74 (3d Cir. 2024).

13 We apply de novo review to the dismissal of the complaint for improper venue where, as here, the court did not consider transfer of venue. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995).

14 *See Bestwall LLC v. Armstrong World Indus.*, 47 F.4th 233, 242 (3d Cir. 2022).

## III. Discussion

### A. The District Court Erred in Dismissing Weiser's Claims for Lack of Personal Jurisdiction and Improper Venue.

***3** Weiser appeals the October 9, 2020 (ECF No. 36), order dismissing, for lack of personal jurisdiction, his request for a vexatious litigant order and his claims for negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract.[15] He appeals the same order dismissing his abuse of process claim for improper venue.

15 Weiser requested the vexatious litigant order to enjoin Hartleib from filing any actions against him, making any filings or submissions in any suit that involves him, and contacting any individual or entity about him without first obtaining leave of the court.

#### *1. Vexatious Litigant and Negligent Misrepresentation*

The District Court improperly dismissed Weiser's request for a vexatious litigant order and his negligent misrepresentation claim. Pursuant to Rule 4(k) of the Federal Rules of Civil Procedure, a district court sitting in diversity "typically exercises personal jurisdiction according to the law of the state where it sits."[16] Pennsylvania's long-arm statute authorizes courts to exercise personal jurisdiction to the "fullest extent allowed by the Constitution."[17] In order for a court to exercise personal jurisdiction over an out-of-state defendant, the Due Process Clause of the Fourteenth Amendment requires that the defendant have "certain minimum contacts" with the forum state.[18]

16 *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also* Fed. R. Civ. P. 4(k)(1)(A).

17 *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting 42 Pa. Cons. Stat. § 5322(b)).

18 *O'Connor*, 496 F.3d at 316 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Weiser does not argue that the District Court has general jurisdiction over Hartleib. Therefore, the analysis turns to whether specific jurisdiction exists, which requires courts to find that (1) the defendant " 'purposefully directed [its] activities' at the forum,"[19] (2) "the litigation 'arise[s] out of or relate[s] to' at least one of those activities,"[20] and (3) if the first two prongs are satisfied, "the exercise of jurisdiction otherwise 'comport[s] with fair play and substantial justice.' "[21] Purposeful contact exists where a defendant "deliberately reache[s] into Pennsylvania to target ... its citizens."[22] Communications sent "into the forum may count toward the minimum contacts that support jurisdiction."[23] While we have not yet adopted a specific standard for relatedness, for tort claims "a defendant's contacts with the forum need not have been the proximate cause of the plaintiff's injuries."[24] Reciprocity is central to determining if a claim arose out of a defendant's contacts with the forum, as we recognize that "[w]ith each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations."[25]

19 *Id.* at 317 (alteration and omissions in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

20 *Id.* (quoting *Helicopteros Nacionales de Colmbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

21 *Id.* (quoting *Burger King*, 471 U.S. at 476).

22 *Id.* at 318.

23 *Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993).

24 *O'Connor*, 496 F.3d at 320.

25 *Id.* at 323 (citing *Int'l Shoe*, 326 U.S. at 319).

We will first consider Weiser's request for a vexatious litigant order. Weiser's request is premised on numerous acts attributed to Hartleib, including calling and emailing Weiser Firm client Monica Ross-Williams (which she characterized as intimidating, harassing and threatening); sending multiple emails to Weiser, attorneys involved in the Sprint litigation, and the Kansas state court; submitting amicus briefs and appearing at hearings in Weiser Firm cases across the country; and filing a malpractice lawsuit against Weiser and the Weiser Firm, even though the firm never represented Hartleib as a client.

***4** In dismissing Weiser's request for a vexatious litigant order for lack of personal jurisdiction, the District Court concluded that several of the emails that serve as the basis for Weiser's request were not directed to Pennsylvania. We disagree. Four of the emails Weiser identifies are addressed to him and speak directly to him, and Weiser and at least one other Weiser Firm attorney are copied on all of the emails.[26] Hartleib's emails to Weiser and other Pennsylvania-based attorneys did not "end up" in the state by chance; rather, Hartleib deliberately sent them into the forum.[27]

26 Hartleib copied Weiser Firm attorney Brett Stecker on nine emails he sent between March 6, 2017, and March 14, 2019. James Ficaro, another Weiser Firm attorney, is copied on all but one of those emails. Alfred Yates, a Pittsburgh-based attorney, is copied on five of the emails.

27 Appx Vol. 1 27 (quoting *PPG Indus. v. Jiangsu Tie Mao Glass Co., Ltd.*, 2020 WL 1526940, at *4 (W.D. Pa. Mar. 31, 2020)).

Weiser further alleges that Hartleib purposely availed himself of the forum state by attempting to initiate a cross-complaint against the Weiser Firm, and by reaching out to a Chester County detective to express his intention to file a bar complaint and a civil action. The District Court observed that "nothing appeared to come of" Hartleib's attempts at filing a cross-complaint; "no court filings, no new actions initiated, et cetera."[28] The court also concluded that Hartleib's emails to the detective were unclear as to who was the target of Hartleib's planned actions. However, in one of the emails, Hartleib explicitly writes, "I am going to bring a civil suit against Weiser."[29] These examples, even if Hartleib did not ultimately execute his objectives, constitute deliberate action into the forum that should be properly factored into the specific jurisdiction analysis.

28 Appx Vol. 1 29.

29 Appx Vol. 2 1312.

The District Court also erred in failing to consider the letter sent to Chester County judges because Hartleib's affidavit stated that he did not send the letter. Although a plaintiff is not permitted to "rely on the *bare pleadings alone* in order to withstand a defendant's Rule 12(b)(2) motion,"[30] this does not mean the plaintiff is precluded from relying on materials attached to the complaint that go beyond the mere pleadings. Moreover, as in Weiser's case, "when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."[31]

30 *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984) (emphasis added).

31 *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).

The District Court afforded too much weight to Hartleib's self-serving statement that he did not write the letter, when Weiser had already provided evidence to the contrary, including the letter itself, two statements to courts in Georgia and Minnesota, and several emails drafted by Hartleib with similar style and punctuation as the anonymous letter. Additionally, the contents of the letter are focused on the same object of Hartleib's self-expressed fixation, the Weiser Firm's hiring of Silow to work on the Sprint derivative action and the consequences of Silow's deception. Thus, the District Court erred when it failed to consider Weiser's "competent evidence" regarding the anonymous letter to determine whether to include the letter in its personal jurisdiction analysis.[32]

32 *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (explaining that when facing a jurisdictional challenge, a "plaintiff must 'prov[e] by affidavits *or other competent evidence* that jurisdiction is proper' ") (emphasis added) (citation omitted).

***5** Regarding Weiser's negligent misrepresentation claim, Pennsylvania's long-arm statute contains a "tort out/harm in" provision. As a result, personal jurisdiction extends to

"anyone who causes harm or tortious injury, intentionally or not, in Pennsylvania through acts or omissions outside Pennsylvania."[33] Nonetheless, due process requires that the minimum contacts threshold be met for a negligent misrepresentation claim. Weiser bases his claim on several communications Hartleib made outside of the forum, including a phone call and email to firm client Ross-Williams and to courts in Georgia and Ohio, where the Weiser Firm was involved in pending litigation. Weiser asserts that these communications, accusing the Weiser Firm of engaging in fraudulent billing and being a "criminal enterprise," resulted in money damages and lost opportunities for himself, as a Pennsylvania resident, and for his Pennsylvania-based business.[34]

33 *Pennzoil Prod. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 201 (3d Cir. 1998); 42 Pa. Cons. Stat. § 5322(a)(4).

34 Appx Vol. 2 73.

In dismissing Weiser's negligent misrepresentation claim, the District Court concluded that Hartleib did not initiate his communications with third parties "for the specific purpose of communicating with Weiser and the Firm in Pennsylvania."[35] We disagree. Hartleib was aware that Ross-Williams was a Weiser Firm client and reached out to her *because* she was a Weiser Firm client. Further, Hartleib deliberately sent the Ross-Williams email to Weiser, two other Weiser Firm attorneys, and Pittsburgh-based attorney Alfred Yates—all parties who live and work in Pennsylvania. In the email, Hartleib explains additional intentional action into the forum, including that he has "contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints" against Weiser and the Weiser Firm.[36]

35 Appx Vol. 1 32.

36 Appx Vol. 2 142. There is no singular District Attorney's Office in Pennsylvania. The record reflects that Hartleib did email a Detective Sergeant at the Chester County District Attorney's Office several times expressing his desire to file a civil action against Weiser and criminal charges against Silow and his son.

Hartleib's communications to courts and individuals outside of the forum also directly relate to the communication he sent into the forum. These communications share a common accusation that Weiser and the Weiser Firm engaged in deception and criminal activity related to the Sprint litigation. While Hartleib may have had several reasons for initiating contact with these various third parties, all of the parties share a direct connection to the Weiser Firm. Hartleib's intent was to send a message to the Weiser Firm in Pennsylvania and impact the firm's business in Pennsylvania. Hartleib's contact with the forum is therefore sufficient to establish minimum contacts, and Weiser's negligent misrepresentation claim arose out of those contacts.

### *2. Intentional Interference with Prospective Contractual Relations and Tortious Interference with Contract*

The District Court also improperly dismissed Weiser's claims for intentional interference with prospective contractual relations and tortious interference with contract. Where a plaintiff brings intentional tort claims, the *Calder* effects test applies, and the court may exercise personal jurisdiction over an out-of-state defendant if the plaintiff "felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered" *and* the defendant "expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity."[37]

37 *Marten*, 499 F.3d at 297 (citing *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998)).

For his intentional interference with prospective contractual relations claim, Weiser asserts that Hartleib interfered with the Weiser Firm's future partnerships with other firms involved in the same work by filing an amicus brief and appearing at an oral argument in a derivative action in the District of Minnesota to oppose the Weiser Firm's inclusion in the litigation support structure. Weiser also alleges in his supplemental brief that Hartleib sought to interfere with settlement negotiations in Pennsylvania between the Weiser Firm and Abelson when he offered to help Abelson file a cross-complaint against the firm.

***6** To support the "brunt of the harm" prong, Weiser cites *Remick v. Manfredy*,[38] which held that where an out-of-state defendant commits tortious conduct with the intent to interfere with a contract, the plaintiff feels the brunt of the harm where his business practice is based.[39] The District Court noted that *Remick* is distinguishable because the plaintiff there asserted in an affidavit that he performed the majority of the work under the contract in Pennsylvania,

whereas Weiser provided no such testimony. However, an affidavit is not required. Even without an affidavit, Weiser avers "specific facts" that he is a Pennsylvania resident whose business has its sole location in Pennsylvania.[40] Thus, he is entitled to the reasonable inference that he and the Weiser Firm felt the brunt of the harm of Hartleib's alleged actions in Pennsylvania, where Weiser works and where the Weiser Firm is based. The same applies to Weiser's tortious interference with contract claim.

38 238 F.3d 248 (3d Cir. 2001).

39 *See id.* at 260.

40 *See Marten*, 499 F.3d at 298.

Addressing the second prong of the *Calder* test, Weiser argues that Hartleib's efforts to sabotage the Weiser Firm's business were "expressly aimed at injuring [Plaintiffs] in Pennsylvania where [they] live and work."[41] We agree. In one email Weiser identifies, Hartleib twice describes his actions against the Weiser Firm as a personal "quest."[42] In another email, Hartleib wrote that partnering with him to take legal action "could lead to the demise of the Weiser Firm."[43] These communications underline the animus behind Hartleib's actions; that is, to put a Pennsylvania-based corporation out of business.

41 Appellant's Br. 47 (quoting *Remick*, 238 F.3d at 260).

42 Appx. Vol. 2 280–82.

43 Appx Vol. 2 1307–08.

Similarly, for the tortious interference with contract claim, Hartleib's contact with Ross-Williams was expressly aimed at injuring Weiser, the Weiser Firm, and the forum. Hartleib contacted Ross-Williams and numerous attorneys who worked collaboratively with the Weiser Firm to state that the firm engaged in "fraudulent billing" practices and "criminal acts."[44] In doing so, Hartleib directed his actions toward triggering consequences in the forum for Weiser and the Weiser Firm. In sum, both prongs of the *Calder* test are satisfied for Weiser's intentional tort claims to extend personal jurisdiction over Hartleib.

44 Appx Vol. 1 14.

*3. Abuse of Process*

Additionally, the District Court erred when it dismissed Weiser's abuse of process claim for improper venue. The parties agree that venue can be proper in this litigation only under 28 U.S.C. § 1391(a)(2).[45] Section 1391(a)(2) does not require the court "to determine the 'best' forum or the forum with the most substantial events, ... rather more than one federal district may be the site of substantial events or omissions and therefore more than one federal district may be a proper venue in a given case."[46] Importantly, "a court deciding venue does not [look] to a single triggering event prompting the action, but to the entire sequence of events underlying the claim."[47]

45 That section establishes that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a)(2).

46 *Superior Precast, Inc. v. Safeco Ins. Co. of Am.*, 71 F. Supp. 2d 438, 444 (E.D. Pa. 1999) (citation omitted).

47 *Leone v. Cataldo*, 574 F. Supp. 2d 471, 484 (E.D. Pa. 2008) (internal quotations omitted) (quoting *Uffner v. La Reunion Francaise*, 244 F.3d 38, 42 (1st Cir. 2001)).

In dismissing Weiser's abuse of process claim, the District Court acknowledged the unusual facts of the case, writing: "[W]e certainly appreciate Plaintiffs' argument that Hartleib should not be permitted to gallivant across the country, inserting himself into litigations in which Plaintiffs are involved, and then be immune from being haled into court here[.]"[48] We recognize that Hartleib's alleged conduct directed at Weiser and the Weiser Firm occurred in various jurisdictions throughout the country. We are, however, persuaded by Weiser's argument that "the central axle of all of the abusive actions taken by Appellee across the country" are Weiser and the Weiser Firm, located in the Eastern District of Pennsylvania.[49] In tort actions, at least two of our sister circuits have recognized "the locus of the injury" as a relevant factor in determining substantiality of the events for proper venue.[50] Moreover, Hartleib's various filings and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

court appearances demonstrate that the Eastern District of Pennsylvania would not be an "unfair or inconvenient place of trial" to Hartleib, given his willingness to travel to courts outside of his California home to involve himself in Weiser Firm actions across the country. [51]

48 Appx Vol. 1 47.

49 Appellant's Reply Br. 7.

50 *Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1075–76 (9th Cir. 2001) (concluding that in an action under the disclosure provision of the Fair Credit Reporting Act, "at least one of the 'harms' suffered by the Plaintiffs is akin to the tort of invasion of privacy and was felt" where plaintiffs resided in Nevada .... "Thus, venue was proper [in Nevada]" (citing *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867–68 (2d Cir. 1992))).

51 *See Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994) (quoting *LeRoy v. Great W. United Corp.*, 443 U.S. 173, 183–84 (1979)).

***7** In addition, Weiser points to substantial events that occurred within the district, for example, Hartleib's email to Weiser seeking an apology and threatening that "other action is eminent!" [52] Hartleib sought involvement in the Weiser Firm's Pennsylvania-based litigation against Abelson and Silow, describing himself as a layperson who "has defeated and humiliated [the Weiser Firm], and I am far from finished." [53] Hartleib contacted a Chester County detective to inquire about filing criminal charges and expressed his plans to file a bar complaint and "civil suit against Weiser." [54] Taken collectively, Hartleib's threats and attempts to initiate legal processes in Pennsylvania constitute a "substantial part of the events ... giving rise to the claim" of abuse of process. [55]

52 Appx Vol. 2 63, 168.

53 Appx Vol. 2 1305–09. Abelson did not file a cross-complaint against the Weiser Firm and the parties eventually reached a settlement.

54 Appx Vol. 2 1310–13. The Restatement (Second) of Torts defines the general principle of abuse of process as "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts § 682 (1977).

55 28 U.S.C. § 1391(a)(2).

**B. The District Court Did Not Err in Dismissing Weiser's Defamation Claims to the Extent they are Based on Untimely and Privileged Statements.**

Next, Weiser argues that the District Court erred when it limited the scope of his claims for defamation, disparagement, and false light through its March 31, 2022 (ECF No. 151), and April 12, 2022 (ECF No. 154), orders. Weiser's claims are premised on seventeen statements allegedly made by Hartleib. [56] The court allowed Weiser to proceed with claims based on only two of those statements, holding that claims based on twelve of the statements are time-barred and claims based on three of the statements are barred by the judicial privilege. [57] We discern no error in that decision.

56 Weiser maintains that he identified eighteen statements. In a clarifying order, the court explained that Weiser's complaint did not identify the "Equifax statements" as a basis for defamation claims and, in the alternative, that it would be protected by the judicial privilege. Appx Vol. 1 88.

57 We assume the parties' familiarity with the statements referred to in this opinion. For a comprehensive accounting of those statements, *see* Memorandum on Defendant's Motion to Dismiss at 12–15, *Weiser Law Firm, P.C. v. Hartleib*, No. 2:19-cv-02728-KSM (E.D. Pa. Mar. 31, 2022), ECF No. 150.

Twelve of Hartleib's statements were made more than a year before Weiser filed his claims against Hartleib and are therefore barred under Pennsylvania's one-year statute of limitations. [58] Weiser maintains that each statement was part of a continuing unlawful practice, and as a result, claims based on those statements are timely under the continuing violations doctrine. [59] But that doctrine does not apply to defamation-based claims, so the court did not err in dismissing the claims based on those statements. [60]

58 42 Pa. Stat. Cons. Ann. § 5523(1) (providing a one-year limitations period for "[a]n action for libel, slander or invasion of privacy"); *see also Pro Golf Mfg. v. Trib. Revs. Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002) (applying a one-year statute of limitations to commercial disparagement claims because "the statute of limitations for slander is the same whether the slander involves property or the person").

59 The continuing violation doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal citation omitted).

60 *See Smith v. IMG Worldwide, Inc.*, 437 F.Supp.2d 297, 304 (E.D. Pa. 2006) ("Federal courts almost universally decline to apply the continuing tort doctrine to defamation claims.") (cleaned up).

***8** The District Court was likewise correct to apply judicial privilege to three of Hartleib's statements. Under Pennsylvania law, statements "issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought" cannot give rise to liability for defamation.[61] Weiser maintains that Hartleib's statements are not protected because they do not meet either requirement. We disagree. Two of the statements were presented in an amicus brief to the court in the Minnesota derivative suit and were pertinent and material to that proceeding.[62] The third statement was made to a detective for the express purpose of reporting alleged criminal acts. The privilege undoubtedly applies to "statements made to law enforcement officials for the purpose of persuading those officials to initiate criminal proceedings."[63] Hartleib's statement to the detective meets that criteria, regardless of whether he harbored any ulterior motives when reporting Weiser's alleged criminality.[64]

61 *Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004) (internal emphasis omitted) (quoting *Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986)).

62 Hartleib accused the firm of fraudulent billing practices and urged the district court not to approve the firm's inclusion in a litigation support structure. The court had no prohibition on amicus briefs, and the statements were reasonably relevant to the district court's decision to allow the firm to participate in the litigation. Weiser's statements in the Georgia-based derivative litigation are privileged for similar reasons.

63 *Schanne v. Addis*, 121 A.3d 942, 947–48 (Pa. 2015). Weiser argues that statements "made with the bare possibility that a criminal proceeding might be instituted" do not fall within the scope of the privilege. *See* Appellant's Br. 60 (quoting *Parks Miller v. Cty. of Centre*, 702 F. App'x. 69, 73 (3d Cir. 2017)). But the non-precedential opinion that he relies on reached the more limited holding that allegedly defamatory statements made before the speaker even contemplated a criminal investigation were not protected. *See Parks Miller*, 702 F. App'x at 73.

64 *See Schanne*, 121 A.3d at 947–48; *Richmond v. McHale*, 35 A.3d 779, 784–85 (Pa. Super. Ct. 2012) ("[T]he existence of the privilege does not depend upon the motive of the defendant in making the allegedly defamatory statement. The privilege is absolute and cannot be destroyed by abuse." (citing *Greenberg v. Aetna Ins. Co.*, 235 A.2d 576 (Pa. 1967))).

### C. The District Court Did Not Abuse its Discretion in Denying Weiser's Motion to Quash Hartleib's Third-Party Subpoenas.

Finally, Weiser argues the District Court, in its August 26, 2022 (ECF No. 173), and September 8, 2022 (ECF No. 181), orders, erred by refusing to quash the subpoenas Hartleib served for Weiser's medical records. "It is a well-established principle that the scope and conduct of discovery are within the sound discretion of the trial court."[65] As a result, we will not disturb a district court's discovery order unless the appellant shows that the court abused its discretion.[66] A party may show an abuse of discretion by demonstrating that "the court's decision was arbitrary, fanciful or clearly unreasonable."[67]

65 *Borden Co. v. Sylk*, 410 F.2d 843, 845 (3d Cir. 1969).

66 *United States v. Collins*, 36 F.4th 487, 494 (3d Cir. 2022) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010)).

67 *Id.* (quoting *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 201 (3d Cir. 2012)).

Weiser fails to make that showing. The District Court denied Weiser's motion to quash on the ground that his medical records were relevant to his claim for intentional infliction of emotional distress. Relevance under Federal Rule of Civil Procedure 26 is a broad standard.[68] The court's finding that the medical records were relevant to Hartleib's defense against the claim that he caused Weiser to develop post-traumatic stress disorder, among other mental and physical ailments, was not clearly unreasonable.[69] Furthermore, the court's September 8, 2022 (ECF No. 181), order limited the subpoenas to the extent they were overbroad and entered a protective order to guard against potential misuse of Weiser's information. Put differently, the court did not abuse its discretion.

68 *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

69 The District Court also noted that Weiser could avoid production of his medical records if he withdrew his claim for intentional infliction of emotional distress or identified his primary care physician.

## IV. Conclusion

***9** For the above reasons, we will reverse the District Court's October 9, 2020 (ECF No. 36), order and remand for further proceedings. We will affirm the District Court's March 31, 2022 (ECF No. 151), April 12, 2022 (ECF No. 154), August 26, 2022 (ECF No. 173), and September 8, 2022 (ECF No. 181), orders.

### All Citations

Not Reported in Fed. Rptr., 2024 WL 5219737

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.